

FILED
CLERK, U.S. DISTRICT COURT

NOV 1 9 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1  Daniel L. Germain (Cal. Bar No. 143334)
2  **ROSMAN & GERMAIN LLP**
   16311 Ventura Boulevard
   Suite 1200
3  Encino, CA 91436-2152
   Telephone: (818) 788-0877
4  Facsimile: (818) 788-0885
   E-Mail: R&G@Lalawyer.com
5
6  *Counsel for Plaintiffs*

7  *(Additional counsel listed on signature page)*

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  THOMAS YOUNG and GREGORY          Case No. CV 10-8914 (MANx)  ODW
13  FILZEN, individually and on behalf of
    all others similarly situated,
14                                      **CLASS ACTION COMPLAINT**
15                Plaintiffs,
16         v.                           **JURY TRIAL DEMANDED**
17  BABETTE E. HEIMBUCH, JAMES P.
18  GIRALDIN, GISSELLE ACEVEDO,
    BRIAN E. ARGRETT, JESSE CASSO,
19  JR., CHRISTOPHER M. HARDING,
20  WILLIAM P. RUTLEDGE, STEVEN
    L. SOBOROFF, ADMINISTRATIVE
21  COMMITTEE OF THE FIRST
22  FEDERAL BANK OF CALIFORNIA
    EMPLOYEE STOCK OWNERSHIP
23  PLAN and DOES 1-10,
24
25                Defendants.
26
27
28

─ 1 ─

CLASS ACTION COMPLAINT

Plaintiffs Thomas Young and Gregory Filzen ("Plaintiffs"), participants in the First Federal Bank of California Employee Stock Ownership Plan (the "Plan") during the proposed Class Period (defined below), allege as follows on behalf of the Plan, themselves and a class of all others similarly situated:

## INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries.

2.     Plaintiffs were participants in the Plan during the Class Period, during which time the Plan held interests in the common stock of FirstFed Financial Corp. ("FirstFed" or the "Company").

3.     Although Defendants had discretion to determine the Plan's investments and overall investment policy, common stock of FirstFed was the principal investment of the Plan throughout the Class Period.

4.     Plaintiffs allege that Defendants, as "fiduciaries" of the Plan as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to the Plan, them and other affected participants and beneficiaries in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Plan's holdings of FirstFed stock.

5.     Specifically, Plaintiffs allege in Count I that Defendants, each having certain responsibilities regarding the management and investment of the Plan's assets, breached their fiduciary duties to them, the Plan and the proposed Class by failing to prudently and loyally manage the Plan's investment in Company securities by (1) continuing to invest the Plan's assets in FirstFed common stock when it was imprudent to do so and (2) maintaining the Plan's pre-existing heavy investment in FirstFed equity when Company stock was no longer a prudent investment for the Plan.  These actions and inactions run directly counter to the express purpose of ERISA pension plans, which are designed to

help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.     Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and their participants' best interests in mind.

7.     Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management and administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that the fiduciary appointees were imprudently investing Plan assets in FirstFed stock when it was no longer prudent to do so.

8.     Plaintiffs allege that Defendants allowed the heavy imprudent investment of the Plan's assets in FirstFed equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent because, as explained below in detail and among other things: (a) First Federal Bank of California (the "Bank")—the Company's principal subsidiary—was heavily and hopelessly entrenched in highly toxic pay option adjustable rate mortgages ("option ARMs"); (b) the Bank had unwisely lowered its underwriting standards and required little or no verification of income or assets with respect to many of the loans in its portfolio; (c) the Bank's belated efforts to alter its lending practices came much too late to have any meaningful impact; (d) the Company failed to make adequate provisions for loan losses; (e) the Bank had loans excessively concentrated in the highly volatile Southern California real estate market; (f) the Bank had an excessive amount of non-performing assets; (g) the Bank was severely undercapitalized, despite the Company's public statements to the contrary; and (h) as a consequence of the above, the heavy investment of employees' retirement savings in Company stock would inevitably result in significant losses to the Plan and, consequently, to the Plan's participants.

9.    This action is brought derivatively on behalf of the Plan to seek losses for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.    Because Plaintiffs' claims apply to the Plan, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiffs to sue for relief to the Plan for breaches of fiduciary duty such as those alleged herein, Plaintiffs bring this derivatively on behalf of the Plan and as a class action on behalf of all participants and beneficiaries of the Plan during the proposed Class Period.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and FirstFed has its principal place of business in this district.  Further, many of the Plan's participants are located in or within close proximity to this district.

## PARTIES

**Plaintiffs**

12.    Plaintiff Thomas Young is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held vested FirstFed shares in his Plan account during the Class Period.

13.    Plaintiff Gregory Filzen is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held vested FirstFed shares in his Plan account during the Class Period.

**Defendants**

**Non-party First Federal Bank of California**

14.    Though not named as a defendant in this action, the Bank was the sponsor and administrator of the Plan.  *See* 2008 Form 5500.  The Bank was a fiduciary of the Plan and

exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. The Bank acted through its Board of Directors, the Administrative Committee (described below), as well as the Bank's CEO and other officers/employees appointed by the Bank to perform Plan-related fiduciary functions in the course and scope of their employment.  On Friday, December 18, 2009, the Bank was closed by the Office of Thrift Supervision ("OTS"), which appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver.  The Bank's assets were subsequently purchased by OneWest Bank, FSB.

**Director Defendants**

15.   Defendant Babette E. Heimbuch ("Heimbuch") served as Chairwoman and CEO of the Company and of the Bank during the Class Period.

16.   Defendant James P. Giraldin ("Giraldin") served as President, Chief Operating Officer and as a director during the Class Period.

17.   Defendant Gisselle Acevedo ("Acevedo") served as a director during the Class Period.

18.   Brian E. Argrett ("Argrett") served as a director during the Class Period.

19.   Defendant Jesse Casso, Jr. ("Casso") served as a director during the Class Period.

20.   Defendant Christopher M. Harding ("Harding") served as a director during the Class Period.

21.   Defendant William G. Ouchi ("Ouchi") served as a director during the Class Period.

22.   Defendant William P. Rutledge ("Rutledge") served as a director during the Class Period.

23.   Defendant Steven L. Soboroff ("Soboroff") served as a director during the Class Period.

24.   Defendants Acevedo, Argrett, Casso, Giraldin, Harding, Heimbuch, Ouchi, Rutledge and Soboroff are hereinafter collectively referred to as the "Director Defendants."

25.   Upon information and belief, each of the Director Defendants served as a director of both FirstFed and the Bank during the Class Period. The Company's public filings list the names of each director and "the year each first became a director of our bank subsidiary, First Federal Bank of California (the "Bank"), and of our Company." *See, e.g.*, FirstFed Definitive Proxy Statement, at 5, filed with the SEC on March 31, 2009, attached hereto as Exhibit A ("2009 Proxy Statement").

**Administrative Committee**

26.   The Plan was administered by an Administrative Committee comprised of up to three persons appointed by the Board of Directors of the Bank. *See* 2008 Form 5500.

27.   The Doe Defendants include members of the Administrative Committee, the identities of whom are currently unknown to Plaintiffs. Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join the members of the Administrative Committee to the instant action, as well as any other officers, directors and employees FirstFed and/or the Bank who were fiduciaries of the Plan during the Class Period.

**THE PLAN**

28.   The Plan is an employee benefit plan, within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A), and an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

29.   The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

30.     The Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a Plaintiff nor a defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan. Stated differently, in this action, Plaintiffs seek relief that is "plan-wide."

31.     The Plan is sponsored by the Bank and administered by the Bank through the Administrative Committee.[1]

32.     The Plan is purportedly an employee stock ownership plan ("ESOP"). However, the Plan is actually the result of amendments and restatements of the First Federal Bank of California Profit Sharing Plan to include employee stock ownership features.

33.     The Plan is not required to invest in FirstFed common stock. Rather, the Administrative Committee has discretion to determine how the Plan's assets are invested. The 2008 Form 5500 states that "[t]he Administrative Committee determines the investment policy of the Plan."

34.     The Plan covers all employees of the Bank who have completed at least 1,000 hours of service at the beginning of the Plan year.

35.     Each participant's account is credited with employer contributions and forfeitures of terminated participants' non-vested accounts.

36.     Vesting in participant accounts is based on years of service at a rate of 20% per year starting in two years of service with full vesting after six years of service. A participant is 100% vested after seven years of service, upon death, disability or retirement.

37.     As of December 31, 2006, the Plan owned 677,846 shares of FirstFed common stock, with a fair value of $45,395,347. In 2007, the value of the Plan's holdings of

---

[1]     The information in this section is derived from the Bank's 2008 Form 5500 for the Plan, filed with the Department of Labor and the Department of the Treasury (the "2008 Form 5500"), attached hereto as Exhibit B.

Company stock decreased by over $20,126,744.  In 2008, the value of the Plan's holdings in Company stock decreased by an additional $20,766,428.

## CLASS ACTION ALLEGATIONS

38.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(1) and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons, excluding Defendants, who were participants in or beneficiaries of the First Federal Bank of California Employee Stock Ownership Plan at any time between January 26, 2007 and the present (the "Class Period").

39.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are at least several hundred members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

40.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants owed a fiduciary duty to the Plan, Plaintiffs and members of the Class;

(b)    whether Defendants breached their fiduciary duties to the Plan, Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plan and members of the Class have sustained damages and, if so, the proper measure of damages.

41.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

42.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in complex class actions and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Plan or the Class.

43.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

44.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

45.    During the Class Period, upon information and belief, each Defendant was a fiduciary of the Plan, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plan and/or authority over the management or disposition of the Plan's assets.

46.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

47.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform

fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

48.  At all times relevant to this Complaint, Defendants were fiduciaries of the Plan because:

(a)  they were so named;

(b)  they exercised authority or control respecting management or disposition of the Plan's assets;

(c)  they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)  they had discretionary authority or discretionary responsibility in the administration of the Plan.

49.  As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

50.  Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration; rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them.  The claims against each Defendant are based on such specific discretion and authority.

51.    Instead of delegating all fiduciary responsibility for the Plan to external service providers, the Bank chose to assign the appointment and removal of fiduciaries to itself.

52.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the plan sponsor.

53.    During the Class Period, all of Defendants acted as fiduciaries pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

**Director Defendants' Fiduciary Status**

54.    Upon information and belief, each of the Director Defendants was a fiduciary of the Plan, as the Bank's Board of Directors had primary oversight of the Plan. Specifically, the Director Defendants were responsible for appointing members of the Administrative Committee, which had discretion to determine/alter the Plan's investment policy. *See* 2008 Form 5500, Notes to Financial Statements, at 5, 12 (noting that the Board of Directors of the Bank appointed the Plan's Administrative Committee and that the Administrative Committee is responsible for managing the Plan's investments).

55.    The Director Defendants thus bore ultimate responsibility for appointing, monitoring and, if necessary, removing members of the Administrative Committee and other Company officers/employees' delegated duties with respect to the administration/management of the Plan and management of the Plan's assets.

56.    The Director Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**Administrative Committee's Fiduciary Status**

57.    The Administrative Committee was comprised of up to three persons appointed by the Board of Directors of the Bank.

58. The Administrative Committee was responsible for managing, monitoring and, if necessary, altering the Plan's investments. *See* 2008 Form 5500, Notes to Financial Statements, at 9 ("[t]he Administrative Committee determines the investment policy of the Plan").

59. The Administrative Committee was likely a named fiduciary of the Plan.

60. The members of the Administrative Committee were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and/or authority and control over management and disposition of the Plan's assets.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

61. ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants, which includes the duty to speak truthfully to participants in the Plan when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries. A plan fiduciary also "has an affirmative duty to inform beneficiaries of circumstances that threaten the funding of benefits." *Acosta v. Pacific Enter.*, 950 F.2d 611, 619 (9th Cir. 1991).

62. During the Class Period, upon information and belief, the Company and certain other Defendants made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements. Upon information and belief, at all times during the Class Period, the Company's SEC filings were incorporated into and part of the SPDs. Defendants acted as fiduciaries to the extent of this activity.

## SUBSTANTIVE ALLEGATIONS

63.   Throughout the Class Period, FirstFed described itself simply as the parent company of the Bank, which operated approximately 39 retail banking offices in Southern California.  The Bank's central lending office was located in Los Angeles, California.

64.   Throughout the Class Period, Defendants knew or should have known that FirstFed stock was an imprudent Plan investment because: (a) the Bank was heavily and hopelessly entrenched in highly toxic option ARMs; (b) the Bank lowered its underwriting standards and required little or no verification of income or assets with respect to many of the loans in its portfolio; (c) the Bank's belated efforts to alter its lending practices came much too late to have any meaningful impact; (d) the Company failed to make adequate provisions for loan losses; (e) the Bank had loans excessively concentrated in the highly volatile Southern California real estate market; (f) the Bank had an excessive amount of non-performing assets; (g) the Bank was severely undercapitalized, despite the Company's public statements to the contrary; and (h) as a consequence of the above, the Plan's heavy investment of employees' retirement savings in Company stock would inevitably result in significant losses to the Plan and, consequently, to the Plan's participants.

65.   Defendants knew or should have known all of these facts – and thus knew or should have known that Company stock was an imprudent investment for the Plan – yet wholly failed to take any actions to protect the interests of the Plan participants.  As a result of Defendants' breaches of fiduciary duty, the Plan suffered devastating losses, losing essentially **all** of its assets.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan lost the near entirety of its value.

## A.   The Bank Gambled its Future on Residential Mortgage Loan Products Commonly Described as "Ticking Time Bombs" and "Liar Loans"

66.   Beginning as early as 2004, the Bank made a stark break from its traditionally conservative lending model and began focusing on particularly high-risk residential mortgage loans.  As the Los Angeles Times shrewdly observed in early 2006:

> For much of its 77 years in Santa Monica, First Federal Bank of California led an unremarkable existence . . . Nowadays First Federal is stirring up more excitement, on account of its emphasis on making relatively risky home loans.
>
> In fact, to listen to some Wall Street skeptics you might conclude that **this sleepy savings and loan has taken a figurative dive off the end of the Santa Monica Pier**.

E. Scott Reckard, *Betting Big on Adjustables*, Los Angeles Times (April 2, 2006), available at: http://articles.latimes.com/2006/apr/02/business/fi-firstfed2 (Reckard 1) (emphasis added).

67.    This caustic critique was based upon the fact that, particularly during 2004 and 2005, FirstFed fully embraced one of the most toxic and most criticized loan products on the market:  the option ARM.

68.    The option ARM was and is widely known as one of the most troublesome and toxic loan products in the mortgage industry.  Use of these inherently risky loans was known to greatly increase the risk of borrower default.  In April 2006, the Los Angeles Times reported:

> Regulators, consumer advocates and skeptical investors have raised questions about the deferred-interest loans, formally known as payment-option adjustable-rate mortgages, or option ARMs for short.
>
> Option ARM borrowers can choose to pay less than the full interest due each month, but there's a trade-off: The difference is added to the loan balance and the full monthly payments must be made starting at a later time, often after five years. These full payments also can be triggered if the loan balance rises enough, to 110% or more of the original amount.

> In an environment of rising interest rates, borrowers in certain circumstances could see their payments as much as double if this occurred.

Reckard 1.

69.     While many lenders chose to steer clear of these toxic loans, FirstFed became enamored with them.  Indeed, as the Los Angeles Times noted in its April 2006 article, FirstFed was substantially more entrenched in option ARM loans than even the nation's largest subprime lenders:

> First Federal has taken to them like few others. Of all the home loans that Washington Mutual held at the end of 2005, 52% were option ARMs, the company said in its annual report to the Securities and Exchange Commission. Golden West and Downey said more than 90% of their loans were option ARMs. **At First Federal, 100% of residential mortgages were option ARMs.**

*Id* (emphasis added).

70.     The same article noted that analysts were observing the high level of risk associated with the type of loans held by FirstFed and issuing early warnings.   For example, one analyst stated:

> "I think this spring you will see housing prices crack," said Richard X. Bove, a banking analyst with investment bank Punk, Ziegel & Co. That, he added, "is going to be terrible" for people with mortgages that let them pay less -- sometimes a lot less -- than the full monthly payment during the early years of the loans.
>
> After those payments are reset to their full amounts, "I think you're going to see a wave of defaults," Bove said.

*Id.*

71.     The April 2, 2006 Los Angeles Times article also reported that critics of FirstFed were worried that the Bank was "overindulging borrowers' lust for artificially low initial payments" and that "[b]y generating so-called exotic or nontraditional

- 15 -

mortgages…these S&Ls have allowed speculators to buy homes they can ill afford -- and will be unable to resell when the mortgage payments rise and home prices take a tumble." *Id.*

72. Company executives were aware of the harsh criticism of the Bank's extreme gamble with option ARM loans. However, when questioned, the Company's executives brashly rejected their critics and claimed that the Company had more than adequate reserves to cover its losses. As the Los Angeles Times reported in April 2006:

> First Federal executives contend that they also have more experience with this kind of mortgage and that they build in more safeguards. Those include setting aside large reserves for losses and maintaining tough standards for credit scores, debt loads, down payments and other indicators of repayment probability.

*Id.*

73. Upon information and belief, following the heavy criticism from the Los Angeles Times, Company executives—including Defendant Giraldin—provided similar reassurances to the Bank's employees.

74. Critics of FirstFed's risky business model were also concerned that FirstFed's heavy concentration of option ARM loans was artificially inflating its financial results. As the Los Angeles Times explained:

> Risk aside, some critics say that deferred-interest loans distort the picture of the thrift's true performance. By a quirk of accounting rules, the deferred interest added to the loan balance is recorded as revenue, inflating financial results, the skeptics say.

Reckard 1.

75. However, the Company showed no concern whatsoever. In response to this criticism, Defendant Giraldin simply retorted, "We think those folks don't really understand the operations of a bank." *Id.*

76.  FirstFed's executives also insisted that they knew better than other lenders. The Los Angeles Times reported that, in an interview in early 2006:

> Because the company's top leaders are trained as accountants, not salespeople, "we tend to be more conservative," Heimbuch said. "We understand that there is risk in what we do."

*Id.*  However, despite these claims of being "more conservative" than its peers, as noted above, nearly 100 percent of the Bank's loan portfolio was invested in high-risk ARMs.

77.  Also during an interview in early 2006, Defendants Heimbuch, Giraldin and Chief Financial Officer Douglas Goddard admitted that the Bank veered outside of traditional underwriting practices:

> In a recent interview at First Federal's modest headquarters in downtown Santa Monica, Heimbuch, Giraldin and Goddard acknowledged that their loans bent once-traditional rules. The thrift allows borrowers to defer interest payments, for example, and often waives the requirement for them to produce pay stubs or other proof of income.

*Id.*

78.  FirstFed also maintained a large concentration of low and no-documentation loans.  Upon information and belief, approximately 80% of the Bank's loans required little or no proof of borrowers' assets and income.  In early 2006, the Los Angeles Times criticized FirstFed and noted that:

> "Low doc" and "no doc" loans also fueled its boom -- by the end of last year, 4 of 5 First Federal borrowers got credit without having to document their earnings, their assets or either.

Reckard 1.

79.  As early as September 2006, BusinessWeek referred to option ARMs as "nightmare mortgages." In an article published in September 2006, BusinessWeek warned of the perils of option ARMs:

> Those who took the bait are in for a nasty surprise. While many Americans have started to worry about falling home prices, borrowers who jumped into so-called option ARM loans have another, more urgent problem: payments that are about to skyrocket.
>
> The option adjustable rate mortgage (ARM) might be the riskiest and most complicated home loan product ever created…The option ARM's low payments are only temporary. And the less a borrower chooses to pay now, the more is tacked onto the balance.

Mara Der Hovanesian, *Nightmare Mortgages*, BusinessWeek.com (September 11, 2006), available at: http://www.businessweek.com/magazine/content/06_37/ b4000001.htm.

80.   In the same article, BusinessWeek quoted George McCarthy, a housing economist at New York's Ford Foundation, as warning, "The option ARM is 'like the neutron bomb. It's going to kill all the people but leave the houses standing.'" *Id.*

81.   In September 2006, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC, the Office of Thrift Supervision ("OTS") and the National Credit Union Administration published the final Interagency Guidance on Nontraditional Mortgage Product Risks ("Guidance"), which addressed adjustable rate and interest-only loans. Nontraditional products were generally defined as loans that allowed interest-only payments or had the potential for negative amortization. *See* Interagency Guidance on Nontraditional Mortgage Product Risks, attached hereto as Exhibit C.

82.   In part, the Guidance provided that:

> Central to prudent lending is the internal discipline to maintain sound loan terms and underwriting standards despite competitive pressures. **Institutions are strongly cautioned against ceding underwriting standards to third parties that have different business objectives, risk tolerances, and core competencies.** [emphasis added]

*Id.*

---

CLASS ACTION COMPLAINT

83.   As described below, FirstFed failed to follow this guidance.

84.   As a result of FirstFed's entrenchment in toxic option ARM loans, Defendants knew or should have known by no later than January 26, 2007 (the beginning of the Class Period) that FirstFed common stock was an imprudent investment for the Plan's assets.

**B.   FirstFed's Financial Condition Grew Increasingly Precarious, Yet Defendants Took No Action to Protect the Plan's Assets**

85.   At the beginning of the Class Period, FirstFed common stock was trading for approximately $66 per share.

86.   As noted above, at least 90 percent of FirstFed's "Alt-A" home mortgage loans were low or no-documentation loans. On March 19, 2007, CNN published an article noting, in part, that such loans were harshly criticized by industry experts:

> Subprime mortgages have been generating a lot of attention, and worry, among investors, economists and regulators, but those loans may be only part of the threat posed to the housing market by risky lending.
>
> Some experts in the field are now concerned about the so-called Alt. A mortgage loan market, which has grown even faster than the market for subprime mortgage loans to borrowers with less than top credit.
>
> Alt. A refers to people with better credit scores (A-rated) who borrow with little or no verification of income, or so-called alternative documentation.
>
> But some people in the industry call them "stated income" loans, or worse, "liar loans."

Chris Isidore, *'Liar Loans': Mortgage Woes Beyond Subprime*, CNNMoney.com (March 19, 2007), available at: http://money.cnn.com/2007/03/19/news/economy/ next_subprime/index.htm?postversion=2007031917.

87.   On April 19, 2007, the Wall Street Journal published an article that referred to option ARMs as "ticking time bombs," noting that:

CLASS ACTION COMPLAINT

> The loans are tempting because they give borrowers several payment choices each month, including a minimum payment that lets them pay no principal and only part of the interest normally due. When borrowers choose that option, the loan balance expands -- a phenomenon known in the mortgage trade as "negative amortization."
>
> After a specified period, often five years, borrowers must start repaying the principal and meeting the full interest payments. That can cause monthly payments to more than double. If the balance outstanding gets too high -- the ceiling generally is 110% to 125% of the original amount borrowed -- borrowers can face sharply higher payments even sooner.

James Hagerty and Ruth Simon, *Option ARMs Emerge as Home-Loan Worry*, The Wall Street Journal (April 19, 2007), available at: http://online.wsj.com/article/SB117685894809873420.html.

88.    On October 11, 2007, FirstFed was downgraded to "market perform" from "outperform" by analyst Paul J. Miller at Friedman, Billings, Ramsey & Co.  On this day, FirstFed stock closed at $50.58 per share and, subsequently, continued to slide as the Company's condition worsened.

89.    On October 19, 2007, FirstFed was downgraded again, this time to "underperform" from "market perform" by analyst Paul J. Miller at Friedman, Billings, Ramsey & Co.  Meanwhile, by the end of 2007, the Company's stock had lost almost half of its value from the beginning of the year.

90.    Despite the Company's continuously worsening financial condition and future outlook, the Plan's fiduciaries continued to sit idly by as the value of the Company's stock—and, accordingly, the Plan's assets—plummeted.

91.    On January 25, 2008, in a press release accompanying its fourth quarter and year-end 2007 financial results, the Company indicated that it was heavily plagued by the negative amortization and payment shock features of the Bank's option ARM loan products.  FirstFed stated that option ARMs "that have reached their maximum allowable

negative amortization, which now require an increased payment, are a contributing factor in the higher level of delinquent loans."

92.   In the same press release issued on January 25, 2008, FirstFed stated that, "During the fourth quarter of 2007, just over 1,800 borrowers, with loan balances of approximately $830 million, reached their maximum level of negative amortization and had a resulting increase in their required payment."   To make matters worse, in the same press release, the Company estimated that an additional 2,400 loans totaling approximately $1.1 billion could reach their maximum allowable negative amortization during 2008.

93.   Beginning in February 2008, with the publication of its first data report, The State Foreclosure Prevention Working Group—a conglomerate of 12 state attorneys general (Arizona, California, Colorado, Florida, Illinois, Iowa, Massachusetts, Nevada, North Carolina, Ohio, Texas and Washington), bank regulators for New York, North Carolina, and Maryland, and the Conference of State Bank Supervisors—became highly critical of option ARMs.   *See* Analysis of Mortgage Servicing Performance, State Foreclosure Prevention Working Group, Data Reports 1-5, available at: http://www.csbs.org/regulatory/Pages/ SFPWG.aspx.

94.   Throughout the spring of 2008, the value of the Company's stock continued to plummet.   Then, on April 3, 2008, FirstFed was downgraded to "neutral" from "outperform" by analyst Moshe Orenbuch at Credit Suisse.   On this day, FirstFed stock closed at $26.28 per share.

95.   On August 4, 2008, the Los Angeles Times reported that FirstFed's executives were aware of the risky nature of the Bank's lending practices at least by the end of 2005, if not earlier.   According to the article, in 2005, "[a]t FirstFed Financial Corp., for example, the vast majority of borrowers weren't required to produce pay stubs or tax returns to prove they earned as much as they claimed.   **FirstFed executives say they started worrying as the year wore on**" (emphasis added).   FirstFed subsequently took steps to alter its lending strategy, but it was too late. E. Scott Reckard, *FirstFed Reduced Loan Risk Early On*, Los Angeles Times (August 4, 2008) (noting that FirstFed raised

standards in 2005 but nonetheless saw a leap in delinquencies), *available at:* http://articles.latimes.com/2008/aug/04/business/fi-firstfed4.

96.   Also on August 6, 2008, The Wall Street Journal reported that the Bank was facing defaults sooner than other banks from borrowers who could not afford higher payments on option ARMs.   This was happening earlier at FirstFed than at some other banks because FirstFed set a 110% cap on many of its option ARMs, while many other lenders have higher caps.   *See* Ruth Simon, *FirstFed Grapples with Payment-Option Mortgages*, Wall Street Journal (August 6, 2008), A2, available at: http://online.wsj.com/article/SB121798100185115205.html.

97.   The same article also reported that FirstFed had failed to follow a central tenet set forth in the aforementioned Guidelines issued by the OTS—that it should not cede underwriting standards to third parties. Rather, as Defendant Heimbuch admitted during an interview for the article, when investment bankers entered the industry and set lower lending standards, FirstFed followed suit. *Id.* As a result, FirstFed's option ARMs were inherently problematic and left the Company exposed to devastating losses.

98.   The following day, on August 7, 2008, FirstFed was downgraded to "underperform" from "market perform" by analyst Paul Miller at Friedman, Billings, Ramsey & Co.

99.   Meanwhile, analysts were continuing to express dismal views of option ARMs.   For example, in September 2008, one Fitch Ratings analyst observed, "'The combined impact of payment shock, negative amortization, declining home prices and restricted availability of mortgage credit may leave many option ARMs' borrowers unwilling to continue paying their mortgage.'" *See* Paul Jackson, *Fitch Warns on Option ARMs; "High Defaults Await,"* HousingWire.com (September 2, 2008) (quoting group managing director Huxley Somerville), available at: http://www.housingwire.com/2008/09/02/fitch-warns-on-option-arms-high-defaults-await.

100. On September 15, 2008, Reuters.com reported that analysts were predicting that as many as 45 percent of borrowers with option ARMs issued from 2004 to 2007 and

CLASS ACTION COMPLAINT

bundled into securities may default.  *See* Bob Ivry and Linda Shen, *Washington Mutual Hobbled By Increasing Defaults on Option ARMs*, Reuters.com (September 15, 2008) (quoting Fitch Ratings analysts Roelof Slump and Stefan Hilts), available at: http://www.bloomberg.com/apps/ news?pid=newsarchive &sid=aNSwdt57nTBI.

101. On October 31, 2008, in a press release accompanying the release of its preliminary financial results for the third quarter of 2008, FirstFed acknowledged the substantial impact of its option ARM products on its poor financial condition.   The Company stated that the "level of delinquent loans during 2008 was significantly impacted by adjustable rate mortgages that reached their maximum allowable negative amortization and required increased payment."

102. On February 2, 2009, Bloomberg published an article that referred to option ARMs—FirstFed's chosen product—as "bombs."   In a scathing article, the author observed:

> When talking about the U.S. home market, mentioning "the other shoe to drop" was quaint about a year ago. Now we are referring only to bombs.
>
> The latest ordnance is the option adjustable-rate mortgage, one of the many sucker loans marketed during the housing boom. Option ARMs basically gave borrowers four ways to pay back, most of them involving low initial outlays that would reset at much higher monthly amounts at a future date….And the brokers, lenders and Wall Street mavens who sold and repackaged these loans deserve nothing but contempt.
>
> *****************
>
> Consistent with the worst of the bubble-inflated loan practices, these ARMs required little income documentation. You even had the option of starting out with a low monthly payment that morphed into a negative amortization loan. That means you could owe more principal than you originally borrowed, even though the home value dropped.

John F. Wasick, *U.S. Mortgage Time Bomb Needs Defusing Yesterday*, Bloomberg.com (February 2, 2009), available at: http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a8vqJQKnq3iw.

103. On February 26, 2009, NYSE Regulation, Inc. ("NYSE Regulation"), a not-for-profit organization dedicated to strengthening market integrity and investor protection, announced that it had determined that FirstFed's common stock should be suspended prior to the market opening on March 4, 2009 due to the fact that the Company had fallen below the NYSE's continued listing standard requiring average global market capitalization over a consecutive 30 day trading period of not less than $15 million. *See* Press Release, *NYSE Suspends FirstFed Financial Corp and Moves to Remove from the List* (February 26, 2009), available at: http://www.nyse.com/press/1235647172086.html.

104. On September 18, 2009, Consumerist.com, working in partnership with Consumer Reports, published strong criticism of the type of ARMs that comprised the bulk of FirstFed's loan portfolio:

> Option-ARM or "pay option" loans are so risky that they are illegal in some states. Option-ARM mortgages allow the borrower to pay little or nothing at first - and any unpaid interest is added to the principal due on the loan. This results in a mortgage that grows over time.
>
> Eventually, when the borrower owes 10-15% more than the original loan, the payments increase rapidly. By rapidly, we are talking about **5 to 10 times as much as the borrower was used to paying.** These loans tend to be "jumbo" which makes them even more difficult to refinance than regular loans.

Meg Marco, *Newsflash: The Next Tsunami Of Aggressively Irresponsible Loans Didn't Magically Disappear*, Consumerist.com (September 18, 2009) (emphasis in original), available at: http://con.st/5362596.

105. On October 29, 2009, the California Attorney General's office issued a press release wherein it used the term "ticking time bomb" to describe ARMs of the type

embraced by FirstFed.   The State Attorney General heavily criticized option ARMs, stating, "Homeowners with Pay Option ARMs are sitting on ticking time bombs."   *See* Press Release, Office of the Attorney General for the State of California, *Brown Calls on Banks and Loan Servicers to Detail Plans to Stem New Wave of Foreclosures* (October 29, 2009), available at: http://ag.ca.gov/newsalerts/release.php?id=1828.

106.  By this time, the Company's stock had plummeted to $0.36 per share.

## C.   The Bank was Cited by the OTS for Engaging in Unsound Practices and, After Failing to Remedy These Practices, Was Closed by the OTS

107.  Meanwhile, while these events were occurring, as a result of the Bank's lending practices and the Company's failure to adequately reserve for loan losses, FirstFed's financial condition was such that, on January 26, 2009, the OTS served the Company and the Bank with cease-and-desist orders (the "Orders"), citing the Bank for engaging in "unsafe or unsound practices, which have resulted in inadequate asset quality, earnings, liquidity planning and capital levels."   The Orders required, among other things, that the Bank give notice and in some cases receive permission from the OTS before making loans or paying dividends.

108.  Further, the Company was required to submit to the OTS, within fifteen days, a detailed capital plan to address how the Bank would remain "well capitalized" at each quarter-end through December 31, 2011.   In a related press release, Defendant Heimbuch stated that "FirstFed has been working with the OTS to address the challenges we are currently experiencing and we intend to immediately begin satisfying our obligations under today's orders."   Defendant Heimbuch further stated that the Company and the Bank had made "substantial progress on addressing a number of the OTS's concerns," and that the hope was to finalize the plans promptly.

109.  On May 28, 2009, the OTS issued to FirstFed and the Bank Amended Orders to Cease and Desist (the "Amendments").   The Amendments required, among other things, that the Company and the Bank submit a detailed capital plan to the OTS addressing how

the Bank would meet and maintain a Tier 1 Core Capital Ratio of 7% and a minimum Total Risk-Based Capital Ratio of 14% by September 30, 2009.

110. FirstFed and the Bank failed to comply with the terms of the Orders and the Amendments.

111. Finally, on December 11, 2009, Defendant Heimbuch resigned as Chairwoman of the Company and the Bank, and announced that she would retire as CEO and a director effective December 31, 2009.

112. Just one week later, on Friday, December 18, 2009, the Bank was closed by the OTS, which appointed the FDIC as receiver. It was announced that the 39 branches of the Bank would reopen the following day as branches of OneWest Bank, FSB.

113. The next trading day, FirstFed stock closed at $0.05 per share.

114. Then, on or about January 6, 2010, FirstFed filed for Chapter 11 bankruptcy protection, listing assets of $4.47 million and a debt of $159.7 million.

115. As described further herein, Defendants, as fiduciaries of the Plan, were obligated to continuously ensure that the Plan's assets were prudently invested. However, Defendants failed to do so, to the substantial detriment of the Plan and its participants.

116. Throughout the Class Period, as a result of the Bank's reckless lending practices, the Company's financial performance steadily declined, as depicted below:



Source: BigCharts.com.

117. Accordingly, due to Defendant's failure to take action to protect the Plan's assets, the Plan's imprudent investments in FirstFed common stock were decimated, as indicated below:

CLASS ACTION COMPLAINT



*Source:* http://finance.yahoo.com/

**D.    Defendants Knew or Should Have Known That FirstFed Stock Was an Imprudent Investment for the Plan, Yet Failed To Protect the Plan's Participants**

118. During the Class Period, Defendants knew or should have known that the Company's stock was an imprudent Plan investment but did nothing to protect the heavy investment of Plan participants' retirement savings in FirstFed stock.

119. As a result of the enormous erosion of the value of Company stock, the Plan's participants, the retirement savings of whom were heavily invested in FirstFed stock, suffered unnecessary and unacceptable losses.

120. Because of their high ranking positions within the Company and/or their status as Plan fiduciaries, Defendants knew or should have known of the existence of the above-mentioned problems.

121. As described, above, at least certain Defendants had actual knowledge of the Company's problems prior to the beginning of the Class Period. For example, as reported

by the Los Angeles Times in April 2006, Defendant Giraldin was well aware of criticism that recording deferred interest on option ARMs had the effect of artificially inflating the Company's earnings. However, rather than take action, Defendant Giraldin deflected the issue and accused the Company's critics of simply not understanding the operations of a bank. *See* Reckard 1, *supra*.

122. Also during an interview in or around April 2006, Defendants Heimbuch and Giraldin admitted that the Bank deviated from traditional underwriting practices by allowing borrowers to defer interest payments on loans and by failing to require borrowers to provide documentation of their ability to repay their loans. *Id.*

123. Defendants knew or should have known that, due to the Company's exposure to crippling losses stemming from the problems described above, the Company stock price would suffer and devastate participants' retirement savings as the Company's condition continuously worsened. Notwithstanding such knowledge, Defendants failed to protect the Plan and the Plan's participants from foreseeable losses.

124. During the Class Period, despite their obligation to prudently manage the Plan's assets—including the Plan's heavy investment in FirstFed stock—the Company and the Director Defendants misrepresented the Company's true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company stock and concealing from participants the fiduciary breaches alleged herein. For example, at least as late as October 2007, the Company stubbornly insisted that its problems were solely due to falling house prices. In a press release issued on October 25, 2007, FirstFed stated that loan charge-offs and non-performing assets "have increased over the last year due to increased single family loan delinquencies and foreclosed single family loans in response to the weakened real estate market throughout California."

125. In addition, upon information and belief, the Director Defendants failed to adequately review the performance of the other fiduciaries of the Plan, including the Administrative Committee, to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

126. Defendants failed to conduct an appropriate investigation into whether FirstFed stock was a prudent investment for the Plan and failed to make prudent decisions regarding whether to continue to invest the Plan's assets in FirstFed stock and maintain the Plan's existing holdings of such stock.

127. An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in FirstFed stock was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

128. Because Defendants knew or should have known that FirstFed was not a prudent investment option for the Plan, they had an obligation to protect the Plan and the Plan's participants from unreasonable and entirely predictable losses incurred as a result of the Plan's gargantuan investment in FirstFed stock.

129. Defendants had available to them several different options for satisfying this duty, including, among other things: divesting the Plan of FirstFed stock; discontinuing further contributions to and/or investment in FirstFed stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by FirstFed they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of FirstFed stock.

130. Despite the availability of these and other options, Defendants failed to take action to protect participants from losses resulting from the Plan's investment in FirstFed stock. In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company stock despite numerous warning signs concerning the risky nature of the Company's lending practices and even as FirstFed's problems came to light.

**E.    At Least Certain of the Defendants Suffered From Conflicts Of Interest**

131. FirstFed's SEC filings during the Class Period, including Form DEF 14A Proxy Statements, make clear that a portion of certain officers' compensation was in the form of stock option awards.  For example, for the years 2007 and 2008, Defendants Heimbuch and Giraldin collectively received over $1.5 million in stock option awards. *See* Exhibit A, attached hereto, at 19.

132. Because the compensation of at least some of the Defendants was significantly tied to the price of FirstFed stock, at least certain if not all Defendants had incentive to keep the Plan's assets heavily invested in FirstFed stock on a regular ongoing basis. Elimination of Company stock as an investment option or vehicle for the Plan would have reduced the overall market demand for FirstFed stock and sent a negative signal to Wall Street analysts, the results of which would have adversely affected the price of FirstFed stock and thereby reduced the compensation for at least certain Defendants.

133. Some Defendants may have had no choice in tying their compensation to FirstFed stock (because compensation decisions were out of their hands) but Defendants did have the choice of whether to keep the retirement savings of the Plan's participants and beneficiaries tied up to a large extent in FirstFed stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

134. These conflicts of interest put certain Defendants in the position of having to choose between their own interests as executives and stockholders and the interests of the Plan participants and beneficiaries, whose interests Defendants were obligated to loyally serve with an "eye single" to the Plan.

### CLAIMS FOR RELIEF UNDER ERISA

135. At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

136. ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

137. ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

138. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

139. These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).    They entail, among other things:

    (a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

    (b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)     The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

140.  ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

141.  Plaintiffs therefore bring this action under the authority of ERISA § 502(a) for relief under ERISA § 409 to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## COUNT I

### FAILURE TO PRUDENTLY AND LOYALLY MANAGE PLAN ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY ALL DEFENDANTS)

142.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

143. At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and management of the Plan and/or authority or control over disposition of the Plan's assets.

144. Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that the Plan's investments in FirstFed stock were prudent. Defendants are liable for losses incurred as a result of such investments being imprudent.

145. A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

146. Even with respect to an ESOP, plan fiduciaries may not blindly invest in employer securities regardless of the circumstances. To the contrary, while the duty to diversify does not apply to company stock investments *per se* in an ESOP, plan fiduciaries remain bound by the other core ERISA fiduciaries duties, including the duties to act loyally, prudently and for the exclusive purpose of providing benefits to plan participants. These duties apply to **all** of the plan's investments—including company stock.

147. Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or their assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to

refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments.

148. Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants clearly knew or should have known that FirstFed common stock was not a suitable and appropriate investment for the Plan. Investment in Company stock during the Class Period was plainly not a prudent investment. Despite knowing that investment in Company stock was imprudent, Defendants failed to take any meaningful steps to protect the Plan's participants from the inevitable losses that they knew would ensue as the Company's financial condition steadily worsened.

149. Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of FirstFed stock when they knew or should have known that it was not a suitable and appropriate Plan investment. Defendants had the fiduciary obligation to liquidate the Plan's holdings of Company stock on participants' behalf to ensure that they did not suffer a financial loss.

150. Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants' failure to disclose crucial information regarding the Company's operations and imprudence of investing the Plan's assets in Company stock. Defendants knew or should have known of such breaches by other Plan fiduciaries yet made no effort to remedy them. Further, certain Defendants who appointed fiduciaries enabled the breaches of those fiduciary appointees by failing to adequately monitor their performance and failing to take corrective action as necessary.

151. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement savings. Had Defendants taken appropriate steps to comply with their fiduciary obligations, they could have liquidated the

Plan's holdings in Company stock and thereby eliminated, or at least significantly reduced, losses to the Plan.

152.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## COUNT II

### BREACH OF DUTY TO AVOID CONFLICTS OF INTEREST (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY ALL DEFENDANTS)

153.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

154.  At all relevant times, as alleged above, Defendants were fiduciaries within the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

155.  ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty – that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

156.  Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

157.  As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been substantially minimized or avoided altogether.  Therefore, as a direct and proximate

result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement savings.

158. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## COUNT III

### FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION
### (BREACHES OF FIDUCIARY AND CO-FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405
### BY THE DIRECTOR DEFENDANTS)

159. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

160. At all relevant times, as alleged above, the Director Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

161. At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the Administrative Committee and other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

162. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that the monitoring fiduciaries, the Director Defendants, had the duty to:

(a)   Ensure that the monitored fiduciaries possessed the needed credentials and experience or used qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(b)     Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(c)     Ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan's investments;

(d)     Ensure that the monitored fiduciaries had ready access to outside, impartial advisors when needed;

(e)     Ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and

(f)     Ensure that the monitored fiduciaries reported regularly to the monitoring fiduciaries.  The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

163. Under ERISA, an appointing fiduciary must ensure that the appointed fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, an appointing fiduciary must provide the fiduciary-appointees with complete and accurate information in their possession that they know or reasonably should know that the appointees must have in order to prudently manage a plan and the plan's assets.

164. The Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment and (b) failing to ensure that the appointed fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.

165. The Director Defendants knew or should have known that the appointed fiduciaries were (i) continuing to invest the assets of the Plan in FirstFed common stock

when it no longer was prudent to do so; and (ii) imprudently allowing the Plan to continue offering FirstFed stock as an investment alternative. Despite this knowledge, the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

166. In addition, the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the appointed fiduciaries accurate information about the financial condition of FirstFed that they knew or should have known that these appointees needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

167. The Director Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches despite having knowledge of them.

168. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

169. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**CAUSATION**

170. The Plan suffered millions of dollars in losses because substantially **all** assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties.

171. Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and the Plan's participants would have avoided all or a substantial portion of the losses that they suffered through the Plan's continued investment in Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

172. As a consequence of Defendants' breaches, the Plan suffered significant losses.

173. ERISA § 502(a), 29 U.S.C. § 1132(a), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

174. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

175. Plaintiffs, the Plan, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (3) taxable costs and (4) interests on these amounts, as provided by law; and (5) such other legal or equitable relief as may be just and proper.

176. Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.     A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.     An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of FirstFed maintained by the Plan in proportion to the accounts' losses attributable to the decline in FirstFed's stock price;

F.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.     An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED:  November 19, 2010              Respectfully submitted,

Daniel L. Germain (State Bar No. 143334)
**ROSMAN & GERMAIN LLP**
16311 Ventura Boulevard, Suite 1200

Encino, CA 91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Mark K. Gyandoh
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiffs and the Proposed Class*

- 42 -

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  November 19, 2010          Respectfully submitted,

_____ .

Daniel L. Germain (State Bar No. 143334)
**ROSMAN & GERMAIN LLP**
16311 Ventura Boulevard, Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Mark K. Gyandoh
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT

# Exhibit A

Definitive Proxy Statement

**PLEASE MARK VOTES** **REVOCABLE PROXY**                                    With-For All
AS IN THIS EXAMPLE                    **FIRSTFED FINANCIAL CORP.**    For hold Except

### Proxy for Annual Meeting—April 29, 2009

**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**

The undersigned hereby appoints Babette E. Heimbuch and James P. Giraldin as proxies, each with the power to appoint his/her substitute, and hereby authorizes them to represent and to vote as designated herein all shares of Common Stock of FirstFed Financial Corp. held of record by the undersigned as of March 2, 2009, at the annual meeting of stockholders to be held on April 29, 2009, or any adjournment or postponement thereof. A vote FOR nominees Casso, Harding and Soboroff, and FOR Proposal 2 is recommended by the Board of Directors.

1. ELECTION OF DIRECTORS (except as marked to the contrary below):

Terms as Directors expiring 2012:

**Jesse Casso, Jr., Christopher M. Harding and Steven L. Soboroff INSTRUCTION: To withhold authority to vote for any individual nominee, mark "For All Except" and write that nominee's name in the space provided below.**

For Against Abstain

2. Ratification of Grant Thornton LLP as the Company's independent auditors for 2009.

3. In their discretion, the proxies are authorized to vote upon such other business that may properly come before the meeting.

**THIS PROXY WHEN PROPERLY EXECUTED WILL BE VOTED IN THE MANNER DIRECTED HEREIN BY THE UNDERSIGNED STOCKHOLDER. IF NO DIRECTION IS MADE, THIS PROXY WILL BE VOTED FOR THE DIRECTORS NAMED IN PROPOSAL 1 AND FOR PROPOSAL 2.**

Please sign exactly as your name appears on this card. When shares are held by joint tenants, both should sign. When signing as attorney, executor, administrator, trustee or guardian, please give full title as such. If a corporation, please sign in full corporation name, by president or other authorized officer. If a partnership, please sign in partnership name by authorized person.

| Please be sure to date and sign this proxy card in the box below. | Date |
| --- | --- |
| Sign above | |

Detach above card, sign, date and mail in postage paid envelope provided.

☐                **FIRSTFED FINANCIAL CORP. 12555 W.**                ☐
**Jefferson Blvd., Los Angeles, CA 90066**

### PLEASE MARK, SIGN, DATE AND MAIL THE PROXY CARD PROMPTLY USING THE ENCLOSED ENVELOPE.

IF YOUR ADDRESS HAS CHANGED, PLEASE CORRECT THE ADDRESS IN THE SPACE PROVIDED BELOW AND RETURN THIS PORTION WITH THE PROXY IN THE ENVELOPE PROVIDED.

| **PROXY MATERIALS ARE AVAILABLE ON-LINE AT:** |
| --- |
| **http://www.cfpproxy.com/5015** |

DEF 14A 1 ddef14a.htm DEFINITIVE PROXY STATEMENT

# SCHEDULE 14A

### Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934
### (Amendment No. __ )

Filed by the Registrant ☒          Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement
☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☒   Definitive Proxy Statement
☐   Definitive Additional Materials
☐   Soliciting Material Pursuant to §240.14a-12

---

## FIRSTFED FINANCIAL CORP.
#### (Name of Registrant as Specified In Its Charter)

---

#### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒   No fee required.
☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   (1)   Title of each class of securities to which the transaction applies:

---

   (2)   Aggregate number of securities to which the transaction applies:

---

   (3)   Per unit price or other underlying value of the transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

---

   (4)   Proposed maximum aggregate value of the transaction:

---

   (5)   Total fee paid:

---

☐   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)   Amount Previously Paid:

_____

(2)   Form, Schedule or Registration Statement No.:

_____

(3)   Filing Party:

_____

(4)   Date Filed:

_____

**FIRSTFED FINANCIAL CORP.**
12555 West Jefferson Boulevard
Los Angeles, California 90066

NOTICE OF 2009 ANNUAL MEETING OF STOCKHOLDERS

To Be Held on April 29, 2009

NOTICE IS HEREBY GIVEN that an annual meeting of stockholders of FirstFed Financial Corp. will be held at its Corporate Headquarters, located at 12555 West Jefferson Boulevard, Los Angeles, California 90066, on April 29, 2009 at 11:00 a.m., local time, for the following purposes:

(1) To elect three directors, each to hold office for a three-year term ending at the 2012 annual meeting of stockholders and until their successors are duly elected and qualified;

(2) To ratify the Audit Committee's appointment of Grant Thornton LLP as our independent auditors for 2009; and

(3) To transact such other business as may properly be brought before the annual meeting or any adjournment or postponement thereof.

**Your board of directors urges stockholders to vote FOR Items 1 and 2.**

These items of business are more fully described in the proxy statement accompanying this notice. Only stockholders of record at the close of business on March 2, 2009 are entitled to vote at the Annual Meeting or any adjournment or postponement thereof.

**Important Notice Regarding the Availability of Proxy Materials for the Stockholder Meeting to Be Held on April 29, 2009:** This Notice of 2009 Annual Meeting of Stockholders and the accompanying Proxy Statement (including a sample proxy card) and our Annual Report on Form 10-K for the fiscal year ended December 31, 2008 may be viewed, printed and downloaded from the Internet at www.firstfedca.com/2009Proxy and www.firstfedca.com/2008AnnualReport, respectively.

If you receive more than one proxy in separate mailings, your shares are registered differently in more than one account. All proxy cards received by you should be signed and mailed to ensure that all of your shares are voted.

By Order of the Board of Directors

/s/ Vikas Arora
Vikas Arora
*Corporate Secretary*

Los Angeles, California
March 31, 2009

**IMPORTANT INFORMATION**

In accordance with the "Notice and Access" rules of the Securities and Exchange Commission (the "SEC") you may access our Proxy Statement at http://www.cfpproxy.com/5015 which does not have "cookies" that identify visitors to the site. Our proxy Statement and 2008 Form 10-K are also available at our website at www.firstfedca.com.

Whether or not you expect to attend the annual meeting in person, we urge you to vote your proxy at your earliest convenience by mail or online using the voting procedures described on your proxy card. The proxy will not be used if you attend and vote in person at the meeting. This will ensure the presence of a quorum at the annual meeting and will save us the expense of additional solicitation. Sending in your proxy will not prevent you from voting your shares at the annual meeting if you desire to do so. You may revoke your proxy at any time before it is exercised by filing a written revocation or a duly executed proxy bearing a later date with our Corporate Secretary or by attending the annual meeting and voting in person. If your shares are held in the name of a brokerage firm or nominee, you will need additional documentation from your record holder in order to vote personally at the annual meeting.

**FIRSTFED FINANCIAL CORP.**
12555 West Jefferson Boulevard
Los Angeles, California 90066

**PROXY STATEMENT**

For the 2009 Annual Meeting of Stockholders
To Be Held on April 29, 2009

**INFORMATION RELATING TO VOTING AT THE ANNUAL MEETING.**

This proxy statement is furnished in connection with the solicitation of proxies by the board of directors of FirstFed Financial Corp. for use at our annual meeting of stockholders to be held on April 29, 2009, and at any adjournment or postponement thereof. The approximate date of mailing of the notice, proxy statement and form of proxy for the meeting is April 2, 2009.

Only those stockholders of record at the close of business on March 2, 2009 will be entitled to vote at the annual meeting. We had a total of 13,684,553 shares of common stock outstanding at that date. Stockholders will be entitled to one vote for each share of common stock held by them of record at the close of business on the record date on any matter that may be presented for consideration and action by the stockholders at the annual meeting. The presence, in person or by proxy, of the holders of a majority of the shares of common stock entitled to vote at the annual meeting is necessary to constitute a quorum at the annual meeting. Directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors. The other matter up for vote at the meeting requires approval by a majority of shares present in person or represented by proxy at the meeting and entitled to vote thereon.

All valid proxies received in response to this solicitation will be voted in accordance with the instructions indicated by the stockholders giving the proxies. If proxies are received with no contrary instructions given, they will be voted in favor of the election of the three director nominees named in this proxy statement and the other proposals described herein. Abstentions and broker non-votes are counted for purposes of determining whether a quorum of stockholders is present at the annual meeting but are not considered as having voted on the outcome of a vote. Proxies solicited hereby may be voted for adjournment or postponement of the annual meeting (whether or not a quorum is present for the transaction of business) in order to permit further solicitation of proxies if the board of directors determines that an adjournment or postponement would be advisable in order to obtain sufficient votes for approval of the matters to be voted upon at the annual meeting.

If you are a participant in the First Federal Bank of California Employee Stock Ownership Plan ("ESOP"), you may direct the trustee or plan administrator how to vote the number of shares allocated to your account. The proxy card indicates any common stock allocated to your ESOP account.

The board of directors does not know of any other business to be presented for action at the annual meeting. If any other business is properly presented at the annual meeting and may properly be voted upon, the proxies solicited hereby will be voted on such matters in accordance with the best judgment of the proxy holders named in such proxies. A stockholder proxy may be revoked at any time before it is voted at the annual meeting by giving written notice of such revocation to our Corporate Secretary (which notice may be given by the filing of a duly executed proxy bearing a later date) at the address set forth above or by attending the annual meeting and voting in person.

To the extent necessary, proxies may be solicited by our officers and other employees in person, by telephone, or through other forms of communication. Our personnel who participate in this solicitation will not receive any additional compensation for such solicitation. We will request record holders of shares beneficially owned by others to forward this proxy statement and related materials to the beneficial owners of the shares and will reimburse those record holders for their reasonable out-of-pocket expenses incurred in doing so.

1

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS

The information set forth below is based solely on filings made by the listed owner with the Securities and Exchange Commission (the "SEC") through our record date of March 2, 2009. Except as set forth below, no person is known to us to own beneficially more than 5% of the outstanding shares of our common stock.

| Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|
| Findim Group S.A. | 1,366,654[1] | 9.99% |
| 16 Rue Erasme | | |
| L1468 Luxembourg | | |

(1) Based solely on a Schedule 13D/A filed by the beneficial owner with the SEC on February 29, 2008. In that filing, Findim Group S.A. reported having sole voting and dispositive power over 1,366,654 shares.

2

## SECURITY OWNERSHIP OF MANAGEMENT

The following table sets forth, as of March 2, 2009, information concerning the beneficial ownership of shares of our common stock by (i) our directors, (ii) our Chief Executive Officer, (iii) the other executive officers named in the summary compensation table in this proxy statement, and (iv) all current directors and named executive officers as a group. The following summary is based on information furnished by the directors and officers. Unless otherwise indicated, each person listed has sole investment and voting power with respect to the shares indicated and the address of each person is c/o FirstFed Financial Corp., 12555 West Jefferson Boulevard, Los Angeles, California 90066. As of March 2, 2009, there were 13,684,553 shares of our stock outstanding.

| Name of Beneficial Owner | Common Stock Beneficially Owned [1] | | |
| --- | --- | --- | --- |
| | Number of Shares [2] | Option Shares [3] | Percent of Class |
| Gisselle Acevedo | 1,670 | — | * |
| David W. Anderson | 1,218 | 5,200 | * |
| Brian E. Argrett | 2,570 | — | * |
| Nicholas C. Biase [4] | 1,366,654 | — | 9.9% |
| Jesse Casso, Jr. | 4,570 | 12,000 | * |
| James P. Giraldin | 64,201 | 63,376 | * |
| Douglas J. Goddard | 12,628 | 30,650 | * |
| Christopher M. Harding | 13,536 | 24,000 | * |
| Babette E. Heimbuch | 407,442 | 119,490 | 3.8% |
| Shannon A. Millard | 40,076 | 30,265 | * |
| William G. Ouchi | 106,903 | 32,000 | * |
| William P. Rutledge | 12,670 | 32,000 | * |
| Steven L. Soboroff | 22,125 | 4,000 | * |
| All directors and executive officers as a group (13 persons) | 2,056,263 | 352,981 | 17.6% |

* Represents beneficial ownership of less than one percent of the Company's issued and outstanding common stock as of March 2, 2009.

(1) Beneficial ownership as reported in the above table has been determined in accordance with the rules of the SEC. In calculating percentage ownership, each person is deemed to beneficially own shares subject to options that are exercisable within 60 days, but options owned by others (even if exercisable within 60 days) are not deemed to be outstanding shares. Unless otherwise indicated, beneficial ownership represents both sole voting and sole investment power.

(2) The number of shares shown for each person includes shares, if any, held beneficially or of record by the person's spouse; voting and investment power of the shares indicated may also be shared by spouses. Includes, with respect to each of the named executive officers and all executive officers as a group, shares held through the First Federal Bank of California Employee Stock Ownership Plan. Includes, with respect to each nonemployee director, 835 shares of restricted stock which remain subject to vesting requirements.

(3) Reflects options to purchase common stock issued by the Company which, as of March 2, 2009, were unexercised but were exercisable on or within 60 days after that date. These shares are excluded from the column headed "Number of Shares."

(4) Represents shares held by Findim Group, S.A. ("Findim"), an entity for which Mr. Biase serves as a director. Mr. Biase disclaims beneficial ownership of the shares held by Findim, except to the extent of his pecuniary interest therein.

3

## PROPOSAL 1
## ELECTION OF DIRECTORS

Our certificate of incorporation provides that our board of directors shall consist of not less than seven and not more than fifteen directors unless a greater number is fixed by the board of directors, that the directors shall be divided into three staggered classes as nearly equal in number as possible, that each class of directors shall be elected for a term of three years and that one class of directors shall be elected annually. The class of directors scheduled to be elected at the annual meeting is composed of three directors who will be elected to serve a three year term ending at the 2012 annual meeting of stockholders and until their successors are duly elected and qualified. The nominees receiving the highest number of votes, up to the number of directors to be elected, will be elected.

The following table sets forth the name of, and certain information regarding, the three persons nominated for election to the Board of Directors at the Annual Meeting. All of the nominees are presently directors. If any nominee should be unable to serve as a director, the person or persons voting the proxies solicited hereby will select another nominee in his place. Each nominee has indicated his willingness to serve if elected and we have no reason to believe that any of the nominees will be unable or unwilling to serve if elected. Biographical information regarding the nominees appears below the table.

### Nominees for Election at the Annual Meeting

| Name | Positions Currently Held with the Company |
|------|-------------------------------------------|
| Jesse Casso, Jr. | Director; Member of the Audit Committee |
| Christopher M. Harding | Director; Chair of the Compensation Committee |
| Steven L. Soboroff | Director; Member of the Compensation and Governance & Nominating Committees |

*Jesse Casso, Jr.* is the Managing Partner of Casmar Capital Partners, LLC, a private equity investment and advisory firm. He was a Managing Director of Investment Banking at Merrill Lynch from 1996 to 2003. Prior to that he was an investment banker with Goldman, Sachs & Co. Mr. Casso serves on the board of directors of Entravision Communications Corporation and The California Endowment and is the Chairman of Camino Real Foods, Inc. Mr. Casso became a Director in 2003.

*Christopher M. Harding* has been a partner in the law firm of Harding Larmore Mullen Jakle Kutcher & Kozal, LLP since 1986. He is active in numerous civic and youth-serving organizations including the Santa Monica Chamber of Commerce, the Santa Monica Youth Athletic Foundation, Upward Bound House, Santa Monica Basketball Club, Community for Excellent Public Schools and the Boys & Girls Clubs of Santa Monica. He has served as a Director of the Bank since 1984, and of the Company since 1987.

*Steven L. Soboroff* served as President of Playa Vista, a real estate development corporation, from October 15, 2001 to December 31, 2008. As of January 1, 2009, Mr. Soboroff was appointed as the Chairman and CEO of Playa Vista. He is Chairman of the board of the Weingart Foundation, Chairman Emeritus of Big Brothers and Big Sisters of Greater Los Angeles, Past President of the Recreation and Parks Commission for the City of Los Angeles and a former Senior Advisor to the Mayor of Los Angeles. Mr. Soboroff has been a Director since 1991.

### THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS
### THAT YOU VOTE FOR NOMINEES
### JESSE CASSO, JR., CHRISTOPHER M. HARDING AND STEVEN L. SOBOROFF

4

Set forth below are the names of the persons nominated by the board of directors for election as directors at the annual meeting, as well as all other directors, together with their ages and year each first became a director of our bank subsidiary, First Federal Bank of California (the "Bank"), and of our Company.

| Nominees for Election | Age | Position Held With Company | Became Director (1) | Term to Expire (2) |
|---|---|---|---|---|
| Jesse Casso, Jr. | 53 | Director | 2003 | 2009 |
| Christopher M. Harding | 56 | Director | 1984 | 2009 |
| Steven L. Soboroff | 60 | Director | 1991 | 2009 |
| Continuing Directors | | | | |
| Gisselle Acevedo (3) | 51 | Director | 2007 | 2010 |
| Nicholas C. Biase (4) | 41 | Director | 2008 | 2010 |
| James P. Giraldin | 56 | Director, President, Chief Operating Officer | 2002 | 2010 |
| Babette E. Heimbuch | 61 | Chairman of the Board, Chief Executive Officer | 1986 | 2010 |
| Brian E. Argrett | 45 | Director | 2006 | 2011 |
| William G. Ouchi | 65 | Director | 1995 | 2011 |
| William P. Rutledge | 67 | Director | 1995 | 2011 |

(1) The date given is the earlier of the date the director became a director of FirstFed Financial Corp. or our bank subsidiary, First Federal Bank of California.

(2) For nominees for election, year listed is year term expires if re-elected as a director at the annual meeting.

(3) Ms. Acevedo was appointed on May 24, 2007 by the board to serve for a term expiring in 2010.

(4) Mr. Biase was appointed on July 24, 2008 by the board to serve for a term expiring in 2010.

Biographical information, including the principal occupations, business experience during the last five years and other present directorships, for each of our continuing directors appears below.

*Gisselle Acevedo* is the President and Chief Executive Officer of Para Los Niños, a nonprofit agency that provides child care, schooling and other services to at-risk children and their families. Prior to joining Para Los Niños in June 2006, Ms. Acevedo served as President and General Manager of the Los Angeles edition of Hoy (the second largest Spanish language daily newspaper), Vice President of Public Affairs of the Los Angeles Times and President of the Los Angeles Times Foundation. Ms. Acevedo has also served as Executive Director of Corporate Communications and Public Affairs for AT&T Broadband and as Director of Government Relations and Public Affairs for the Metropolitan Transit Authority. Ms. Acevedo serves on the board of directors of The John F. Kennedy School of Government, Women's Leadership Board, The Executive Service Corp. of Southern California, Farmers Insurance Company and Health Net, Inc. Ms. Acevedo became a Director of the Bank and the Company in May 2007.

*Brian E. Argrett* is the President and Chief Executive Officer of Fulcrum Capital Group, LLC, a private equity firm specializing in buyouts, expansion financing, recapitalizations, and growth through internal and/or external initiatives. Prior to joining Fulcrum Capital Group in 1992, Mr. Argrett spent three years as a transactional attorney with the law firm of Pircher, Nichols & Meeks in Los Angeles. Mr. Argrett also serves on the board of directors of Senor Snacks Holdings, and National Association of Investment Companies (NAIC). Mr. Argrett became a Director in 2006.

*Nicholas C. Biase* is a member of the Board of Directors of Findim Group S.A., a financial holding corporation for a group of companies in the real estate, agriculture and finance sectors. Prior to joining Findim in 1996, Mr. Biase served as Vice President of Refco, Inc., a company involved in the trading and brokerage in futures, foreign exchange and interest rate areas. Mr. Biase has also served as President and Chairman of the Board of Directors of the Montauk Lake Club and as a Member of the Board of Directors of Monterey Bay Bancorp (1997-2002). Mr. Biase serves on the Board of Directors of Pasa, an Italian and Spanish food company. Mr. Biase became a Director of the Bank and the Company in July 2008, having been appointed by the Board.

5

*James P. Giraldin* joined us in 1992 as Executive Vice President/Chief Financial Officer. Prior to joining us, Mr. Giraldin was Chief Executive Officer of Irvine City Bank for five years. He previously served as Chief Financial Officer for two other savings and loan associations and was a certified public accountant with KPMG LLP. Mr. Giraldin was appointed as our Chief Operating Officer and Senior Executive Vice President of the Bank and the Company in 1997. Mr. Giraldin was appointed as our President in April 2002. Mr. Giraldin also became a Director in 2002. Mr. Giraldin serves as Vice Chairman of the board of directors of the Federal Home Loan Bank of San Francisco and is on the Executive Board of the Boys and Girls Clubs of Santa Monica.

*Babette E. Heimbuch* has been Chairman of our board of directors since April 2002. Ms. Heimbuch has served as Chief Executive Officer since January 1997 and was Chief Operating Officer from 1989 to 1997. She joined us in 1982 as Senior Vice President, Chief Financial Officer. She was appointed Executive Vice President in 1985, and was elected a Director of our bank subsidiary in 1986. In 1987, she was appointed Senior Executive Vice President and was elected a director of the Company. Prior to joining us, Ms. Heimbuch was employed by the accounting firm of KPMG LLP serving as the Audit Manager assigned to us. Ms. Heimbuch serves on the board of Scope Industries. Ms. Heimbuch is also on the Board of Advisors of the Santa Monica-UCLA Medical Center.

*William G. Ouchi* is the Sanford and Betty Sigoloff Distinguished Professor in Corporate Renewal for the UCLA Anderson School of Management, where he has been a professor since 1979. In 1993, Dr. Ouchi was appointed to serve as special policy advisor to Los Angeles Mayor Richard J. Riordan, and from 1994 to 1995 was Mayor Riordan's Chief of Staff. Dr. Ouchi has written numerous books and articles on business management and organization. Dr. Ouchi serves on the board of The Alliance for College-Ready Public Schools and the Conrad N. Hilton Foundation. Dr. Ouchi also serves on the board of AECOM, The California Heart Center Foundation, The Japanese American National Museum, and Sempra Energy Corp. He is also the Chairman of Independent Citizens for California's Children. Dr. Ouchi became a Director in 1995.

*William P. Rutledge* was, until his resignation in March 1997, President and Chief Executive Officer of Allegheny-Teledyne, Inc, the world's top specialty metals producer. He joined Teledyne in 1986. Mr. Rutledge serves on the boards of AECOM, Sempra Energy Corp., and Communications and Power Industries, Inc., is Chief Executive Officer of Aqua Naro Technologies, LLC and is a Trustee of The John Wayne Cancer Institute and Trustee Emeritus of Lafayette College. Mr. Rutledge became a Director in 1995.

**Corporate Governance**

The following are summaries of selected provisions of our corporate governance guidelines, which are available in their entirety at our website (www.firstfedca.com).

Director Independence. In accordance with our corporate governance guidelines, which are consistent with the applicable rules of the New York Stock Exchange (the "NYSE") and federal securities laws, we have established categories of immaterial relationships that are deemed not to have any bearing on a director's independence. The corporate governance guidelines provide that no director will be considered non-independent solely as a result of any of the following relationships:

(i) if currently or at any time during the preceding three years the director was an employee or executive officer of, or a member of his or her immediate family was an employee or an executive officer of, another company that makes payments to or receives payments from us for property or services in an amount which is less than $1 million and less than two percent (2%) of the annual consolidated gross revenues of the other company, determined for the most recent completed fiscal year;

(ii) if currently or at any time during the preceding three years the director or a member of his or her immediate family was a director of another company that makes payments to or receives payments from us for property or services in an amount which is less than the greater of $1 million and two percent (2%) of the annual consolidated gross revenues of the other company, determined for the most recent completed fiscal year;

6

(iii) if the director or a member of his or her immediate family is an executive officer of another company which is indebted to us, or to which we are indebted, and the total amount of indebtedness either of them owes to the other is less than one percent (1%) of the total consolidated assets of the other company;

(iv) if the director or a member of his or her immediate family serves as an officer, director or trustee of a tax exempt organization, and our discretionary contributions to the organization are no greater than the greater of $50,000 or one percent (1%) of that organization's total annual consolidated gross revenues (determined for the most recent completed fiscal year);

(v) if the director or a member of his or her immediate family serves as a non-employee director of another company (and has not been determined by such other company to be non-independent), on whose board one or more of our other directors sit as non-employee directors;

(vi) if the director or a member of his or her immediate family maintains one or more deposit accounts with us, provided that there is no obligation or requirement to maintain the existence of such accounts and such accounts exist on terms and conditions that are no more favorable than those offered to the general public; or

(vii) if the director or a member of his or her immediate family maintains one or more loans with us, provided that there is no obligation or requirement to maintain the existence of such loans and such loans are made on substantially the same terms as those prevailing at the time for comparable transactions with non-affiliated persons, except for the interest rates and loan fees charged in accordance with our Employee Loan Benefit Program.

The board annually reviews all business, commercial and charitable relationships of the directors to determine whether directors meet these categorical independence tests. The board makes its determination of director independence prior to director elections and explains in our annual proxy statement the basis for any determination by the board that a relationship was immaterial despite the fact that it did not meet the categorical standards of immateriality set forth above.

These director independence guidelines are subject to future changes by the board, upon recommendation of the Governance & Nominating Committee, as it may find necessary or advisable for us to achieve our governance objectives or as required by law or pursuant to the rules and regulations of the SEC and the NYSE. The board has determined that all of its current directors, other than Ms. Heimbuch and Messrs. Biase and Giraldin, have no relationships with us that are outside of the categorical standards and are therefore independent directors pursuant to the corporate governance guidelines. Ms. Heimbuch and Mr. Giraldin are not independent as they are executive officers of our Company; Mr. Biase is not independent as he is a member of the board of directors of a beneficial holder of 9.99% of our outstanding common stock.

Board Meetings and Committees; Annual Meeting Attendance. We have standing Audit, Compensation and Governance & Nominating Committees. The board of directors has determined that each member of the Audit, Compensation and Governance & Nominating Committees meets the applicable laws and listing standards regarding "independence" and that each member is free of relationships that would interfere with the individual exercise of independent judgment.

*Attendance at Meetings.* During 2008, there were ten regular meetings of the board of directors, as well as four special meetings called for by the circumstances. No director attended fewer than 75% of the aggregate number of such meetings and of the meetings of the committees on which he or she served during the period during which he or she held a position on the board. We expect all incumbent directors and director nominees to attend our annual meetings of stockholders and any absence must be approved by the Chairman of the Board at the time the meeting date is set by the board. All nine then-existing board members attended our 2008 annual meeting of stockholders.

*Meetings of Non-Management Directors.* Our non-management directors meet separately on a regular basis, usually after each regular meeting of the board. Each non-management director serves as presiding director of those meetings on a rotating basis.

7

*Audit Committee.* The Audit Committee currently consists of Messrs. Rutledge (Chair), Argrett and Casso and Dr. Ouchi, all of whom are independent directors. During 2008, the Audit Committee held ten meetings. The board of directors has determined that all members of the Audit Committee satisfy the financial literacy requirements of the NYSE, and that Messrs. Casso, Rutledge and Argrett qualify as "audit committee financial experts" as defined by the rules of the SEC. The background of each of the members of the Audit Committee can be found in this proxy statement on pages 4 through 6. The board of directors has adopted a charter governing the duties and responsibilities of the Audit Committee. The Audit Committee Charter is available on our website (www.firstfedca.com). Pursuant to its Charter, the functions performed by the Audit Committee include:

- providing direct communication between the board of directors and our internal and external auditors;

- monitoring the design and maintenance of our system of internal accounting controls;

- selecting, evaluating, and, if necessary, replacing the external auditors;

- reviewing of results of internal and external audits as to the reliability and integrity of financial and operating information and the systems established to monitor compliance with our policies, plans and procedures and with laws and regulations;

- reviewing the relationships between us and the external auditors to determine the independence of the external auditors; and

- preparing of the Audit Committee Report for inclusion in our proxy statement. The report of the Audit Committee can be found in this proxy statement on page 25.

*Compensation Committee.* The Compensation Committee, which held three meetings in 2008, currently consists of directors Harding (Chair), Acevedo, Argrett, Rutledge and Soboroff, all of whom are independent directors. The Compensation Committee's Charter is available on our website (www.firstfedca.com). This Committee administers our salary and other compensation programs. The Compensation Committee is responsible for recommending compensation levels for our senior executives. The target goals for officers below Senior Vice President generally are set at the beginning of each year by management and approved by the Compensation Committee. Our CEO and President make recommendations as to the senior and executive officers' compensation to the Compensation Committee. After consideration of management's recommendations, the Compensation Committee makes its recommendations to the board of directors, which has final approval of the compensation packages (management directors Heimbuch and Giraldin do not participate in discussion or approval of their own compensation packages). The Compensation Committee also evaluates director compensation levels and forms of compensation from time to time, and makes recommendations for any changes to director compensation to the board of directors for consideration. Occasionally, the Compensation Committee and/or our management hire outside compensation consultants to advise them. The Compensation Committee also prepares the Compensation Committee Report for inclusion in our proxy statement. The report of the Compensation Committee can be found in this proxy statement on page 18.

*Compensation Committee Interlocks and Insider Participation.* All members of the Compensation Committee during 2008 were independent directors, and none were our employees or former employees. During 2008, none of our executive officers served on the compensation committee or the board of directors of another for-profit company whose executive officer (s) served on our Compensation Committee or board of directors.

*Governance & Nominating Committee.* The Governance & Nominating Committee is comprised of directors Ouchi (Chair), Rutledge and Soboroff. The Governance & Nominating Committee held two meetings in 2008. The charter of this Committee is available on our website (www.firstfedca.com). The Governance & Nominating Committee is responsible for recommending governance guidelines; establishing a continuous process to help the board as a whole, as well as individual directors, become more valuable strategic assets; and identifying, evaluating and recommending director candidates, including candidates suggested by our stockholders (see "Stockholder Communications" below). The Governance & Nominating Committee periodically makes recommendations of qualified nominees for election to the board of directors. It identifies director candidates who are recommended by members of the board of directors, management, stockholders and others, which may include search firms. At a minimum, a board nominee is expected to have significant management or leadership experience which is relevant to our business, the absence of any conflicts of interest, as well as personal and professional integrity. The Committee does not assign specific weights to particular criteria and other than the general qualities described above, there are no specific qualities or skills that the Committee believes are necessary as a requirement for consideration for any prospective nominee. The Governance & Nominating Committee seeks to maintain a board that, as a whole, provides a mix of experience, knowledge and abilities to meet its current and future needs in order to fulfill its responsibilities. To achieve that mix, the Committee also

8

considers the current composition and capabilities of the existing board, as well as additional skills and experience considered useful in light of our current and future needs. The Committee approved the appointment of Mr. Biase to our board in July 2008, as well as nomination of the candidates reflected in Proposal 1, all of whom are directors standing for re-election. The Committee is authorized under its charter to engage its own advisors.

## Stockholder Communications

*Election of Directors.* Our board of directors has amended our corporate governance guidelines to provide that in an uncontested election (i.e., an election where the only nominees are those recommended by the board of directors), any nominee for director who receives a greater number of votes "withheld" from his or her election than votes "for" such election shall promptly tender his or her resignation following certification of the stockholder vote. The Governance & Nominating Committee will consider the resignation offer and recommend to the board whether to accept it. The board (other than the director who has tendered his or her resignation) will act on the Governance & Nominating Committee's recommendation within 90 days following certification of the stockholder vote. The board will promptly disclose its decision whether to accept the director's resignation offer (and the reasons for rejecting the offer, if applicable).

*Nominations for Directors.* Our bylaws provide that only persons nominated in accordance with the procedures set forth in the bylaws shall be eligible for election as directors. Stockholder nominations must be made pursuant to written notice received by us not less than 60 days nor more than 90 days prior to the scheduled date of the annual meeting. The notice must state the nominee's name, age and address (business and residence), the nominee's principal occupation or employment, and the class and number of shares of our common stock beneficially owned by the nominee on the date of the notice. The required notice must also disclose certain information relating to the nominee which would be required to be disclosed in a proxy statement and in certain other filings under the federal securities laws. In addition, the stockholder making the nomination must disclose his or her name and address as it appears on our books, the name and principal business or residence address of any other record or beneficial stockholders known by the nominating stockholder to support such nominee, and the class and number of shares of our common stock beneficially owned by the nominating stockholder and any such supporting stockholders on the date of the notice.

The Governance & Nominating Committee considers suggestions from many sources, including stockholders, regarding possible candidates for director. Stockholder suggestions should be provided to the Committee in writing at least 120 days prior to the date of the next scheduled annual meeting. Stockholders should include in such communications the name and biographical data, and the number of shares of our common stock owned for both the proposed candidate and the individual making the proposal, as well as information regarding the relationship between the proposed candidate and the individual making the proposal. A written statement from the candidate consenting to be named as a candidate and, if nominated and elected, willingness to serve as a director should accompany any such recommendation. The Governance & Nominating Committee considers stockholder nominees for director in the same manner as nominees for director from other sources. Stockholders may send any recommendations for director nominees or other communications to the board of directors or any individual director at the following address. All reported communications received are forwarded to the board or the individual director(s) to whom they are addressed:

> Board of Directors (or Governance & Nominating Committee or name of individual director)
> c/o Corporate Secretary
> FirstFed Financial Corp.
> 12555 West Jefferson Boulevard
> Los Angeles, California 90066
> Attn: Stockholder - Board Communications

## Transactions with Related Persons

As a result of being regulated by the Office of Thrift Supervision, the Bank and its subsidiaries have written policies in place governing related party transactions. Furthermore, the Sarbanes-Oxley Act of 2002 generally prohibits loans by us to our executive officers and directors. However, this law contains a specific exemption from this prohibition for loans made by the Bank that are in compliance with federal banking regulations. Under these regulations, loans or extensions of credit to executive officers and directors must generally be made on

9

substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with other persons, unless the loan or extension of credit is made under a benefit program generally available to all other employees and does not give preference to any insider over any other employee. Additionally, the loans must not involve more than the normal risk of repayment or present other unfavorable features.

*Employee Loan Benefit Program -- Home Loans.* In compliance with these regulations, our bank subsidiary makes loans and extensions of credit in the ordinary course of business to our executive officers, directors and employees. Home loans under our employee loan benefit program, or ELBP, described below may be made at different rates than those offered to the general public; however, our bank subsidiary does not give preference to any director or officer over any other employee, and such loans do not involve more than the normal risk of repayment or present other unfavorable features. In addition, any loans made to a director or executive officer in an amount that, when aggregated with the amount of all other loans to the person and his or her related interests, would be in excess of the greater of $25,000 or 5% of our bank subsidiary's capital and surplus, up to a maximum of $500,000, must be approved in advance by a majority of the disinterested members of the board of directors of our bank subsidiary.

Directors, officers, and other employees of the Bank may obtain a loan under the ELBP. To qualify under the ELBP, all real estate and home equity credit line loans are required to be secured by the employee's primary residence. ELBP loans require ninety days of full-time employment with us. All ELBP loans are made on substantially the same terms as those prevailing at the time for comparable transactions with non-affiliated persons, except for the interest rates and loan fees charged. We currently have outstanding ELBP loans to directors Argrett, Casso, Harding and Ouchi and to named executive officers Goddard and Millard.

The characteristics of ELBP loans are reviewed regularly by the Bank's Loan Committee and were last modified in June 2008. ELBP real estate loans currently are written as adjustable mortgage loans with, for the first $650,000 of the loan amount, an initial interest rate equal to the 12-MAT index plus 0.50%. Thereafter, the interest rate adjusts every six months. The loans do not allow for negative amortization.

*Other Related Person Loans.* During most of 2008, Mr. Harding had a business line of credit with us in the maximum amount of $100,000. The loan was made (i) in the ordinary course of business, (ii) on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with other customers, and (iii) did not involve more than the normal risk of collectability or present other unfavorable features. Mr. Harding does not participate in board discussions regarding review and renewals of this line of credit. The line of credit expired on October 10, 2008.

**Other Corporate Governance Matters**

Our board of directors has adopted a Code of Ethical Conduct, which is available on our website (www.firstfedca.com) and is applicable to all of our directors, officers and employees. The Code of Ethical Conduct requires that our directors, executive officers and employees avoid conflicts of interest, comply with all laws and other legal requirements, conduct business in an honest and ethical manner and otherwise act with integrity and in our Company's and our stockholders' best interests. Under the Code of Ethical Conduct, directors, executive officers and employees are required to report any conduct that they believe, in good faith, to be an actual or apparent violation of the Code. In order to encourage compliance with the Code of Ethical Conduct, we have established procedures to receive, retain and treat complaints received regarding accounting, internal controls or auditing matters. These procedures ensure that individuals may submit concerns regarding questionable accounting or auditing matters in a confidential or anonymous manner. Our Code of Ethical Conduct prohibits retaliation against anyone who reports actual or apparent violations of the Code. Any amendment to, or waiver from, a provision of the Code of Ethical Conduct that apply to our directors or executive officers, including our Chief Executive Officer, Chief Financial Officer, Controller and persons performing similar functions, may be made only by the independent directors of the board and will be promptly posted on our website.

10

## Information Relating to Executive Officers

Set forth below are the names and ages of our current executive officers, other than Ms. Heimbuch and Mr. Giraldin, together with the positions held by these persons.

| Name | Age | Title |
|------|-----|-------|
| David W. Anderson | 40 | Executive Vice President/Chief Credit Officer |
| Douglas J. Goddard | 56 | Executive Vice President/Chief Financial Officer |
| Shannon A. Millard | 46 | Executive Vice President/President of Retail Banking |

*David W. Anderson* joined us in July 2004. Mr. Anderson was formerly with Unicon Financial Services, Inc. for twelve years, most recently as Partner. In that role, he provided consulting services in lending, credit and compliance programs for small and medium-sized financial institutions. During his last six months of employment with Unicon, Mr. Anderson served as acting Chief Credit Officer of Hawthorne Savings.

*Douglas J. Goddard* joined us in April 1997. Previously, Mr. Goddard served as Controller of California United Bank. He has held positions at Security Pacific Bank, Community Bank and KPMG LLP.

*Shannon A. Millard* joined us in 1992. Ms. Millard was the Bank's Executive Vice President/Chief Credit Officer from 1994 through May 2004. From May 2004 through November 2005, Ms. Millard served as the Executive Vice President of the Bank's residential lending division. In November 2005, Ms. Millard became the Chief Lending Officer over both residential and income property lending. In January 2006, Ms. Millard's title was changed to Executive Vice President/President of Real Estate Division. In March 2007, Ms. Millard became the Bank's Executive Vice President/President of Retail Banking. Ms. Millard was formerly with the Bank of California for six years, most recently as the Vice President in charge of Real Estate Services. Prior to that, Ms. Millard was with Sumitomo Bank.

11

## Compensation Discussion and Analysis

*Compensation Philosophy and Objectives.* Our senior management generally is compensated in the form of base salary plus discretionary cash and equity incentive compensation. These components of compensation are designed to be attractive in comparison to similar employers, allowing us to attract, retain and motivate talented employees with a high level of professional stature and experience, as well as to align management's interests with the interests of our stockholders. The process of determining the appropriate level of each component consists of establishing overall compensation for each senior manager, and allocating that compensation between currently paid compensation and long-term compensation, and between base salary and incentive compensation. At the senior executive level, incentive compensation is generally designed to reward company-wide performance through awards tied primarily to the level of earnings and return on equity, and with a greater allocation to long-term compensation relative to other officers. For other levels of management, generally, incentive compensation is designed to reward the accomplishment of specific operational goals within specific areas of their job function, with greater relative allocation to currently paid compensation.

*Executive Compensation in 2008 and 2009.* Based on our lack of profitability and the loss in stockholder value that took place in 2008, none of our officers received any bonus cash compensation for 2008 nor equity incentive compensation in 2009 for the 2008 fiscal year. In addition, officers were not given raises in base salary for 2009 and the CEO and COO also did not receive a raise in base salary for 2008. Our named executive officers had their base salaries reduced by 10% in March 2009.

*Role of Chief Executive Officer.* Our CEO provides recommendations to the Compensation Committee on matters of compensation philosophy, plan design and the general guidelines for executive officer compensation. These recommendations are then considered by the Compensation Committee. While the CEO generally attends Compensation Committee meetings to assist the Committee by providing information and answers to questions, she is not present for the executive sessions or for any discussion of her own compensation.

*Overall Compensation Levels.* Historically, we attempted to target the overall compensation levels for our management, including the named executive officers identified in this proxy statement, at the 75th percentile of our peer group within the banking and thrift industry. Our human resources department participates in, obtains information from, and analyzes the results of salary and benefits surveys conducted annually by various banking and human resource groups. This includes the SNL Executive Compensation Review for Banks and Thrifts, which utilizes information obtained from all public banks and thrifts throughout the United States. We have used this survey for over twelve years. Periodically we use consultants to perform a study of the compensation of our senior management compared to similar companies, as well as to provide general data to assist us with the establishing other levels of compensation. The last such study was undertaken in 2006. Additionally, for the executive positions disclosed in this proxy statement, we compared compensation levels to the following institutions in 2007, which we believed were comparable to us in terms of asset size, lines of business, geographic location, and/or competitive need for acquisition and retention of executive talent:

- Cathay General Bancorp
- City National Bank
- CVB Financial Corp.
- Downey Financial Corp.*
- East West Bancorp
- First Community Bancorp
- First Republic Bank
- Pacific Capital Bancorp
- PFF Bancorp.*
- Sterling Financial Corp.
- SVB Financial
- UCBH Holdings
- Umpqua Holding Corp.
- West America Bancorp

* Institutions are no longer in existence.

12

We did not make a similar comparison in 2008 and, except for cost-of-living raises given to our Chief Credit Officer, Chief Financial Officer and President of Retail Banking, no changes were made to overall targeted executive compensation for 2008.

*Elements of Compensation.* We seek to achieve our compensation objectives through five compensation elements:

- a base salary;

- a variable, annual bonus based on individual and Company performance;

- annual grants of long-term, equity-based compensation in the form of stock options;

- retirement plans and agreements and programs defining when payments are made in connection with termination of employment following a change of control; and

- benefits and perquisites.

*Allocation among Components.* In addition to participating in retirement plans and receiving employee benefits and perquisites, our 2008 target compensation structure provided our management with a base salary, performance-based bonus and equity-based compensation (in the form of stock options), allocated as follows:

| Position | Base Salary | Bonus Target | Equity Target |
|---|---|---|---|
| Chief Executive Officer | 50.0% | 25.0% | 25.0% |
| President/Chief Operating Officer | 52.6% | 23.7% | 23.7% |
| Executive Vice Presidents | 58.8% | 20.6% | 20.6% |
| Senior Vice Presidents | 62.3% | 18.8% | 18.8% |

As shown, the most senior levels of management are the most heavily weighted in favor of performance-based compensation, while lower levels of management receive a greater portion of compensation as base salary. This practice is consistent with the practices observed at similar companies, as well as with our compensation philosophy. In all of the categories presented above, no bonuses or equity compensation was awarded for 2008 based on the Company's financial performance.

*Base Salaries.* We seek to provide our senior management with base salary at a level that will reflect his or her professional status, experience, responsibilities, value to the Company and demonstrated performance.

The base salaries for the named executive officers are determined by the Compensation Committee based on its subjective evaluation of a variety of factors, including:

- the nature and responsibility of the position;

- the impact, contribution, expertise and experience of the individual executive;

- competitive market information regarding salaries to the extent available;

- the importance of retaining the individual along with the competitiveness of the market for the individual executive's talent and services; and

- the recommendations of the Chief Executive Officer and President (except in the case of her or his own compensation).

Base salaries are designed to provide some certainty in compensation allocation. Due to the significant competition for executive employees in our geographic area – and the high cost of housing in Los Angeles, which makes it difficult to attract qualified candidates from many other areas – we provide a greater allocation of total salary to base salary relative to the other two components (bonus and equity compensation), as these employees have a need for assured cash compensation in order to facilitate an appropriate lifestyle.

With regard to the compensation of Babette Heimbuch, our Chairman and CEO, we also considered our financial results under her leadership, along with the Company's significant losses in 2008. The overall compensation

13

of our CEO, before retirement benefits, was established in 2007 based on information obtained from surveys and review of compensation arrangements of CEOs at similarly situated institutions, and has not been increased since that time. For Ms. Heimbuch, the appropriate level of assured base salary for 2008 was $600,000 and, for 2009 is $552,500 (reflecting the March 2009 reduction). The process for salary determination for the other named executive officers was conducted in a similar fashion.

Due to our financial performance, our current regulatory position and the loss of stockholder value in 2007 and 2008, as well as the challenges we are currently experiencing in our industry (as described more fully in our Annual Report on Form 10-K for the fiscal year ended December 31, 2008), the Compensation Committee determined that there would be no increase in the base salary for 2008 and a reduction in base salary for 2009 for Ms. Heimbuch, our CEO.

We followed the same process for the evaluation of target levels of compensation for our President and COO, James P. Giraldin. As to Mr. Giraldin, we set the overall base salary, before retirement benefits, at $450,000 for 2007, and it was not increased for 2008. This was within the range of what was suggested by our analyses of comparable positions undertaken in 2007. After the 10% reduction that took place in March 2009, Mr. Giraldin's base salary was decreased to $414,375 for 2009, which we believed was appropriate given our financial performance, our current regulatory position and the loss of stockholder value in 2007 and 2008.

In establishing the 2008 target compensation levels for the three other named executive officers, a similar process was used. However, unlike Ms. Heimbuch and Mr. Giraldin, the three Executive Vice Presidents did receive cost-of-living adjustments to their base salaries in 2008. For 2009, base salaries for these officers initially was unchanged from 2008, but was reduced by 10% in March 2009.

*Bonuses.* The compensation program provides for a bonus that is linked to annual individual and Company performance. The objective of the program is to compensate individuals annually based on the achievement of specific annual goals that the Compensation Committee believes correlate closely with growth of long-term stockholder value.

For 2008, the performance goals for our CEO and COO included return on equity, achievement of goals by such individual's subordinates, and capital and liquidity management. The remainder of senior management generally has performance goals that vary based upon the strategic goals for the relevant business unit, which may include operational performance or individual objectives. We selected these goals, which are reviewed in the fourth quarter of each year, because they furthered our strategic plans in light of the declining real estate market and stressed financial industry, and were believed to be in the best interests of stockholders to maintain, and subsequently to return to, profitability. The target goals were linked to operational objectives that we believed to be generally within the executives' control, but other than for the CEO under the Executive Incentive Bonus Plan (discussed below), the objectives provided some discretion for adjustment based on external factors beyond management's control, such as federal monetary policies, lending regulations, the unforeseeable and cyclical real estate market, unique events that can have an impact on the financial markets (such as natural disasters) and the condition of the economy in which we conduct our business, including general employment levels, as these factors may affect return on equity, stock appreciation and other target goals. The method of determining base salary and overall targeted compensation is described above. The Compensation Committee sets goals intending that the relative difficulty of achieving the target level is consistent from year to year. Goal achievement can range from 0 – 100%, before any discretionary award by the board may be made. Depending on the nature of the goals, the executive's performance is evaluated on either an achieve/non-achieve standard, or on a percentage of accomplishment, as deemed appropriate by the Compensation Committee. For 2008, the payout percentage to all named executive officers was 0%.

The specific performance goals for the Company's named executive officers in 2008 were as follows:

- Babette Heimbuch: Other than eligibility for incentive compensation awarded under the Executive Incentive Bonus Plan described below, Ms. Heimbuch's performance goals included (i) achieving a minimum return on equity percentage of 5% (reduced from the prior year based on the deteriorating banking environment) and (ii) achievement of goals by subordinate officers.

- James Giraldin: Mr. Giraldin's performance goals for fiscal 2008 were both qualitative and quantitative in nature, and included (i) expanding loan modifications to prevent foreclosures, (ii) achieving a minimum return on equity of 7% and (iii) overall goal achievement by his subordinate officers.

14

- David Anderson: Mr. Anderson's performance goals for fiscal 2008 were qualitative in nature, and included (i) completing staffing for the Bank's loss mitigation unit and refining mitigation analytics to lead to more successful modifications, (ii) completing staffing for the Bank's REO liquidation unit and establish procedures to ensure that REO volume does not substantially increase from June 30, 2008 and (iii) ensuring adequate and consistent levels of staffing in the Bank's loan service department.

- Douglas Goddard: Mr. Goddard's performance goals for fiscal 2008 were qualitative, rather than quantitative, in nature and included: (i) developing and implementing the Bank's accounting policy with respect to accounting for troubled debt restructurings in light of modification goals, (ii) developing a quarterly analyst reporting package to provide information to the investment community on the Bank's performance and results, especially efforts to modify problem loans and (iii) overseeing and directing the negotiation of a new data processing contract.

- Shannon Millard: Ms. Millard's performance goals for fiscal 2008 were quantitative in nature, and included various targets for deposit and fee income growth from our retail branch network. While we will not disclose these targets due to competitive constraints, the targets set forth for Ms. Millard are greater that our historical growth rates, but were achievable with effort.

Funding for the annual incentive program for all officers is determined solely by the board, and our financial performance, including Company profitability and stock performance, are significant factors in determining any bonus award payout. For bonus compensation for 2008, the board determined that no cash bonus award would be payable to any of our named executive officers (or indeed to any of our officers) even though they individually achieved certain of their bonus goals. This decision was due primarily to the overall financial performance of the Company, more generally, our industry, and ultimately, the effect our financial performance had on our regulatory position and stock price during 2008. The board believes that the bonus compensation of all executive officers, and especially the CEO and COO, should be closely tied to those factors.

Until recently, we felt that the adverse tax consequences of paying compensation in excess of $1 million was not significant, given that the levels of the most senior officers' salaries were well below $1 million. As we grew and the compensation of our CEO increased, the board concluded that structuring the CEO's compensation to meet the requirements imposed by federal tax law for deductibility of executive compensation in excess of $1 million was beneficial to us and our stockholders. Accordingly, in 2008, the board and our stockholders approved an executive incentive plan designed to meet those requirements (the "Executive Incentive Bonus Plan"). The Executive Incentive Bonus Plan is intended to qualify as performance-based compensation eligible for deductibility under Section 162(m) of the Internal Revenue Code of 1986, as amended. However, we reserve the right to use our judgment to make compensation payments that do not comply with the requirements of Section 162(m) if we believe that those payments are in the best interests of the stockholders, given changing business conditions or the executive's performance. For 2008, there was no payout made pursuant to the Executive Incentive Bonus Plan.

We award discretionary cash bonuses based upon performance objectives. For certain of our key executives whose overall compensation may exceed $1 million, we anticipate that any bonuses for 2009 and beyond will be made in accordance with the Executive Incentive Bonus Plan. Currently, only the CEO has been identified as a potential participant in the Executive Incentive Bonus Plan. For senior management other than the CEO, performance goals may include, but are not necessarily limited to, the performance goals identified in the Executive Incentive Bonus Plan.

Generally, the Compensation Committee has discretion to make recommendations to increase the size of any award or payout as to the specific performance goals in cases where unforeseeable circumstances during the year, deemed to be outside of the employee's control, made achievement of the goal particularly difficult to attain. The Compensation Committee also has the discretion to reduce the size of any award or payout as to any officer. Performance goals may be revised during the year should circumstances warrant such revision.

Under the Executive Incentive Bonus Plan approved by stockholders in 2008, and consistent with Internal Revenue Service rules for deductibility of executive compensation in excess of $1 million, the Compensation Committee has no discretion to revise the performance goals so as to compensate the CEO in the absence of attainment of the previously-established goals. The specific targets for the CEO under the Executive Incentive Bonus

15

Plan were established by the Compensation Committee, and consisted of a predetermined return on equity percentage (as described above) and the average percentage goal achievement of the Company's executive vice presidents for any payouts under the Executive Incentive Bonus Plan. Although the Executive Incentive Bonus Plan requires that the executive achieve a predetermined target selected by the Compensation Committee before there may be any plan award payout, it also vests the Compensation Committee with full discretion to make a downward adjustment to such award if deemed appropriate, even if the goals are achieved.

*Equity Compensation.* Since going public in 1983, we have utilized incentive stock options to compensate management employees. This form of equity compensation is commonly used in rewarding and motivating employees in our industry. Our practice for many years has been to determine the dollar amount of equity compensation that we want to provide (in accordance with the overall allocation of target compensation shown on page 13). Based on this amount, we then grant a number of stock options to acquire shares of our common stock at an exercise price equal to the fair market value closing price on the date of grant, using a Black-Scholes model to determine the current value of such options. Subject to the policy on coordinating grants with the release of material non-public information (as described below), these awards are approved at the first meeting of the Compensation Committee and board each year following the availability of the financial results. The schedule for meetings of the Compensation Committee and board is set several months in advance. Although an earnings announcement is typically also made at the time of such meetings in January, the board's process is to delegate authority to the Compensation Committee to determine the effective date of the awards, which is typically after the dissemination of the earnings release. This process is intended to coordinate grants to executive officers with the release of material non-public information, whether positive or negative, in order to facilitate an exercise price at fair market value which reflects the investing market's absorption of such information.

Incentive stock options generally are awarded to officers holding the title of Senior Vice President and higher. The awards are also time-based, as the options generally vest over a six-year period. The current stock option plan under which awards to officers are made was approved by our stockholders in 2004. In establishing award levels, the Compensation Committee does not factor in prior awards that are fully vested. Grants were made on January 28, 2008 for the last fiscal year. No equity incentive compensation was awarded to any officers in 2009 based on the Company's financial performance in the 2008 fiscal year.

*Severance Benefits.* We do not have a policy of providing severance benefits to any employees except as described below under "Change of Control Arrangements" or otherwise required by law.

*Retirement Plans.* We do not have a traditional defined benefit pension plan. A former pension plan was terminated and its benefits were disbursed to existing participants. That plan was replaced with a 401(k) plan pursuant to which we match employee contributions in an amount equal to up to 50% of an employee's contributions (up to six percent of the employee's compensation, capped at the current maximum set by the Internal Revenue Service) to the plan. The amount that we match to the contributions to the 401(k) plan made by an employee is determined by conducting a compensation analysis through the collection and review of the compensation being paid by peer group institutions. In addition, we have an employee stock ownership plan, which is a profit sharing plan available to all eligible employees (generally, employees who meet the minimum hours of service requirement). Pursuant to this plan, at the end of the fiscal year, our board may authorize a contribution to the ESOP based on our net profits. Since there were no such profits in 2008, the aggregate contribution for the year was approximately $244,000, which was the amount necessary for the ESOP to pay off its outstanding loan from the Company. The ESOP assets consist of common stock of the Company which is allocated to the accounts of participants, and unallocated stock of the Company which will be allocated in future years. Contributions to the 401(k) plan and ESOP are factored into account in the calculation of targeted overall compensation for senior management, as well as for other employees.

We also maintain an unfunded supplemental retirement plan, or SERP, for the current CEO and COO and two previously retired executives. Pursuant to the SERP, the CEO and COO will receive additional benefits payable upon retirement at age 60 of later (or reduced levels for early retirement under certain conditions). Additional details regarding the SERP are provided in the table below entitled "2008 Pension Benefits".

*Change of Control Agreements.* We believe that reasonable change of control agreements for key executives (currently, three executive vice presidents, the COO and the CEO) are in the best interests of stockholders in order to mitigate any reluctance of those executives to pursue potential change of control transactions that are in the best interests of stockholders, and to retain those executives during a period of possible instability resulting from a change of control. The cash components of any change of control benefits are paid in a lump sum and are based on

16

a multiple of three times base salary (generally defined as the average salary during the previous five years) and bonus. Under the terms of the equity compensation arrangements applicable to these executive officers, a change of control would also cause all equity compensation to immediately vest. In the event that change of control benefits are triggered, health and other insurance benefits are continued for three years. Terminated employees would be entitled to receive any benefits that they otherwise would have been entitled to receive under our 401(k) plan, ESOP and SERP (if applicable), although those benefits are not increased or accelerated. We feel that the amount of compensation payable in the event of a change of control is consistent with that offered by similarly situated companies. The ability to offer a change of control arrangement for key executives enables the Company to attract talent for senior positions, and at the same time ensure that executives receive a certain level of compensation in the near future if they are not retained following a change of control.

Because of the tax imposed by Internal Revenue Code Section 280G, we have agreed to reimburse the executive officers for the taxes, if any, imposed as a result of change of control benefits. All change of control benefits are "double trigger" (accelerated vesting is triggered by two events: a change of control plus a triggering termination under the change of control agreement), rather than "single trigger" (automated accelerated vesting upon a change of control). We feel that a "double trigger" change of control is more consistent with the spirit with which such payments are intended.

Based on a hypothetical termination date of December 31, 2008 following a change of control and assuming the Company were not under regulatory restrictions to which it is now subject, the termination benefits for our CEO and COO under the change of control agreements would have been as shown below. The payouts to other executives would be calculated in a similar manner, based on their salaries. The amounts earned through the assumed termination date are estimates of the amounts which would be paid out to the executives upon their termination. The actual amounts to be paid out can only be determined at the time of such executive's termination of employment following a change of control.

|  | CEO | COO |
|---|---|---|
| Base Salary | $1,667,628 | $1,250,748 |
| Bonus | $ 894,000 | $ 694,500 |
| Healthcare and other Insurance benefits | $ 39,203 | $ 16,267 |
| TOTAL: | $2,600,831 | $1,961,515 |

For purposes of these benefits, a change of control is generally deemed to occur if (a) a stockholder or group of stockholders acquires beneficial ownership of 15% or more of our common stock (the threshold is 25% for acceleration of stock options under the 1994 Stock Option and Stock Appreciation Rights Plan); or (b) 25% or more of the directors in office were not nominated for initial election to the board of directors by directors who were in office at the time of the current directors' nomination; or (c) a merger or other transaction occurs in which stockholders prior to the merger do not own at least 50% of the voting power after the transaction; or (d) there is a liquidation or dissolution or the sale of all or substantially all of our assets.

Based on the Company's current regulatory position and financial condition, many of the change of control benefits the named executive officers would have under their respective change of control agreements would not be payable even in the event they are triggered.

***Perquisites and Other Benefits.*** Senior management does not receive perquisites not given to other officers and employees, and, with the exception of the SERP for the CEO and COO, receive benefits on the same terms as other officers and employees. These benefits include medical and dental insurance, a car allowance, life insurance, and eligibility to participate in the Employee Loan Benefit Program described above.

***Board Process.*** The Compensation Committee reviews all compensation and awards to executive officers, which includes the CEO, COO, executive vice presidents and senior vice presidents. The Compensation Committee makes its recommendation on compensation and awards to the board, which approves all compensation and awards for senior management. In making its recommendations as to the CEO and COO, the Compensation Committee

17

reviews each person's performance and compensation, has discussions with those individuals, consults with outside consultants where it deems appropriate, and establishes the compensation levels. For other senior officers, the Compensation Committee receives and evaluates the recommendations of the CEO and COO that generally, with occasional adjustments, are approved. The board has delegated option granting authority to the Compensation Committee.

**REPORT OF THE COMPENSATION COMMITTEE**
**OF**
**FIRSTFED FINANCIAL CORP.**

*Notwithstanding any statement to the contrary in any of our previous or future filings with the Securities and Exchange Commission, the following report of the Compensation Committee of the Board of Directors on executive compensation shall not be deemed to be "soliciting material" or "filed" with the Securities and Exchange Commission, nor shall this information be incorporated by reference into any future filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended.*

Each of the members of the Compensation Committee is independent as defined under the New York Stock Exchange's listing standards. Set forth below is the report submitted by Mr. Harding (Chair), Ms. Acevedo and Messrs. Argrett, Rutledge and Soboroff.

Decisions on compensation of the Company's executives are made by a Compensation Committee composed entirely of nonemployee directors appointed by the Company's board of directors. The members of the Compensation Committee have the responsibility to oversee the Company's various compensation plans, including the annual bonus plan, stock option programs, ESOP, 401(k) Plan and annual salary review. The Committee reviews compensation levels of all members of management, including executive officers, evaluates their performance, and considers officer succession and related matters. The Committee reviews with the board all aspects of compensation for officers at the level of senior vice president or above, as well as reviewing bonus compensation for certain vice presidents.

In fulfilling its oversight responsibilities, the Compensation Committee reviewed and discussed the Company's Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K for the fiscal year ended December 31, 2008 with the Company's management. Based on such review and discussion referred to above, the Compensation Committee recommended to the board that the Compensation Discussion and Analysis be included in this proxy statement and incorporated by reference into the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 for filing with the Securities and Exchange Commission.

> Respectfully Submitted,
>
> The Compensation Committee of the Board of Directors:
>
> Christopher M. Harding (Chair)
> Gisselle Acevedo
> Brian E. Argrett
> William P. Rutledge
> Steven L. Soboroff

18

## 2008 SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($)[1] | Non-Equity Incentive Plan Compensation ($)[2] | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($)[3] | All Other Compensation ($)[4] | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Babette E. | 2008 | $600,000 | — | — | $458,538 | — | $ (104,747) | $ 8,122 | $ 961,913 |
| Heimbuch, CEO | 2007 | $600,000 | — | — | $478,493 | — | $ 1,012,465 | $43,271 | $2,134,229 |
| | 2006 | $556,980 | $650,000 | — | $423,732 | — | $ 741,673 | $30,839 | $2,403,224 |
| James P. Giraldin, | 2008 | $450,000 | — | — | $306,288 | — | $ 391,617 | $ 7,902 | $1,155,807 |
| President/COO | 2007 | $450,000 | — | — | $319,166 | — | $ 520,915 | $40,631 | $1,330,712 |
| | 2006 | $417,780 | $487,500 | — | $282,879 | — | $ 457,401 | $30,839 | $1,676,399 |
| David W. | 2008 | $343,200 | — | — | $106,826 | — | — | $ 7,692 | $ 457,718 |
| Anderson, Chief | 2007 | $300,000 | $ 92,400 | — | $ 88,580 | — | — | $38,111 | $ 519,091 |
| Credit Officer | 2006 | $225,000 | $ 78,750 | — | $ 71,333 | — | — | $30,839 | $ 405,922 |
| Douglas J. | 2008 | $343,200 | — | — | $113,148 | — | — | $ 7,692 | $ 464,040 |
| Goddard, CFO | 2007 | $318,001 | $ 92,400 | — | $103,694 | — | — | $38,111 | $ 552,206 |
| | 2006 | $275,004 | $ 96,250 | — | $ 93,272 | — | — | $30,839 | $ 495,365 |
| Shannon A. | 2008 | $399,360 | — | — | $130,238 | — | — | $ 7,692 | $ 537,290 |
| Millard, President | 2007 | $384,000 | $ 86,016 | — | $126,410 | — | — | $38,111 | $ 634,537 |
| of Retail Banking | 2006 | $360,000 | $115,000 | — | $124,317 | — | — | $30,839 | $ 630,156 |

**Footnotes:**

(1) Amounts calculated utilizing the provisions of Statement of Financial Accounting Standards No. 123R, "Share-based Payments." Refer to Note 1, "Summary of Significant Accounting Policies – Stock Option Plans" and Note 14, "Employee Benefit Plans" in the Notes to Consolidated Financial Statements included in the Annual Report on Form 10-K filed on February 28, 2009 for the relevant assumptions used to determine the valuation of our option awards. There were no forfeitures of stock options by these executives during the 2008 fiscal year.

(2) All cash incentive plan awards are reported for the fiscal year for which they were earned. These awards are traditionally paid during the first quarter of the following fiscal year.

(3) Present values calculated as of December 31, 2008 and December 31, 2007 using a 6.25% discount rate.

(4) Executives do not receive special perquisites or other personal benefits, and operate under the same policies and procedures as other officers and employees. In particular, officers are subject to the same travel and other expense reimbursement policies as other employees and, with the exception of the SERP for the CEO and COO, participate in the same benefit programs as other eligible employees. Under the 401(k) plan, participants are permitted to make contributions on a pre-tax basis up to the IRS limitation, a portion of which is matched by us. One-half of an employee's contribution (up to six percent of the employee's compensation) will be matched, up to a maximum match of $6,750 for 2007 and $6,900 for 2008. Contributions to the 401(k) Plan are not permitted to be invested in our common stock. Officers are eligible to participate in our ESOP and 401(k) savings plan on the same basis as other employees. Compensation also includes a car allowance allocation.

19

## 2008 GRANTS OF PLAN-BASED AWARDS

The following table sets forth certain information with respect to the awards granted during or for the fiscal year ended December 31, 2008 to each of our executive officers listed in the Summary Compensation Table above.

| Name | Grant Date [1] | Estimated Future Payouts Under Non-Equity Incentive Plan Awards [2] | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards Number of Securities Underlying Shares of Stock Units | All Other Option Awards Number of Securities Under-lying Options | Exercise or Base Price of Option Awards | Grant of Fair Vale of Stock & Option Awards [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | | ($/Sh) | ($) |
| Babette E. Heimbuch | 1/25/08 | $ 0 | $150,000 | — | — | 29,000 | 29,000 | — | — | $ 36.07 | $327,700 |
| James P. Giraldin | 1/25/08 | $ 0 | $106,650 | $106,650 | — | 19,500 | 19,500 | — | — | $ 36.07 | $220,350 |
| David W. Anderson | 1/25/08 | $ 0 | $ 70,669 | $ 70,669 | — | 11,700 | 11,700 | — | — | $ 36.07 | $132,210 |
| Douglas J. Goddard | 1/25/08 | $ 0 | $ 70,669 | $ 70,669 | — | 11,700 | 11,700 | — | — | $ 36.07 | $132,210 |
| Shannon A. Millard | 1/25/08 | $ 0 | $ 82,268 | $ 82,268 | — | 11,700 | 11,700 | — | — | $ 36.07 | $132,210 |

(1) Options to purchase common stock were granted under the plan, which provides for the granting of options at an exercise price equal to the fair market value of common stock on the grant date. "Fair market value" is defined as the closing price of common stock on the grant date. All options granted become exercisable 20%, 40% and 40% on the second, fourth and sixth anniversary dates of the date of grant, respectively. The exercise price may be paid by delivery of already owned shares, subject to certain conditions. All options were granted for terms of 10 years, subject to earlier termination in certain events related to termination of employment.

(2) Estimated non-equity incentive plan target awards are for the fiscal year ending December 31, 2008, based on annual salaries for the named individuals. Target and maximum amounts assume achievement of 100% of goals. The CEO's non-equity incentive plan maximum is based upon the Executive Incentive Bonus Plan. Other than under this plan, which currently applies only to the CEO, there are no maximum award amounts, and the Compensation Committee has discretion to recommend a non-equity incentive plan award which is greater than the target award. As described in "Compensation Discussion and Analysis" above, due to the Company's financial position, its current regulatory position and the loss of stockholder value in 2008, no non-equity incentive plan awards were made for the 2008 fiscal year.

(3) Refer to Note 1, "Summary of Significant Accounting Policies – Stock Option Plans" and Note 14, "Employee Benefit Plans" in the Notes to Consolidated Financial Statements included in the 2008 Annual Report on Form 10-K for the relevant assumptions used to determine the valuation of our option awards.

20

## 2008 OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END

| Name | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date |
|---|---|---|---|---|
| Babette E. Heimbuch | 20,150 | — | $ 16.125 | 1/27/2009 |
| | 23,950 | — | $ 13.125 | 1/26/2010 |
| | 11,850 | — | $ 31.4375 | 1/24/2011 |
| | 13,800 | — | $ 26.75 | 1/24/2012 |
| | 8,724 | 5,816 | $ 30.02 | 2/26/2013 |
| | 9,000 | 6,000 | $ 43.00 | 2/24/2014 |
| | 5,400 | 21,600 | $ 52.47 | 1/26/2015 |
| | 6,000 | 24,000 | $ 59.20 | 2/23/2016 |
| | — | 20,000 | $ 67.26 | 1/26/2017 |
| | — | 29,000 | $ 36.07 | 1/25/2018 |
| James P. Giraldin | 12,800 | — | $ 16.125 | 1/27/2009 |
| | 8,000 | — | $ 31.4375 | 1/24/2011 |
| | 9,300 | — | $ 26.75 | 1/24/2012 |
| | 5,886 | — | $ 30.02 | 2/26/2013 |
| | 6,000 | 4,000 | $ 43.00 | 2/24/2014 |
| | 3,600 | 14,400 | $ 52.47 | 1/26/2015 |
| | 4,000 | 16,000 | $ 59.20 | 2/23/2016 |
| | — | 13,334 | $ 67.26 | 1/26/2017 |
| | — | 19,500 | $ 36.07 | 1/25/2018 |
| David W. Anderson | 1,000 | 4,000 | $ 52.47 | 1/26/2015 |
| | 1,400 | 5,600 | $ 59.20 | 2/23/2016 |
| | — | 4,000 | $ 67.26 | 1/26/2017 |
| | — | 11,700 | $ 36.07 | 1/25/2018 |
| Douglas J. Goddard | 5,900 | — | $ 16.125 | 1/27/2009 |
| | 6,775 | — | $ 13.125 | 1/26/2010 |
| | 3,350 | — | $ 31.4375 | 1/24/2011 |
| | 4,000 | — | $ 26.75 | 1/24/2012 |
| | 1,959 | 1,306 | $ 30.02 | 2/26/2013 |
| | 2,160 | 1,440 | $ 43.00 | 2/24/2014 |
| | 1,000 | 4,000 | $ 52.47 | 1/26/2015 |
| | 1,400 | 5,600 | $ 59.20 | 2/23/2016 |
| | — | 4,000 | $ 67.26 | 1/26/2017 |
| | — | 11,700 | $ 36.07 | 1/25/2018 |
| Shannon A. Millard | 2,360 | — | $ 16.125 | 1/27/2009 |
| | 3,320 | — | $ 13.125 | 1/26/2010 |
| | 4,100 | — | $ 31.4375 | 1/24/2011 |
| | 5,000 | — | $ 26.75 | 1/24/2012 |
| | 3,915 | 2,610 | $ 30.02 | 2/26/2013 |
| | 2,160 | 1,440 | $ 43.00 | 2/24/2014 |
| | 1,400 | 5,600 | $ 52.47 | 1/26/2015 |
| | 1,800 | 7,200 | $ 59.20 | 2/23/2016 |
| | — | 4,000 | $ 67.26 | 1/26/2017 |
| | — | 11,700 | $ 36.07 | 1/25/2018 |

Options become exercisable in installments as follows: 20% on the second anniversary date of grant, an additional 40% on the fourth anniversary date of grant, and the remaining 40% on the sixth anniversary date of grant. Options expire ten years after the date of grant.

21

## 2008 OPTION EXERCISES AND STOCK VESTED

| | Option Awards | |
|---|---|---|
| NAME | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($)[1] |
| Babette E. Heimbuch | 3,766 | $ 85,677 |
| James P. Giraldin | 12,100 | $ 228,690 |

(1) Represents the difference between the exercise price and the fair market value of the common stock on the date of exercise.

## 2008 PENSION BENEFITS

| Name | Plan Name | Number of Years Credited Service (#) | Present Value of Accumulated Benefit ($) | Payments During Last Fiscal Year ($) |
|---|---|---|---|---|
| Babette E. Heimbuch | Supplemental Executive Retirement Plan | 26 | $ 8,562,982 [1] | - 0 - |
| James P. Giraldin | Supplemental Executive Retirement Plan | 16 | $ 5,888,764[1] | - 0 - |

(1) Present values calculated as of December 31, 2008 using a 6.25% discount rate. The benefits shown above, which are aggregate numbers, assume that annual benefits are payable for life beginning at age 60. The accumulated benefits shown above are calculated as if the executives terminated their employment on December 31, 2008, and then begin receiving payments for life at age 60. The projected benefits at age 60 are calculated assuming the executives remain employed until age 60 at their current pay level. Refer to Note 14, "Employee Benefit Plans," in the Notes to Consolidated Financial Statements included in the 2008 Annual Report on Form 10-K for the relevant assumptions used to determine the present value of the benefits under the SERP.

22

## 2008 DIRECTOR COMPENSATION

| Name [1] | Fees Earned or Paid in Cash ($) | Stock Awards ($) [2] | Option Awards ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation ($)(3) | Total ($) |
|---|---|---|---|---|---|---|
| Gisselle Acevedo | $55,100 | $60,000 | — | — | — | $115,100 |
| Brian E. Argrett | $62,600 | $60,000 | — | — | — | $122,600 |
| Nicholas C. Biase[4] | $22,170 | — | — | — | — | $ 22,170 |
| Jesse Casso, Jr. | $59,600 | $60,000 | — | — | — | $119,600 |
| Christopher M. Harding | $57,000 | $60,000 | — | — | $ 7,750 [3 & 5] | $124,750 |
| William G. Ouchi | $64,600 | $60,000 | — | — | $ 10,000 [3] | $134,600 |
| William P. Rutledge | $69,600 | $60,000 | — | — | — | $129,600 |
| Steven L. Soboroff | $57,100 | $60,000 | — | — | — | $117,100 |

(1) Babette E. Heimbuch, our CEO, and James P. Giraldin, our COO and President, both directors of our Company, have been omitted from this table since they are employees and receive no compensation for serving on the board.

(2) Amounts calculated utilizing the provisions of Statement of Financial Accounting Standards (SFAS) No. 123R, "Share-based Payments." Refer to Note 14, "Employee Benefit Plans," in the Notes to Consolidated Financial Statements included in the 2008 Annual Report on Form 10-K for additional information regarding these option awards. The full grant date fair value of the stock option awarded to each nonemployee director, computed in accordance with SFAS No. 123R, is $60,000.

(3) All Other Compensation includes matching charitable contributions made under our director matching contribution program.

(4) Mr. Biase joined the board in July 2008.

(5) Mr. Harding's compensation includes $3,750, which is our 2008 contribution to the annual premium on a life insurance policy of which the Bank is the primary beneficiary. The remainder of the premium is paid through paid-up additions in the policy.

Our directors receive compensation for serving on the board of the Bank, and do not receive separate compensation for serving on our board. Officers who are directors receive no compensation for serving on the board. For 2008, outside directors received annual directors' retainer fees of $40,000 and also received meeting fees for each regular board meeting attended. Members of board committees also received additional fees for attending regular committee meetings. Committee Chairs also receive a fee for performing that function.

The First Federal Bank of California 1997 Nonemployee Director Stock Incentive Plan, under which each nonemployee director received an annual grant of nonstatutory stock options to acquire 4,000 shares of common stock, was terminated in April 2006 upon approval by the stockholders of the 2007 Nonemployee Directors Restricted Stock Plan. Under this plan, nonemployee directors receive compensation in the form of shares of restricted common stock equal in value to 150% of the then-current retainer fee. Stock value is calculated at the fair market value of common stock on the date of the grant. During the year ended December 31, 2008, each director received 1,670 restricted shares of common stock based on a fair market value of $36.07 per share as of the date of grant, January 25, 2008. Due to our financial performance, our current regulatory position and the loss of stockholder value in 2008, our board suspended automatic grants under the plan; as such, no shares of restricted stock to the nonemployee directors were granted in 2008.

23

## EQUITY COMPENSATION PLAN

The following table provides information as of December 31, 2008 with respect to compensation plans (including compensation arrangements) under which equity securities are authorized for issuance. We have no equity compensation plans not approved by security holders.

| Plan Category | | Number of securities remaining to be issued upon exercise of outstanding options (#) <br> (a) | Weighted-average exercise price of outstanding options in column (a) ($) <br> (b) | Number of securities available for future issuance under equity comp. plans (excluding securities reflected in Column (a)) (#) <br> (c) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders | 1) Employee | 744,807 | $ 43.01 | 1,669,765 |
| | 2) Nonemployee Directors | 104,000 | $ 37.37 | 182,010[1] |
| Equity compensation plans not approved by security holders | | N/A | N/A | N/A |
| Total | | 848,807 | $ 42.32 | 1,851,775 |

(1) The Nonemployee Directors Stock Incentive Plan terminated in 2006 upon approval by stockholders of the 2007 Nonemployee Directors Restricted Stock Plan. This restricted stock plan has 200,000 shares reserved for issuance; 6,300 shares were awarded during 2007 and 11,690 shares were awarded during 2008 under the restricted stock plan. No shares of restricted stock were granted in 2009.

24

## AUDIT COMMITTEE REPORT

*The information in the Report of the Audit Committee is "furnished" and not "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of that section. Such information is only incorporated by reference in another filing under the Securities Exchange Act of 1934 or the Securities Act of 1933 only if and to the extent such subsequent filing specifically references such information.*

The board has appointed an Audit Committee consisting of the undersigned directors. Each of the members of the Audit Committee is independent as defined under the New York Stock Exchange's listing standards and under the Securities Exchange Act of 1934. The board has adopted and the Audit Committee operates under a written charter with respect to its roles and responsibilities.

Among other things, the Audit Committee has the delegated authority to provide independent, objective oversight of the Company's internal and independent auditors and matters relating to accounting, financial reporting, internal controls and auditing. Management has the primary responsibility for the financial statements and the reporting process, including the system of internal controls. The Audit Committee periodically reviews the Company's internal auditing, accounting and financial controls and policies governing compliance with laws, regulations, rules of ethics and conflicts of interest.

In fulfilling its oversight responsibilities, the Audit Committee reviewed and discussed audited financial statements for the fiscal year ended December 31, 2008 with the Company's management and Grant Thornton LLP, independent auditors. The Audit Committee also discussed with Grant Thornton LLP the matters required to be discussed by Statement on Auditing Standards No. 61 (Communications with Audit Committees). The Audit Committee has received the written disclosures and the letter from Grant Thornton LLP required by applicable rules of the Public Company Accounting Oversight Board and the Audit Committee discussed the independence of Grant Thornton LLP with that firm.

In reliance on the reviews and discussions referred to above, the Audit Committee recommended to the board that, and the board approved, the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 for filing with the Securities and Exchange Commission. The Audit Committee has appointed, and the board has ratified and recommended for stockholder ratification, Grant Thornton LLP as the Company's independent auditors for fiscal year 2009.

Respectfully Submitted,

THE AUDIT COMMITTEE

William P. Rutledge (Chair)
Brian E. Argrett
Jesse Casso, Jr.
William G. Ouchi

## INDEPENDENT PUBLIC ACCOUNTANTS

**Appointment of Independent Auditors**

The Audit Committee has appointed Grant Thornton LLP as our independent auditors for the fiscal year ending December 31, 2009.

**Fees**

The following table sets forth the aggregate fees billed or estimated to be billed for services rendered to us for the fiscal years ended December 31, 2008 and December 31, 2007 by Grant Thornton LLP.

|  | 2008 | 2007 |
|---|---|---|
| Audit Fees (1): | $1,065,000 | $673,844 |
| Audit-Related Fees (2): | $ - 0 - | $ - 0 - |
| Tax Fees (3): | $ - 0 - | $ - 0 - |
| All Other Fees (4): | $ - 0 - | $ - 0 - |
| Total Fees: | $1,065,000 | $673,844 |

(1)  Audit fees represent aggregate fees charged for annual audits and quarterly reviews. Audit fees in 2008 and 2007 also include audit services related to compliance with Section 404 of the Sarbanes-Oxley Act of 2002.

(2)  Audit-related fees consist of aggregate fees charged for assurance and related services that are reasonably related to the performance of the audit and are not reported as Audit fees.

(3)  Tax fees consist of aggregate fees charged for professional services for tax compliance, tax advice, and tax planning.

(4)  All other fees represent aggregate fees charged for products and services other than those services previously reported.

Grant Thornton has not been approved by the Audit Committee to perform any non-audit services during the 2009 fiscal year.

**Audit Committee Preapproval Policy**

All services to be performed for us by Grant Thornton must be preapproved by the Audit Committee or a designated member of the Audit Committee as provided in the Committee's written pre-approval policies.

## PROPOSAL 2
## RATIFICATION OF APPOINTMENT OF INDEPENDENT AUDITORS

The Audit Committee has appointed Grant Thornton LLP as our independent auditors for 2009. This appointment was ratified by our board on January 28, 2009. Our stockholders are requested to ratify this appointment. A representative of Grant Thornton LLP is expected to be present at the annual meeting with the opportunity to make a statement if he or she desires and to respond to appropriate questions.

Although stockholder ratification is not required, the appointment of Grant Thornton LLP is being submitted for ratification at the annual meeting with a view towards soliciting stockholders' opinions, which the Audit Committee will take into account in future deliberations. If Grant Thornton LLP's appointment is not ratified at the annual meeting, the Audit Committee will consider the engagement of other independent auditors. The Audit Committee may terminate the engagement of Grant Thornton LLP as our independent auditors without the approval of stockholders whenever the Audit Committee determines that termination is appropriate.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE FOR THE RATIFICATION OF GRANT THORNTON LLP AS OUR INDEPENDENT AUDITORS FOR 2009.**

26

Definitive Proxy Statement

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934 requires executive officers and directors and persons who beneficially own more than ten percent (10%) of our stock to file initial reports of ownership and reports of changes in ownership with the SEC. Executive officers, directors and greater than ten percent (10%) beneficial owners are required by SEC regulations to furnish us with copies of all Section 16(a) forms they file.

Based solely on our review of the copies of such forms furnished to us and written representations from the executive officers and directors, we believe that all Section 16(a) filing requirements applicable to our executive officers, directors and greater than ten percent (10%) beneficial owners were satisfied in a timely manner.

## AVAILABILITY OF INFORMATION

Stockholders may access our corporate governance principles, the current charters for the Audit, Compensation and Governance & Nominating Committees, and our Code of Ethical Conduct in the About Us - Corporate Governance section of our website at www.firstfedca.com. Any stockholder wishing a written copy of any of these documents may obtain one at no charge by written request to our Corporate Secretary at our corporate headquarters.

## STOCKHOLDER PROPOSALS

Any stockholder wishing to have a proposal considered for inclusion in our 2010 proxy solicitation materials must set forth such proposal in writing and file it with our Corporate Secretary on or before December 22, 2009. The proposals must comply in all respects with the rules and regulations of the SEC. Stockholder proposals not included in our 2010 proxy solicitation materials must, in order to be considered at the 2010 annual meeting, be submitted in writing to our Corporate Secretary no earlier than January 22, 2010 nor later than February 22, 2010.

Our board of directors will review any stockholder proposals that are filed and comply with our bylaws and applicable law and will determine whether such proposals meet applicable criteria for inclusion in our 2010 proxy solicitation materials for consideration at the 2010 annual meeting.

## ANNUAL REPORT

UPON WRITTEN REQUEST OF ANY STOCKHOLDER SOLICITED HEREBY, WE WILL PROVIDE FREE OF CHARGE A COPY OF OUR 2008 ANNUAL REPORT ON FORM 10-K AND/OR THIS 2009 PROXY STATEMENT AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION. REQUESTS SHOULD BE DIRECTED TO CORPORATE SECRETARY, FIRSTFED FINANCIAL CORP., 12555 WEST JEFFERSON BOULEVARD, LOS ANGELES, CALIFORNIA 90066.

We make available free of charge our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and all amendments to such reports filed pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 on our website at www.firstfedca.com as soon as reasonably practicable after filing with the SEC.

By Order of the Board of Directors

/s/ Vikas Arora
Vikas Arora, *Corporate Secretary*

27

# Exhibit B

840295901.481.06.0001

Form **5500**

Department of the Treasury
Internal Revenue Service
Department of Labor
Employee Benefits Security
Administration
Pension Benefit
Guaranty Corporation

## Annual Return/Report of Employee Benefit Plan

This form is required to be filed under sections 104 and 4065 of the Employee
Retirement Income Security Act of 1974 (ERISA) and sections 6047(e),
6057(b), and 6058(a) of the Internal Revenue Code (the Code).

▶ **Complete all entries in accordance with
the instructions to the Form 5500.**

Official Use Only
OMB Nos. 1210-0110 / 1210-0089

**2008**

This Form is Open to
Public Inspection.

**Part I**   Annual Report Identification Information

For the calendar plan year 2008
or fiscal plan year beginning                                                    and ending

A   This return/report is for:   (1)   a multiemployer plan;   (3)   a multiple-employer plan; or

(2)   **X**   a single-employer plan (other than   (4)   a DFE (specify) . .. ...............
a multiple-employer plan);

B   This return/report is:   (1)   the first return/report filed for the plan;   (3)   the final return/report filed for the plan;

(2)   an amended return/report;   (4)   a short plan year return/report
(less than 12 months).

C   If the plan is a collectively-bargained plan, check here ......................................... ....... .................................. ....... .. .. ........................ ▶

D   If filing under an extension of time or the DFVC program, check box and attach required information. (see instructions) ..... .. .......... ▶

**Part II**   Basic Plan Information — enter all requested information.

1a   Name of plan

FIRST  FEDERAL  BANK  OF  CALIFORNIA
EMPLOYEE  STOCK  OWNERSHIP  PLAN

1b   Three-digit plan number (PN) ▶   **002**        1c   Effective date of plan   **02  01  1960**

Caution: *A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.*

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying
schedules, statements and attachments, as well as the electronic version of this return/report if it is being filed electronically, and to the best of my
knowledge and belief, it is true, correct and complete.

Signature of plan administrator

**SIGN HERE** ▶ _____   Date   **07  27  2009**

Type or print name of individual signing as plan administrator

▪   VIKAS  ARORA

Signature of employer/plan sponsor/DFE

**SIGN HERE** ▶ _____   Date   **07  27  2009**

Type or print name of individual signing as employer, plan sponsor or DFE

b   BRENDA J  BATTEY

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.   Cat. No. 13500F   Form **5500** (2008)

0  1  0  8  0  0  0  1  0  A

v11.3

Form 5500 (2008)                                                              Page **2**

Official Use Only

**2a**  Plan sponsor's name and address (employer, if for single-employer plan) (Address should include room or suite no.)

**1)**  F I R S T   F E D E R A L   B A N K   O F   C A L I F O R N I A

**2)**  c / o

**3)**  1 2 5 5 5   W.   J E F F E R S O N   B L V D

**4)**  L O S   A N G E L E S                          **2b**  Employer Identification Number (EIN)

**5)**  C A   9 0 0 6 6 - 7 0 3 6                       9 5   1 1 9 2 0 1 5

**6)**                              **2c**  Sponsor's telephone
                                         number         3 1 0   3 0 2   5 6 0 0

**7)**                              **2d**  Business code
                                    (see instructions)  5 2 2 1 2 0

**8)**

**9)**

**3a**  Plan administrator's name and address (if same as plan sponsor, enter "Same")

**1)**  S A M E

**2)**  c / o

**3)**

**4)**                                           **3b**  Administrator's EIN

**5)**                                              9 5   4 2 1 6 2 3 1

**6)**                                           **3c**  Administrator's telephone number

**7)**                                              3 1 0   3 0 2   5 6 0 0

**4**  If the name and/or EIN of the plan sponsor has changed since the last return/report filed for this plan, enter the name, EIN and the plan number from the last return/report below:

**a**  Sponsor's name

**b**  EIN                                  **c**  PN

0 1 0 8 0 0 0 2 0 B

840295901.481.06.0002

Form 5500 (2008) | Page **3**

Official Use Only

**5** Preparer information (optional)

**a** Name (including firm name, if applicable) and address

1)

2)

3)                                                                 **b**   EIN

4)

5)                                                                 **c**   Telephone number

6)

**6** Total number of participants at the beginning of the plan year .............................. ...... ............... ....   442

**7** Number of participants as of the end of the plan year (welfare plans complete only lines 7a, 7b, 7c, and 7d)

**a** Active participants..................................................................................................................................................   502

**b** Retired or separated participants receiving benefits....................................................................................................   0

**c** Other retired or separated participants entitled to future benefits ................. .. .............. ..............................   0

**d** Subtotal. Add lines 7a, 7b, and 7c .................................. .... ... .... . . -- ... .... -- ... ..........................   502

**e** Deceased participants whose beneficiaries are receiving or are entitled to receive benefits ... .. ..... .. .......   0

**f** Total. Add lines 7d and 7e ............... ............................ ... . ............ . ... . ....................................... ........ .......   502

**g** Number of participants with account balances as of the end of the plan year (only defined contribution plans complete this item) ............................ ............... ..... .. ..   500

**h** Number of participants that terminated employment during the plan year with accrued benefits that were less than 100% vested ............................................. ... .. ... ............................. ..............................   159

**i** If any participant(s) separated from service with a deferred vested benefit, enter the number of separated participants required to be reported on a Schedule SSA (Form 5500) ....................... .... .. .... .. ...   0

0 1 0 8 0 0 0 3 0 C



Form 5500 (2008)                                                                Page **4**

Official Use Only

**8**  Benefits provided under the plan (complete 8a and 8b, as applicable)

**a**  X  Pension benefits  (check this box if the plan provides pension benefits and enter below the applicable pension feature codes from the List of Plan Characteristics Codes printed in the instructions):

2 P

**b**  Welfare benefits  (check this box if the plan provides welfare benefits and enter below the applicable welfare feature codes from the List of Plan Characteristics Codes printed in the instructions):

**9a**  Plan funding arrangement (check all that apply)          **9b**  Plan benefit arrangement (check all that apply)

| | | | | | |
|---|---|---|---|---|---|
| (1) | | Insurance | (1) | | Insurance |
| (2) | | Code section 412(e)(3) insurance contracts | (2) | | Code section 412(e)(3) insurance contracts |
| (3) | X | Trust | (3) | X | Trust |
| (4) | | General assets of the sponsor | (4) | | General assets of the sponsor |

**10**  Schedules attached (Check all applicable boxes and, where indicated, enter the number attached. See instructions.)

**a Pension Benefit Schedules**                                      **b Financial Schedules**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1) | X | R | (Retirement Plan Information) | 1) | X | H | (Financial Information) |
| 2) | | B | (Actuarial Information) | 2) | | I | (Financial Information--Small Plan) |
| 3) | X | E | (ESOP Annual Information) | 3) | | A | (Insurance Information) |
| 4) | | SSA | (Separated Vested Participant Information) | 4) | X | C | (Service Provider Information) |
| | | | | 5) | | D | (DFE/Participating Plan Information) |
| | | | | 6) | | G | (Financial Transaction Schedules) |

0  1  0  8  0  0  0  4  0  D

GPO: U S GOVERNMENT PRINTING OFFICE: 2008—341—601

840295901.481.06.0003

## SCHEDULE C
**(Form 5500)**

Department of the Treasury
Internal Revenue Service

Department of Labor
Employee Benefits Security Administration

Pension Benefit Guaranty Corporation

# Service Provider Information

This schedule is required to be filed under section 104 of the
Employee Retirement Income Security Act of 1974.

▶ **File as an attachment to Form 5500.**

Official Use Only

OMB No. 1210-0110

## 2008

**This Form is Open to
Public Inspection.**

For calendar plan year 2008
or fiscal plan year beginning _____ and ending _____

**A**  Name of plan

FIRST FEDERAL BANK OF CALIFORNIA
EMPLOYEE STOCK OWNERSHIP PLAN

**B**  Three-digit
plan number  ▶  **002**

**C**  Plan sponsor's name as shown on line 2a of Form 5500

FIRST FEDERAL BANK OF CALIFORNIA

**D**  Employer Identification Number

95  1192015

---

**Part I**  **Service Provider Information (see instructions)**

**1**  Enter the total dollar amount of compensation paid by the plan to all persons,
other than those listed below, who received compensation during the plan year:..........

**2**  On the first item below list the contract administrator, if any, as defined in the instructions. On the other items, list service providers in
descending order of the compensation they received for the services rendered during the plan year. List only the top 40. 103-12 IEs should
enter N/A in (c) and (d).

(a)  Name

N / A

(b)  Employer identification number (see instructions)

(c)  Official plan position              C o n t r a c t   a d m i n i s t r a t o r

(d)  Relationship to employer,
employee organization, or person
known to be a party-in-interest

(e)  Gross salary or allowances paid by plan       (f)  Fees and commissions paid by plan       (g)  Nature of service code(s)
(see
instructions)  **1 2**

(a)  Name

(b)  Employer identification number (see instructions)

(c)  Official plan position

(d)  Relationship to employer,
employee organization, or person
known to be a party-in-interest

(e)  Gross salary or allowances paid by plan       (f)  Fees and commissions paid by plan       (g)  Nature of service code(s)
(see
instructions)

**For Paperwork Reduction Act Notice and OMB Control Numbers, see the Instructions for Form 5500. Cat. No. 13515E  Schedule C (Form 5500) 2008**

0 9 0 8 0 0 0 1 0 1



v11.3

Schedule C (Form 5500) 2008        **Page 2**

Official Use Only

**(a)** Name

**(b)** Employer identification number (see instructions)

**(c)** Official plan position

**(d)** Relationship to employer, employee organization, or person known to be a party-in-interest

**(e)** Gross salary or allowances paid by plan     **(f)** Fees and commissions paid by plan     **(g)** Nature of service code(s) (see instructions)

**(a)** Name

**(b)** Employer identification number (see instructions)

**(c)** Official plan position

**(d)** Relationship to employer, employee organization, or person known to be a party-in-interest

**(e)** Gross salary or allowances paid by plan     **(f)** Fees and commissions paid by plan     **(g)** Nature of service code(s) (see instructions)

**(a)** Name

**(b)** Employer identification number (see instructions)

**(c)** Official plan position

**(d)** Relationship to employer, employee organization, or person known to be a party-in-interest

**(e)** Gross salary or allowances paid by plan     **(f)** Fees and commissions paid by plan     **(g)** Nature of service code(s) (see instructions)

**(a)** Name

**(b)** Employer identification number (see instructions)

**(c)** Official plan position

**(d)** Relationship to employer, employee organization, or person known to be a party-in-interest

**(e)** Gross salary or allowances paid by plan     **(f)** Fees and commissions paid by plan     **(g)** Nature of service code(s) (see instructions)



0 9 0 8 0 0 0 2 0 J

8402959 01 . 481 . 06 . 0004

Schedule C (Form 5500) 2008                                                    Page **3**

| Part II | Termination Information on Accountants and Enrolled Actuaries (see instructions) |

Official Use Only

**(a)**
Name

**(b)** EIN                                    **(c)** Position

**(d)**
Address

**(e)** Telephone No.

E
X
P
L
A
N
A
T
I
O
N

**(a)**
Name

**(b)** EIN                                    **(c)** Position

**(d)**
Address

**(e)** Telephone No.

E
X
P
L
A
N
A
T
I
O
N



0 9 0 8 0 0 0 3 0 K

840295901.481.06.0007

## SCHEDULE H
## (Form 5500)

Department of the Treasury
Internal Revenue Service

Department of Labor
Employee Benefits Security Administration

Pension Benefit Guaranty Corporation

# Financial Information

This schedule is required to be filed under Section 104 of the Employee Retirement Income Security Act of 1974 (ERISA) and section 6058(a) of the Internal Revenue Code (the Code).

▶ File as an attachment to Form 5500.

Official Use Only

OMB No. 1210-0110

**2008**

This Form is Open to Public Inspection.

For the calendar plan year 2008
or fiscal plan year beginning _____ and ending _____

**A** Name of plan
FIRST FEDERAL BANK OF CALIFORNIA EMPLOYEE STOCK OWNERSHIP PLAN

**B** Three-digit plan number ▶ 002

**C** Plan sponsor's name as shown on line 2a of Form 5500
FIRST FEDERAL BANK OF CALIFORNIA

**D** Employer Identification Number
95 1192015

---

**Part I**   **Asset and Liability Statement**

**1** Current value of plan assets and liabilities at the beginning and end of the plan year. Combine the value of plan assets held in more than one trust. Report the value of the plan's interest in a commingled fund containing the assets of more than one plan on a line-by-line basis unless the value is reportable on lines 1c(9) through 1c(14). Do not enter the value of that portion of an insurance contract which guarantees, during this plan year, to pay a specific dollar benefit at a future date. Round off amounts to the nearest dollar. MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 1b(1), 1b(2), 1c(8), 1g, 1h, and 1i. CCTs, PSAs, and 103-12 IEs also do not complete lines 1d and 1e. See instructions.

| Assets | (a) Beginning of Year | (b) End of Year |
|---|---|---|
| **a** Total noninterest-bearing cash.............. | 0 | 0 |
| **b** Receivables (less allowance for doubtful accounts): | | |
| (1) Employer contributions ....... | 0 | 0 |
| (2) Participant contributions ....... | 0 | 0 |
| (3) Other .................. | 0 | 0 |
| **c** General investments: | | |
| (1) Interest-bearing cash (including money market accounts and certificates of deposit) .......... | 0 | 0 |
| (2) U.S. Government securities ........... | 0 | 0 |
| (3) Corporate debt instruments (other than employer securities): | | |
| (A) Preferred ...... | 0 | 0 |
| (B) All other ....... | 0 | 0 |
| (4) Corporate stocks (other than employer securities): | | |
| (A) Preferred ...... | 0 | 0 |
| (B) Common ...... | 0 | 0 |
| (5) Partnership/joint venture interests. | 0 | 0 |

For Paperwork Reduction Act Notice and OMB Control Numbers, see the Instructions for Form 5500.   Cat. No. 24420C   Schedule H (Form 5500) 2008



17 0 8 0 0 0 1 0 H

v11.3

Schedule H (Form 5500) 2008                                   Page **2**

Official Use Only

| | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|
| 1c (6) | Real estate (other than employer real property) ...... | O | O |
| (7) | Loans (other than to participants) ... | O | O |
| (8) | Participant loans. | O | O |
| (9) | Value of interest in common/ collective trusts .. | O | O |
| (10) | Value of interest in pooled separate accounts ..... | O | O |
| (11) | Value of interest in master trust investment accounts ............. | O | O |
| (12) | Value of interest in 103-12 investment entities....... | O | O |
| (13) | Value of interest in registered investment companies (e.g., mutual funds) . .. | O | O |
| (14) | Value of funds held in insurance company general account (unallocated contracts) . | O | O |
| (15) | Other.................. | O | O |
| d | Employer-related investments: | | |
| (1) | Employer securities ............ | 22596402 | 1057240 |
| (2) | Employer real property . ............ | O | O |
| e | Buildings and other property used in plan operation ............ | O | O |
| f | Total assets (add all amounts in lines 1a through 1e)... | 22596402 | 1057240 |

**Liabilities**

| | | | |
|---|---|---|---|
| g | Benefit claims payable | 1028600 | 67604 |
| h | Operating payables .... | 235251 | 0 |
| i | Acquisition indebtedness ............ .. | O | O |
| j | Other liabilities....... . .. | O | O |
| k | Total liabilities (add all amounts in lines 1g through 1j) .... | 1263851 | 67604 |

**Net Assets**

| | | | |
|---|---|---|---|
| l | Net assets (subtract line 1k from line 1f) .... | 21332551 | 989636 |



1 7 0 8 0 0 0 2 0 1

840295901.481.06.0008

Schedule H (Form 5500) 2008                                     Page 3

Official Use Only

**Part II**   **Income and Expenses Statement**

2   Plan income, expenses, and changes in net assets for the year. Include all income and expenses of the plan, including any trust(s) or separately maintained fund(s) and any payments/receipts to/from insurance carriers. Round off amounts to the nearest dollar. MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 2a, 2b(1)(E), 2e, 2f, and 2g.

**Income**

|  |  | (a) Amount | (b) Total |
|---|---|---|---|
| a Contributions: | | | |
| (1) Received or receivable in cash from: | | | |
| (A) Employers | | 243733 | |
| (B) Participants | | 0 | |
| (C) Others (including rollovers) | | 0 | |
| (2) Noncash contributions | | 0 | |
| (3) Total contributions. Add lines 2a(1)(A), (B), (C), and line 2a(2) | | | 243733 |
| b Earnings on Investments: (1) Interest: | | | |
| (A) Interest-bearing cash (including money market accounts and certificates of deposit) | | 0 | |
| (B) U.S. Government securities | | 0 | |
| (C) Corporate debt instruments | | 0 | |
| (D) Loans (other than to participants) | | 0 | |
| (E) Participant loans | | 0 | |
| (F) Other | | 0 | |
| (G) Total interest. Add lines 2b(1)(A) through (F) | | | 0 |
| (2) Dividends: | | | |
| (A) Preferred stock | | 0 | |
| (B) Common stock | | 0 | |
| (C) Total dividends. Add lines 2b(2)(A) and (B) | | | 0 |
| (3) Rents | | | 0 |
| (4) Net gain (loss) on sale of assets: | | | |
| (A) Aggregate proceeds | | 0 | |
| (B) Aggregate carrying amount (see instructions) | | 0 | |
| (C) Subtract line 2b(4)(B) from line 2b(4)(A) and enter result | | | 0 |

17080000 30 J

Schedule H (Form 5500) 2008                                   Page **4**

Official Use Only

**2b (5)** Unrealized appreciation (depreciation) of assets:                **(a)** Amount

(A) Real estate ...........................................    0

(B) Other . .....................................    – 2 0 7 6 6 4 2 8

**(b)** Total

(C) Total unrealized appreciation of assets. Add lines 2b(5)(A) and (B) ........    – 2 0 7 6 6 4 2 8

(6)  Net investment gain (loss) from common/collective trusts ..... . .......................    0

(7)  Net investment gain (loss) from pooled separate accounts ... ........................    0

(8)  Net investment gain (loss) from master trust investment accounts ....... ... ......    0

(9)  Net investment gain (loss) from 103-12 investment entities ...............................    0

(10) Net investment gain (loss) from registered investment companies
     (e.g., mutual funds)......... ......... ......................... ............................ ... ...... .. .. .......    0

c Other income.. ......... ..... .... ......... .. ........................... .. ............ ... .. ...    0

d Total income. Add all income amounts in column (b) and enter total .......................    – 2 0 5 2 2 6 9 5

### Expenses

e Benefit payment and payments to provide benefits:

(1)  Directly to participants or beneficiaries,
     including direct rollovers . .. .. ......... . .. .    – 1 8 7 8 5 0

(2)  To insurance carriers for
     the provision of benefits . ...... ............ .. ... ..    0

(3)  Other.............................................. ........... ..  ......    0

(4)  Total benefit payments  Add lines 2e(1) through (3)..........................    – 1 8 7 8 5 0

f Corrective distributions (see instructions) . .. .. ......... .. ......... ...  ...........................    0

g Certain deemed distributions of participant loans (see instructions) ... ....  . ...........    0

h Interest expense . ...  ..... ..... . . .. ...... ..... ......... .. .......................... ... ....................    8 0 7 0

I Administrative expenses.

(1)  Professional fees ......... ....... .... ............ .. ... ...    0

(2)  Contract administrator fees ..............................    0

(3)  Investment advisory and management fees...    0

(4)  Other........................ ... .. .... .... ....   ....... ........    0

(5)  Total administrative expenses. Add lines 2I(1) through (4) ....  ............................    0

J Total expenses  Add all expense amounts in column (b) and enter total ... ..  .. ......    – 1 7 9 7 8 0



1 7 0 8 0 0 0 4 0 K

840295901.481.06.0009

Schedule H (Form 5500) 2008                                    Page **5**

Official Use Only

### Net Income and Reconciliation

| | (b) Total |
|---|---|
| **2k** Net income (loss) (subtract line 2j from line 2d) ......... ... .... .... ...................... | − 2 0 3 4 2 9 1 5 |
| **l** Transfers of assets | |
| (1) To this plan ........... ........ ...... .. .. ................ .. ............... .... ......................... | 0 |
| (2) From this plan .......................... ................ .................... ... ........... | 0 |

### Part III   Accountant's Opinion

**3**  Complete lines 3a through 3c if the opinion of an independent qualified public accountant is attached to this Form 5500. Complete line 3d if an opinion is not attached.

**a**  The attached opinion of an independent qualified public accountant for this plan is (see instructions):

(1)  X  Unqualified      (2)      Qualified      (3)      Disclaimer      (4)      Adverse

**b**  Did the accountant perform a limited scope audit pursuant to 29 CFR 2520.103-8 and/or 103-12(d)? ................    Yes    X   No

**c**  Enter the name and EIN of the accountant (or accounting firm).

Name

▶  MEIR 8 MEIR CPA

EIN  95 4359536

**d**  The opinion of an independent qualified public accountant is not attached because:

(1)      this form is filed for a CCT, PSA or MTIA.    (2)      it will be attached to the next Form 5500 pursuant to 29 CFR 2520.104-50.

### Part IV   Transactions During Plan Year

**4**  CCTs and PSAs do not complete Part IV.  MTIAs, 103-12 IEs, and GIAs do not complete 4a, 4e, 4f, 4g, 4h, 4k, or 5  103-12 IEs also do not complete 4j.

| During the plan year | Yes | No | Amount |
|---|---|---|---|
| **a**  Did the employer fail to transmit to the plan any participant contributions within the time period described in 29 CFR 2510.3-102? (See instructions and DOL's Voluntary Fiduciary Correction Program.) ........... ..... ... | | X | |
| **b**  Were any loans by the plan or fixed income obligations due the plan in default as of the close of the plan year or classified during the year as uncollectible? Disregard participant loans secured by the participant's account balance. (Attach Schedule G (Form 5500) Part I if "Yes" is checked.) .... .. ... .... ... | | X | |
| **c**  Were any leases to which the plan was a party in default or classified during the year as uncollectible? (Attach Schedule G (Form 5500) Part II if "Yes" is checked.) ...................... | | X | |
| **d**  Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 4a. Attach Schedule G (Form 5500) Part III if "Yes" is checked.) . .... ... . .... | | X | |
| **e**  Was this plan covered by a fidelity bond? ........................................ | X | | 1 0 0 0 0 0 0 0 |



170800005 0 L

Official Use Only

|  | Yes | No | Amount |
|---|---|---|---|

**4 f** Did the plan have a loss, whether or not reimbursed by the
plan's fidelity bond, that was caused by fraud or dishonesty? ...... — **X**

**g** Did the plan hold any assets whose current value was neither
readily determinable on an established market nor set by an
independent third party appraiser? ........................................... — **X**

**h** Did the plan receive any noncash contributions whose value was
neither readily determinable on an established market nor set by
an independent third party appraiser? ...................................... — **X**

**i** Did the plan have assets held for investment? (Attach schedule(s)
of assets if "Yes" is checked, and see instructions for format
requirements.) ...... ....... ................................................ **X**

**j** Were any plan transactions or series of transactions in excess
of 5% of the current value of plan assets? (Attach schedule of
transactions if "Yes" is checked and see instructions for format
requirements.) ............ ........... ................ .................... — **X**

**k** Were all the plan assets either distributed to participants or
beneficiaries, transferred to another plan, or brought under the
control of the PBGC? .................... ............. .................... — **X**

**5a** Has a resolution to terminate the plan been adopted during the
plan year or any prior plan year? If yes, enter the amount of any
plan assets that reverted to the employer this year ................ .. — **X**

**5b** If, during this plan year, any assets or liabilities were transferred from this plan to another plan(s), identify the plan(s) to which assets or
liabilities were transferred. (See instructions).

**5b(1)** Name of plan

|  |  |
|---|---|
| **5b(2)** EIN | **5b(3)** PN |

**5b(1)** Name of plan

|  |  |
|---|---|
| **5b(2)** EIN | **5b(3)** PN |

**5b(1)** Name of plan

|  |  |
|---|---|
| **5b(2)** EIN | **5b(3)** PN |

**5b(1)** Name of plan

|  |  |
|---|---|
| **5b(2)** EIN | **5b(3)** PN |

1 7 0 8 0 0 0 6 0 M

840295901.481.06.0010

## SCHEDULE R
**(Form 5500)**

Department of the Treasury
Internal Revenue Service
Department of Labor
Employee Benefits Security Administration
Pension Benefit Guaranty Corporation

# Retirement Plan Information

This schedule is required to be filed under sections 104 and 4065 of the
Employee Retirement Income Security Act of 1974 (ERISA) and section 6058(a)
of the Internal Revenue Code (the Code).

▶ File as an Attachment to Form 5500.

Official Use Only

OMB No. 1210-0110

## 2008

This Form is Open to
Public Inspection.

For the calendar plan year 2008
or fiscal plan year beginning _____ and ending _____

**A** Name of plan

FIRST FEDERAL BANK OF CALIFORNIA
EMPLOYEE STOCK OWNERSHIP PLAN

**B** Three-digit
plan number  ▶  002

**C** Plan sponsor's name as shown on line 2a of Form 5500

FIRST FEDERAL BANK OF CALIFORNIA

**D** Employer Identification Number

95 1192015

---

**Part I**   **Distributions**

All references to distributions relate only to payments of benefits during the plan year.

1  Total value of distributions paid in property other than in cash
or the forms of property specified in the instructions ................................................   0

2  Enter the EIN(s) of payor(s) who paid benefits on behalf of the plan to
participants or beneficiaries during the plan year (if more than two, enter     }  ................   95 1192015
EINs of the two payors who paid the greatest dollar amounts of benefits).

Profit-sharing plans, ESOPs, and stock bonus plans, skip line 3.

3  Number of participants (living or deceased) whose benefits were distributed in a single
sum, during the plan year ....................................................................................

---

**Part II**   **Funding Information** (If the plan is not subject to the minimum funding requirements of section 412 of the
Internal Revenue Code or ERISA section 302, skip this Part)

|  |  | Yes | No | N/A |
|---|---|---|---|---|

4  Is the plan administrator making an election under Code section 412(d)(2) or
ERISA section 302(d)(2)? .................................................................................
If the plan is a defined benefit plan, go to line 7.

5  If a waiver of the minimum funding standard for a prior plan year is being amortized in this
plan year, see instructions, and enter the date of the ruling letter granting the waiver ...............  ▶

If you completed line 5, complete lines 3, 9, and 10 of Schedule MB and
do not complete the remainder of this schedule.

6a  Enter the minimum required contribution for this plan year ... ...............................

b  Enter the amount contributed by the employer to the plan for this plan year .........

c  Subtract the amount in line 6b from the amount in line 6a. Enter the result
(enter a minus sign to the left of a negative amount) ................. ................. ..............
If you completed line 6c, skip lines 7 and 8 and complete line 9.

For Paperwork Reduction Act Notice and OMB Control Numbers, see the Instructions for Form 5500. Cat. No. 24419B  Schedule R (Form 5500) 2008



2 1 0 8 0 0 0 1 0 C

v11.3

Schedule R (Form 5500) 2008 _____ Page **2**

Official Use Only

**7** If a change in actuarial cost method was made for this plan year pursuant to a revenue procedure providing automatic approval for the change or a class ruling letter, does the plan sponsor or plan administrator agree with the change? . . . .. ...... ...    Yes        No        N/A

**Part III   Amendments**

**8** If this is a defined benefit pension plan, were any amendments adopted during this plan year that increased or decreased the value of benefits? If yes, check the appropriate box(es). If no, check the "No" box. (See instructions.) ,..... ... . .... .. .. ........ .    Increase        Decrease   **X**   No

**Part IV   Coverage (See instructions.)**

**9** Check the box for the test this plan used to satisfy the coverage requirements:

**X** ratio percentage test                                        average benefit test



2 1 0 8 0 0 0 2 0 D

8 40295901.481.06.

# FIRST FEDERAL BANK
## OF CALIFORNIA

Corporate Office: 12555 West Jefferson Boulevard • Los Angeles, CA 90066-7036 • (310) 302-5600

July, 27 2009

EBSA (PWBA)
P.O. Box 7043
Lawrence, Kansas 66044-7043

RE:     Form 5500 for First Federal Bank of California
        Employee Stock Ownership Plan
        Plan No. 02
        EIN No. 95-11902015

Certified Mail# 7008 1300 0001 9791 9654

Ladies and Gentlemen:

Enclosed please find the completed Form 5500 for the First Federal Bank of California Employee Stock Ownership Plan for the year ended December 31, 2008. Also enclosed are the financial statements for the same period (with the auditors' report thereon.)

You may contact me at 310-302-1803 if you have any questions.  Thank you.

Sincerely,

Brenda Battey
SVP, Controller

Cc:     Doug Goddard
        Sachi Makita
        Christine Dempsey
        (2) Meir and Meir, CPA's

840295901.481.06.0013

**FIRST FEDERAL BANK OF CALIFORNIA
EMPLOYEE STOCK OWNERSHIP PLAN**

Financial Statements and Schedule

December 31, 2008 and 2007

(With Independent Auditors' Report Thereon)

840295901.481.06.0014

**FIRST FEDERAL BANK OF CALIFORNIA**
**EMPLOYEE STOCK OWNERSHIP PLAN**

Index to Financial Statements and Schedule

| | Page |
|---|---|
| Independent Auditors' Report | 1 |
| Statements of Net Assets Available for Benefits - December 31, 2008 and 2007 | 3 |
| Statements of Changes in Net Assets Available for Benefits - Year ended December 31, 2008 | 4 |
| Notes to Financial Statements | 5 |
| Schedule 1 – Schedule H - Line 4i – Schedule of Assets (Held at End of Year) | 14 |

All other schedules omitted are not applicable or are not required based on disclosure requirements of the Employee Retirement Income Security Act of 1974 and regulations issued by the Department of Labor.

840295901.481.06 0015

# MEIR & MEIR

CERTIFIED PUBLIC ACCOUNTANTS

www.meirandmeir.com
139 SOUTH BEVERLY DR, SUITE 204
BEVERLY HILLS, CA 90212
310 274 7541 TEL
310 274 1015 FAX

**Independent Auditors' Report**

The Administrative Committee
First Federal Bank of California
Employee Stock Ownership Plan

We have audited the accompanying statements of net assets available for benefits of the First Federal Bank of California Employee Stock Ownership Plan ("Plan") as of December 31, 2008 and 2007 and the related statements of changes in net assets available for benefits for the year then ended. These financial statements are the responsibility of the Plan's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the net assets available for benefits of the Plan as of December 31, 2008 and 2007, and the changes in its net assets available for benefits for the year then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements and supplemental schedule have been prepared assuming that First Federal Bank of California, the Plan's sponsor, will continue as a going concern. The report of the Independent Registered Public Accounting Firm on the December 31, 2008 financial statements of FirstFed Financial Corp., and its subsidiary, First Federal Bank of California, ("Company"), was issued under the date of March 30, 2009 and stated that, as discussed in Note 3 to the accompanying financial statements, the Company consented to the issuance of an Order to Cease and Desist by the Office of Thrift Supervision ("OTS"), and it has experienced a significant net loss in 2008 which has resulted in a reduction in its available regulatory capital. A capital plan outlining the Company's plans for maintaining its required levels of regulatory capital has been submitted to the OTS. Failure to maintain its required levels of regulatory capital would require the Company to submit a contingency plan to the OTS to accomplish either a merger with or acquisition by another federally insured institution or a voluntary liquidation of the Company. These matters, among others discussed more fully in Note 3, raise substantial doubt about the plan sponsor's ability to continue as a going concern. The ability of the Company to continue as a going concern is dependent on many factors, including acceptance of the capital plan by the OTS. The uncertainty regarding the Company's ability to continue as a going concern raises substantial doubt about the Plan's continuation. Should the Plan be terminated, the terms discussed in Note 9 to the financial statements would be applicable. The financial statements and supplemental schedule do not include any adjustments that might result from the outcome of this uncertainty.

1



840295901.481.06.0016

www.meirandmei.com

## Independent Auditors' Report, Continued

Our audits were performed for the purpose of forming an opinion on the basic financial statements taken as a whole. The supplemental schedule of assets (held at end of year) is presented for the purpose of additional analysis and is not a required part of the basic financial statements, but is supplementary information required by the Department of Labor's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974. This supplemental schedule is the responsibility of the Plan's management. The supplemental schedule has been subjected to the auditing procedures applied in the audits of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

Beverly Hills, California

June 22, 2009

2

840295901.481.06.0017

## FIRST FEDERAL BANK OF CALIFORNIA
## EMPLOYEE STOCK OWNERSHIP PLAN

Statements of Net Assets Available for Benefits

| | December 31, 2008 | | | December 31, 2007 | | |
|---|---|---|---|---|---|---|
| | Allocated | Unallocated | Total | Allocated | Unallocated | Total |
| Assets: | | | | | | |
| Investments, at fair value (notes 4 and 6): | | | | | | |
| FirstFed Financial Corp. common stock | $ 1,057,240 | - | $ 1,057,240 | $ 22,369,571 | $ 226,831 | $ 22,596,402 |
| Total assets | 1,057,240 | - | 1,057,240 | 22,369,571 | 22,369,571 | 22,596,402 |
| Liabilities: | | | | | | |
| Note payable to FirstFed Financial Corp. (note 6) | - | - | - | - | 235,251 | 235,251 |
| Total liabilities | - | - | - | - | 235,251 | 235,251 |
| Net assets available for benefits | $ 1,057,240 | $ - | $ 1,057,240 | $ 22,369,571 | $ (8,420) | $ 22,361,151 |

See accompanying notes to financial statements.

3

840295901.481.06.0018

**FIRST FEDERAL BANK OF CALIFORNIA**
**EMPLOYEE STOCK OWNERSHIP PLAN**

Statement of Changes in Net Assets
Available for Benefits

|  | For the Year Ended December 31, 2008 | | |
|---|---|---|---|
|  | Allocated | Unallocated | Total |
| Additions to net assets attributable to: |  |  |  |
| Employer contributions | $        - | $   243,733 | $   243,733 |
| Allocation of 6,355 shares of FirstFed Financial Corp. common stock, at market | 11,121 | - | 11,121 |
| Total additions | 11,121 | 243,733 | 254,854 |
| Deductions from net assets attributable to: |  |  |  |
| Net decrease in fair value of investments (note 4) | 20,550,306 | 216,122 | 20,766,428 |
| Benefits paid to participants | 773,146 | - | 773,146 |
| Allocation of 6,355 shares of FirstFed Financial Corp. common stock, at market | - | 11,121 | 11,121 |
| Interest expense paid to party-in-interest (note 6) | - | 8,070 | 8,070 |
| Total deductions | 21,323,452 | 235,313 | 21,558,765 |
| Net increase/decrease | (21,312,331) | 8,420 | (21,303,911) |
| Net assets available for benefits: |  |  |  |
| Beginning of year | 22,369,571 | (8,420) | 22,361,151 |
| End of year | $  1,057,240 | - | $  1,057,240 |

See accompanying notes to financial statements.

4

840295901.481.06.0019

# FIRST FEDERAL BANK OF CALIFORNIA
# EMPLOYEE STOCK OWNERSHIP PLAN

Notes to Financial Statements
December 31, 2008 and 2007

## (1) Plan Description

The following description of the First Federal Bank of California ("Bank") Employee Stock Ownership Plan ("Plan") provides only general information. Participants should refer to the Plan document for a more complete description of the Plan's provisions.

### General

The Plan is a defined contribution plan covering all employees of the Bank who have completed at least 1,000 hours of service at the beginning of the Plan year. The Plan is the result of amendments and restatements of the First Federal Bank of California Profit Sharing Plan to include employee stock ownership features. These changes were effective January 1, 1984. Initially, the funds of the Plan were primarily invested in the Bank's common stock. Since the acquisition of the Bank's common stock by its holding company FirstFed Financial Corp. ("FFC") on September 22, 1987, the funds of the Plan have been invested in shares of FFC common stock. The Plan is administered by an Administrative Committee comprised of up to three persons appointed by the Board of Directors of the Bank. The Bank is the trustee of the Plan. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

### Contributions

Contributions to the Plan are discretionary. The amount contributed may be any amount up to 15% of the earnings of eligible participants plus any additional amounts that may be required to make principal and interest payments on the note payable. Contributions can be made in cash or in stock. Participants are not required or permitted to make any contributions to the Plan.

### Participant Accounts

Each participant's account is credited with employer contributions and forfeitures of terminated participants' non-vested accounts. Forfeitures are allocated five years after a participant terminates. Allocations of contributions and forfeitures are currently made pro rata, based on the base compensation of each participant as compared to the base compensation of all eligible participants. The benefit to which a participant is entitled is that which can be provided from the participant's account.

### Forfeitures

Forfeiture balances as of December 31, 2008 and 2007 were $34,561 and $1,033,522, respectively. During the year ended December 31, 2008, forfeitures of $19,473, and $3,541 were reallocated to participants, and added from non-vested forfeited amounts, respectively.

5

840295901.481.06.0020

## FIRST FEDERAL BANK OF CALIFORNIA
## EMPLOYEE STOCK OWNERSHIP PLAN

Notes to Financial Statements
December 31, 2008 and 2007

**Vesting**

Vesting in participant accounts is based on years of service, subject to certain rules for the measurement of service at a rate of 20% per year starting in two years of service with full vesting after six years of service. A participant is 100% vested after seven years of service, upon death, disability, or retirement.

**Benefit Payments**

Under the terms of the Plan agreement, participants are eligible for benefits after one full year of service with the Bank or its affiliated corporations. The benefit amount is based upon the vested interest in the participant's account at termination. In the event of retirement at or after the normal retirement date, permanent disability or death, the participant or the participant's beneficiary will be entitled to the entire balance in the participant's account.

**Administrative Expenses**

The Bank pays all administrative expenses for the Plan.

**(2) Summary of Significant Accounting Policies**

**Basis of Presentation**

The accompanying financial statements have been prepared using the accrual method of accounting.

All shares of FFC common stock were purchased with proceeds from borrowings under a line of credit with FFC. Borrowings by the Plan are collateralized by the unallocated shares of FFC stock, which are held in safekeeping by the Registrar and Transfer Company. As principal payments are made by the Plan, an appropriate percentage of stock is allocated to eligible participant accounts in accordance with applicable regulations. The lender has no rights against shares once they are allocated under the Plan. Accordingly, the financial statements of the Plan for the years 2008 and 2007 present separately the assets and liabilities and changes therein pertaining to:

    (a)    the accounts of participants with vested rights in allocated stock (Allocated) and
    (b)    stock not yet allocated to employees (Unallocated).

840295901.481.06.0021

FIRST FEDERAL BANK OF CALIFORNIA
EMPLOYEE STOCK OWNERSHIP PLAN

Notes to Financial Statements
December 31, 2008 and 2007

**Valuation of Investments**

Investment transactions are accounted for on a trade-date basis, which is the date the securities are purchased or sold. The Plan's investment in FFC common stock is stated at fair value, which is based upon quotes from a national securities exchange.

**Use of Estimates**

Management has made a number of estimates and assumptions relating to the reporting of the net assets available for benefits and changes therein to prepare these financial statements in conformity with accounting principles generally accepted in the United States of America. Actual results could differ from those estimates.

**Payment of Benefits**

Benefits are recorded when paid.

**(3) Regulatory Matters and Uncertainties**

On January 26, 2009, FirstFed Financial Corp. ("Company") and its wholly-owned subsidiary, First Federal Bank of California ("Bank") each consented to the issuance of an Order to Cease and Desist (the "Company Order" and the "Bank Order," respectively, and together, the "Orders") by the OTS.

The Company Order requires that the Company notify, or in certain cases receive the permission of, the OTS prior to (i) declaring, making or paying any dividends or other capital distributions on its capital stock; (ii) incurring, issuing, renewing, repurchasing or rolling over any debt, increasing any current lines of credit or guaranteeing the debt of any entity; (iii) making payments (including, without limitation, principal, interest or fees of any kind) on any existing debt; (iv) making certain changes to its directors or senior executive officers; (v) entering into, renewing, extending or revising any contractual arrangement related to compensation or benefits with any of its directors or senior executive officers; and (vi) making any golden parachute payments or prohibited indemnification payments. The Company Order also required that the Company submit to the OTS within fifteen (15) days a detailed capital plan to address how the Bank will remain "well capitalized" (as defined in 12 C.F.R. § 565.4) at each quarter-end through December 31, 2011, which the Company did submit in a timely manner.

The Bank Order requires that the Bank notify, or in certain cases receive the permission of, the OTS prior to (i) increasing its total assets in any quarter in excess of an amount equal to net interest credited on deposits during the quarter (other than for balance sheet increases resulting from activities to maintain liquidity); (ii) making certain changes to its directors or senior executive officers; (iii) entering into, renewing, extending or revising any contractual arrangement related to compensation or benefits

7

840295901.481:06.0022

FIRST FEDERAL BANK OF CALIFORNIA
EMPLOYEE STOCK OWNERSHIP PLAN

Notes to Financial Statements
December 31, 2008 and 2007

with any of its directors or senior executive officers; (iv) making any golden parachute or prohibited indemnification payments; (v) paying dividends or making other capital distributions on its capital stock; (vi) entering into certain transactions with affiliates; and (vii) entering into third-party contracts outside the normal course of business.

The Bank Order also required that the Bank submit to the OTS within fifteen (15) days a detailed capital plan to address how the Bank will remain "well capitalized" (as defined in 12 C.F.R. § 565.4) at each quarter-end through December 31, 2011, which the Bank did timely submit. If the Bank fails to remain "well capitalized," the Bank must then submit to the OTS a detailed contingency plan to accomplish either a merger with or acquisition by another federally insured institution or holding company thereof, or a voluntary liquidation of the Bank. The Bank must also submit to the OTS within prescribed time periods a classified asset reduction plan, liquidity plan, business plan and loan documentation plan, and refrain from any unsafe and unsound practices that resulted in the current high level of classified assets, inadequate capital, poor earnings and reliance on wholesale funding. To date, the Bank has timely complied with the plan submission requirements set forth in the Bank Order.

In addition, since December 30, 2008, the Bank has needed the prior approval of the OTS in order to roll over existing brokered deposits or accept new brokered deposits.

Any material failure to comply with the provisions of the Orders could result in enforcement actions by the OTS. While the Company and the Bank each intend to take such actions as may be necessary to enable it to comply with the requirements of its respective Order, there can be no assurance that it will be able to comply fully with the provisions of such Order, or to do so within the timeframes required, that compliance with such Order will not be more time consuming or more expensive than anticipated, or that efforts to comply with such Order will not have adverse effects on its operations and financial condition.

On January 26, 2009, in an effort to comply with the asset growth limitations contained in the Orders, the Company suspended lending for its own portfolio. As a result, the Company reduced the staff of the Bank. As a result of these reductions, the Company recorded approximately $560 thousand in charges for salary and benefits, to be paid in accordance with the California Relocations, Terminations and Mass Layoffs Act, during the quarter ending March 31, 2009.

The Company has $150.0 million in outstanding unsecured fixed/floating rate senior debentures as of December 31, 2008. The Company Order issued by the OTS prohibits the Company from making payments (including, without limitation, principal, interest or fees of any kind) on any existing debt without the consent of the OTS. The Company did not receive consent from the OTS to make the aggregate $2.3 million in interest payments due on March 16, 2009.

Under the indentures governing the debentures, a default in the payment of any interest when it becomes due and payable that is not cured within 30 days is an "event of default." If an event of default occurs

8

840295901.481.06.0023

# FIRST FEDERAL BANK OF CALIFORNIA
# EMPLOYEE STOCK OWNERSHIP PLAN

### Notes to Financial Statements
### December 31, 2008 and 2007

and is continuing with respect to the debentures, the trustee or the holders of not less than 25% in aggregate principal amount of the debentures then outstanding may declare the entire principal of the debentures and the interest accrued thereon immediately due and payable. In addition, the Company may be required to pay additional interest on the debentures and the costs and expenses of collection, including reasonable compensation to the trustee, its agents, attorneys and counsel.

The Bank's ability to continue meet all of the requirements of Orders and continue to be well capitalized will be affected by market conditions in the economy and other uncertainties. Declining real estate values and rising unemployment in the state of California could have a significant impact on future losses incurred on loans. In addition, there can be no assurance in the current economic environment that the Company will be able to raise capital if needed to remain well-capitalized or to meet future regulatory requirements. Due to these conditions and events, substantial doubt exists in the Company's ability to continue as a going concern. The uncertainty regarding the Company's ability to continue as a going concern raises substantial doubt about the Plan continuation.

## (4) Investments

The Plan invests in the common stock of FFC, a party-in-interest. The Administrative Committee determines the investment policy of the Plan. At December 31, 2008 and 2007, the Plan owned 604,137 shares and 630,832 shares, respectively, of FFC common stock with a fair value of $1,057,240 and $22,596,402, respectively. The Plan purchased 22 shares in the year 2008 at the average cost of $18.39 per share. During the year ended December 31, 2008, the Plan's investments decreased in value by $20,766,428.

As of June 30, 2009, the fair value of the Plan's investments decreased to $229,572 which represents an additional decrease of $ 827,668 from the end of the plan year of 2008.

9

840295901.481.06.6024

FIRST FEDERAL BANK OF CALIFORNIA
EMPLOYEE STOCK OWNERSHIP PLAN

Notes to Financial Statements
December 31, 2008 and 2007

**(5) Fair Value Measurement**

The Plan's Investments and loan payable are reported at fair value in the accompanying statements of net assets available for benefits.

| | | **Fair Value Measurements Using:** | |
| --- | --- | --- | --- |
| As of December 31, 2008 | **Fair Value** | **Quoted Prices in Active Markets for Identical Assets (Level 1)** | **Significant Unobservable Inputs (Level 3)** |
| FirstFed Financial Corp common stock | $  1,057,240 | $  1,057,240 | $  — |
| As of December 31, 2007 | | | |
| FirstFed Financial Corp common stock | $  22,596,402 | $  22,596,402 | $  — |
| Loan payable | $  — | $  — | $  235,251 |

SFAS No. 157 Fair Value Measurements, establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. This hierarchy consists of three broad levels: Level 1 inputs consist of unadjusted quoted prices in active markets for identical assets and have the highest priority, and Level 3 inputs have the lowest priority. The Plan uses appropriate valuation techniques based on the available inputs to measure the fair value of its investments. When available, the Plan measures fair value using Level 1 inputs because they generally provide the most reliable evidence of fair value. No Level 2 inputs were available to the Plan, and Level 3 inputs were only used when Level 1 or Level 2 inputs were not available.

**Level 1 Fair Value Measurements**

The fair value of FirstFed Financial Corp common stock is based on quoted net asset values of the shares held by the Plan at year-end.

**Level 2 Fair Value Measurements**

The Plan has no Level 2 investments and loan payables.

840295901.481.06.0025

## FIRST FEDERAL BANK OF CALIFORNIA
## EMPLOYEE STOCK OWNERSHIP PLAN

### Notes to Financial Statements
### December 31, 2008 and 2007

**Level 3 Fair Value Measurements**

The loan payable is not actively traded and significant other observable inputs are not available. Thus, the fair value of the loan payable is equal to the amortized cost of the loan because the loan is secured by unallocated shares of FirstFed Financial Corp which are held by the Plan. The following table provides further details of the Level 3 fair value measurements.

**Fair Value Measurements Using Significant Unobservable Inputs (Level 3)**

| As of December 31, 2008 | Loan Payable | Total |
|---|---|---|
| Beginning Balance | $ 235,251 | $ 235,251 |
| Total gains or losses (realized and unrealized) included in changes in net assets available for benefits | — | — |
| Net activity in note payable | (235,251) | (235,251) |
| Ending balance | $ — | $ — |
| | | |
| As of December 31, 2007 | | |
| Beginning Balance | $ 1,489,416 | $ 1,489,416 |
| Total gains or losses (realized and unrealized) included in changes in net assets available for benefits | — | — |
| Net activity in note payable | (1,254,165) | (1,254,165) |
| Ending balance | $ 235,251 | $ 235,251 |

Gains and losses (realized and unrealized) included in changes in net assets available for benefits for the year ended December 31, 2008 are reported in net appreciation(depreciation)  in fair value of investments.

### (6) Liabilities

The Plan may borrow up to $6,000,000 under a line of credit with FFC.  At December 31, 2008, there was no outstanding loan to the ESOP.  At December 31, 2007, the outstanding loan to the ESOP totaled $235,251.  Interest varies based on the monthly cost of funds for the Bank.  During Plan years 2008 and 2007, the average rates paid were 3.46% and 4.661%, respectively.  The maturity date for the line of credit is December 31, 2013.

11

840295901.481.06.0026

**FIRST FEDERAL BANK OF CALIFORNIA**
**EMPLOYEE STOCK OWNERSHIP PLAN**

Notes to Financial Statements
December 31, 2008 and 2007

**(7)  Tax Status**

The Internal Revenue Service issued its latest determination letters on August 15, 2002 which stated that the Plan and the underlying trust qualify under the applicable provisions of the Internal Revenue Code and therefore are exempt from Federal income taxes.  Subsequently, the Plan has been amended and submitted to the Internal Revenue Service for a determination letter.  In the opinion of the Plan Administrator, the Plan and its underlying trust have operated within the terms of the Plan and should remain qualified under the applicable provisions of the Internal Revenue Code.

**(8)  Related Party Transactions**

All investments of the Plan are shares of FFC common stock managed by the Administrative Committee comprised of up to three persons appointed by the Board of Directors of the Bank.  First Federal Bank of California is the Trustee as defined by the Plan; therefore, these transactions qualify as party-in-interest transactions.

**(9)  Plan Termination**

The Bank has the right to amend or terminate the Plan at any time.  However, no change can be made to cause participants to lose any of their vested benefits.  If the Plan is terminated, each participant will become 100% vested, and the Bank will have the option of continuing the distribution of funds then on deposit, as if the Plan were still operating, or of distributing the entire balance in each participant's account in a lump sum.

**(10)  Reconciliation to Form 5500**

|  | December 31, 2008 | December 31, 2007 |
|---|---|---|
| Net assets per financial statements | $ 1,057,240 | $   22,361,151 |
| Benefits payable per Form 5500 | (67,604) | (1,028,600) |
| Net assets per Form 5500 | $   989,636 | $   21,332,551 |

|  | December 31, 2008 |
|---|---|
| Net decrease in assets per financial statements | $ (21,303,911) |
| Decrease in benefits payable | 960,996 |
| Net decrease in assets per Form 5500 | $ (20,342,915) |

12

8 40295901.481.06.0027

**FIRST FEDERAL BANK OF CALIFORNIA**
**EMPLOYEE STOCK OWNERSHIP PLAN**

Notes to Financial Statements
December 31, 2008 and 2007

**(11)  Administration of Plan Assets**

The Registrar and Transfer Company holds the Plan assets in safekeeping.

Company contributions are held and managed by the Trustee, which administers the payment of interest and principal on the loan.

Officers and/or employees of the Bank perform certain administrative functions.  No such officer or employee receives compensation from the Plan.  Other administrative costs are paid directly by the Bank.

13

840295901.481.06.0028

Schedule 1

7/27/2009

FIRST FEDERAL BANK OF CALIFORNIA
EMPLOYEE STOCK OWNERSHIP PLAN

Schedule H - Line 4i -- Schedule of Assets (Held at End of Year)

December 31, 2008

| (a) | (b) Identify of issue, borrower, lessor or similar party | (c) Description of investment including maturity date, rate of interest, collateral, par or maturity value | (d) Cost | (e) Current Value |
|-----|-----------------------------------------------------------|-----------------------------------------------------------------------------------------------------------|----------|-------------------|
| * | FirstFed Financial Corp. | Common stock, $.01 par value, 604,137 shares owned | $11,019,091 | $1,057,240 |

*Party-in-interest

See accompanying independent auditors' report.

14

840295901.481.06.0029



**FIRST FEDERAL BANK**
OF CALIFORNIA®
401 WILSHIRE BOULEVARD, SANTA MONICA, CA 90401-1480



CERTIFIED MAIL.

7008 1300 0001 9791 9654



$07.00⁰
07/28/2009
US POSTAGE

AUG 05 2009

EBSA (PWBA)
P.O. Box 7043
LAWRENCE, KANSAS
66044-7043

799900010Z

# Exhibit C

**DEPARTMENT OF THE TREASURY**
**Office of the Comptroller of the Currency**
**[Docket No. 06-11]**

**BOARD OF GOVERNORS OF THE**
**FEDERAL RESERVE SYSTEM**
**[Docket No. OP-1246]**

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**DEPARTMENT OF THE TREASURY**
**Office of Thrift Supervision**
**[No. 2006-35]**

**NATIONAL CREDIT UNION ADMINISTRATION**

**Interagency Guidance on Nontraditional Mortgage Product Risks**

**AGENCIES:**  Office of the Comptroller of the Currency, Treasury (OCC); Board of Governors of the Federal Reserve System (Board); Federal Deposit Insurance Corporation (FDIC); Office of Thrift Supervision, Treasury (OTS); and National Credit Union Administration (NCUA).

**ACTION:**  Final guidance.

**SUMMARY:**  The OCC, Board, FDIC, OTS, and NCUA (the Agencies), are issuing final Interagency Guidance on Nontraditional Mortgage Product Risks (guidance).  This guidance has been developed to clarify how institutions can offer nontraditional mortgage products in a safe and sound manner, and in a way that clearly discloses the risks that borrowers may assume.

**FOR FURTHER INFORMATION CONTACT:**
OCC:  Gregory Nagel, Credit Risk Specialist, Credit and Market Risk, (202) 874-5170; or Michael S. Bylsma, Director, or Stephen Van Meter, Assistant Director, Community and Consumer Law Division, (202) 874-5750.
Board:  Brian Valenti, Supervisory Financial Analyst, (202) 452-3575; or Virginia Gibbs, Senior Supervisory Financial Analyst, (202) 452-2521; or Sabeth I. Siddique, Assistant Director, (202) 452-3861, Division of Banking Supervision and Regulation; Kathleen C. Ryan, Counsel, Division of Consumer and Community Affairs, (202) 452-3667; or Andrew Miller, Counsel, Legal Division, (202) 452-3428.  For users of Telecommunications Device for the Deaf ("TDD") only, contact (202) 263-4869.

FDIC:  Suzy S. Gardner, Examination Specialist, (202) 898-3640, or April Breslaw, Chief, Compliance Section, (202) 898-6609, Division of Supervision and Consumer Protection; or Ruth R. Amberg, Senior Counsel, (202) 898-3736, or Richard Foley, Counsel, (202) 898-3784, Legal Division.
OTS:  William Magrini, Senior Project Manager, Examinations and Supervision Policy, (202) 906-5744; or Fred Phillips-Patrick, Director, Credit Policy, (202) 906-7295; or Glenn Gimble, Senior Project Manager, Compliance and Consumer Protection, (202) 906-7158.
NCUA:  Cory Phariss, Program Officer, Examination and Insurance, (703) 518-6618.

**SUPPLEMENTARY INFORMATION:**

**I.     Background**

        The Agencies developed this guidance to address risks associated with the growing use of mortgage products that allow borrowers to defer payment of principal and, sometimes, interest.  These products, referred to variously as "nontraditional," "alternative," or "exotic" mortgage loans (hereinafter referred to as nontraditional mortgage loans), include "interest-only" mortgages and "payment option" adjustable-rate mortgages.  These products allow borrowers to exchange lower payments during an initial period for higher payments during a later amortization period.
        While similar products have been available for many years, the number of institutions offering them has expanded rapidly.  At the same time, these products are offered to a wider spectrum of borrowers who may not otherwise qualify for more traditional mortgages.  The Agencies are concerned that some borrowers may not fully understand the risks of these products.  While many of these risks exist in other adjustable-rate mortgage products, the Agencies' concern is elevated with nontraditional products because of the lack of principal amortization and potential for negative amortization.  In addition, institutions are increasingly combining these loans with other features that may compound risk.  These features include simultaneous second-lien mortgages and the use of reduced documentation in evaluating an applicant's creditworthiness.
        In response to these concerns, the Agencies published for comment proposed Interagency Guidance on Nontraditional Mortgage Products, 70 FR 77249 (Dec. 29, 2005).  The Agencies proposed guidance in three primary areas:  "Loan Terms and Underwriting Standards," "Portfolio and Risk Management Practices," and "Consumer Protection Issues."  In the first section, the Agencies sought to ensure that loan terms and underwriting standards for nontraditional mortgage loans are consistent with prudent lending practices, including credible consideration of a borrower's repayment capacity. The portfolio and risk management practices section outlined the need for strong risk management standards, capital levels commensurate with the risk, and an allowance for loan and lease losses (ALLL) that reflects the collectibility of the portfolio.  Finally, the consumer protection issues section recommended practices to ensure consumers have clear and balanced information prior to making a product choice.  Additionally, this section described control systems to ensure that actual practices are consistent with policies and procedures.

The Agencies together received approximately 100 letters in response to the proposal.[1] Comments were received from financial institutions, trade associations, consumer and community organizations, state financial regulatory organizations, and other members of the public.

## II. Overview of Public Comments

The Agencies received a full range of comments. Some commenters applauded the Agencies' initiative in proposing the guidance, while others questioned whether guidance is needed.

A majority of the depository institutions and industry groups that commented stated that the guidance is too prescriptive. They suggested institutions should have more flexibility in determining appropriate risk management practices. A number observed that nontraditional mortgage products have been offered successfully for many years. Others opined that the guidance would stifle innovation and result in qualified borrowers not being approved for these loans. Further, many questioned whether the guidance is an appropriate mechanism for addressing the Agencies' consumer protection concerns.

A smaller subset of commenters argued that the guidance does not go far enough in regulating or restricting nontraditional mortgage products. These commenters included consumer organizations, individuals, and several community bankers. Several stated these products contribute to speculation and unsustainable appreciation in the housing market. They expressed concern that severe problems will occur if and when there is a downturn in the economy. Some also argued that these products are harmful to borrowers and that borrowers may not understand the associated risks.

Many commenters voiced concern that the guidance will not apply to all lenders, and thus federally regulated financial institutions will be at a competitive disadvantage. The Agencies note that both state financial regulatory organizations that commented on the proposed guidance – the Conference of State Bank Supervisors (CSBS) and the State Financial Regulators Roundtable (SFRR) – committed to working with state regulatory agencies to distribute guidance that is similar in nature and scope to the financial service providers under their jurisdictions.[2] These commenters noted their interest in addressing the potential for inconsistent regulatory treatment of lenders based on whether or not they are supervised solely by state agencies. Subsequently, the CSBS, along with a national organization representing state residential mortgage regulators, issued a press release confirming their intent to offer guidance to state regulators to apply to their licensed residential mortgage brokers and lenders.[3]

---

[1] Nine of these letters requested a thirty-day extension of the comment period, which the Agencies granted.
[2] Letter to J. Johnson, Board Secretary, *et al.* from N. Milner, President & CEO, Conference of State Bank Supervisors  (Feb. 14, 2006); Letter to J. Johnson, Board Secretary, *et al.*, from B. Kent, Chair, State Financial Regulators Roundtable.
[3] Media Release, CSBS & American Association of Residential Mortgage Regulators, "CSBS and AARMR Consider Guidance on Nontraditional Mortgage Products for State-Licensed Entities" (June 7, 2006), *available at*
http://www.csbs.org/Content/NavigationMenu/PublicRelations/PressReleases/News_Releases.htm.   The press release stated:

> The guidance being developed by CSBS and AARMR is based upon proposed guidance
> issued in December 2005 by the Office of the Comptroller of the Currency, the Board of

## II. Final Joint Guidance

The Agencies made a number of changes to the proposal to respond to commenters' concerns and to provide additional clarity. Significant comments on the specific provisions of the proposed guidance, the Agencies' responses, and changes to the proposed guidance are discussed as follows.

### Scope of the Guidance

Many financial institution and trade group commenters raised concerns that the proposed guidance did not adequately define "nontraditional mortgage products." They requested clarification of which products would be subject to enhanced scrutiny. Some suggested that the guidance focus on products that allow negative amortization, rather than interest-only loans. Others suggested excluding certain products with nontraditional features, such as reverse mortgages and home equity lines of credit (HELOCs). Those commenting on interest-only loans noted that they do not present the same risks as products that allow for negative amortization. Those that argued that HELOCs should be excluded noted that they are already covered by interagency guidance issued in 2005. They also noted that the principal amount of these loans is generally lower than that for first mortgages. As for reverse mortgages, the commenters pointed out that they were developed for a specific market segment and do not present the same concerns as products mentioned in the guidance.

To address these concerns, the Agencies are clarifying the types of products covered by the guidance. In general, the guidance applies to all residential mortgage loan products that allow borrowers to defer repayment of principal or interest. This includes all interest-only products and negative amortization mortgages, with the exception of HELOCs. The Agencies decided not to include HELOCs in this guidance, other than as discussed in the Simultaneous Second-Lien Loans section, since they are already covered by the May 2005 Interagency <u>Credit Risk Management Guidance for Home Equity Lending</u>. The Agencies are amending the May 2005 guidance, however, to address the consumer disclosure recommendations included in the nontraditional mortgage guidance.

The Agencies decided against focusing solely on negative amortization products. Many of the interest-only products pose risks similar to products that allow negative amortization, especially when combined with high leverage and reduced documentation. Accordingly, they present similar concerns from a risk management and consumer

---

Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration.

The federal guidance, when finalized, will only apply to insured financial institutions and their affiliates. CSBS and AARMR intend to develop a modified version of the guidance which will primarily focus on residential mortgage underwriting and consumer protection. The guidance will be offered to state regulators to apply to their licensed residential mortgage brokers and lenders.

protection standpoint.  The Agencies did, however, agree that reverse mortgages do not present the types of concerns that are addressed in the guidance and should be excluded.

**Loan Terms and Underwriting Standards**

Qualifying Borrowers

The Agencies proposed that for all nontraditional mortgage products, the analysis of borrowers' repayment capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule.  In addition, the proposed guidance stated that for products that permit negative amortization, the repayment analysis should include the initial loan amount plus any balance increase that may accrue from negative amortization.  The amount of the balance increase is tied to the initial terms of the loan and estimated assuming the borrower makes only the minimum payment.

Generally, banks and industry groups believed that the proposed underwriting standards were too prescriptive and asked for more flexibility.  Consumer groups generally supported the proposed underwriting standards, warning that deteriorating underwriting standards are bad for individual borrowers and poor public policy.

A number of commenters suggested that industry practice is to underwrite payment option adjustable-rate mortgages at the fully indexed rate, assuming a fully amortizing payment.  Yet several commenters argued that this standard should not be required when risks are adequately mitigated.  Moreover, many commenters opposed assuming a fully amortizing payment for interest-only loans with extended interest-only periods.  They argued that the average life span of most mortgage loans makes it unlikely that many borrowers will experience the higher payments associated with amortization.  Additionally, many commenters opposed the assumption of minimum payments during the deferral period for products that permit negative amortization on the ground that this assumption suggests that lenders assume a worst-case scenario.

The Agencies believe that institutions should maintain qualification standards that include a credible analysis of a borrower's capacity to repay the full amount of credit that may be extended.  That analysis should consider both principal and interest at the fully indexed rate.  Using discounted payments in the qualification process limits the ability of borrowers to demonstrate sufficient capacity to repay under the terms of the loan.  Therefore, the proposed general guideline of qualifying borrowers at the fully indexed rate, assuming a fully amortizing payment, including potential negative amortization amounts, remains in the final guidance.

Regarding interest-only loans with extended interest-only periods, the Agencies note that since the average life of a mortgage is a function of the housing market and interest rates, the average may fluctuate over time.  Additionally, the Agencies were concerned that excluding these loans from the underwriting standards could cause some creditors to change their market offerings to avoid application of the guidance.  Accordingly, the final guidance does not exclude interest-only loans with extended interest-only periods.

Finally, regarding the assumption for the amount that the balance may increase due to negative amortization, the Agencies have revised the language to respond to commenters' requests for clarity.  The basic standard, however, remains unchanged.  The

Agencies expect a borrower to demonstrate the capacity to repay the full loan amount that may be advanced.[4] This includes the initial loan amount plus any balance increase that may accrue from the negative amortization provision. The final document contains guidance on determining the amount of any balance increase that may accrue from the negative amortization provision, which does not necessarily equate to the full negative amortization cap for a particular loan.

The Agencies requested comment on whether the guidance should address consideration of future income or other future events in the qualification standards. The commenters generally agreed that there is no reliable method for considering future income or other future events in the underwriting process. Accordingly, the Agencies have not modified the guidance to address these issues.

Collateral-Dependent Loans

Commenters that specifically addressed this aspect of the guidance concurred that it is unsafe and unsound to rely solely on an individual borrower's ability to sell or refinance once amortization commences. However, many expressed concern about the possibility that the term "collateral-dependent," as it is used in the guidance, would be interpreted to apply to stated income and other reduced documentation loans.

To address this concern, the Agencies provided clarifying language in a footnote to this section. The final guidance provides that a loan will not be determined to be collateral-dependent solely because it was underwritten using reduced documentation.

Risk Layering

Financial institution and industry group commenters were generally critical of the risk layering provisions of the proposed guidance on the grounds that they were too prescriptive. These commenters argued that institutions should have flexibility in determining factors that mitigate additional risks presented by features such as reduced documentation and simultaneous second-lien loans. A number of commenters, however, including community and consumer organizations, financial institutions, and industry associations, suggested that reduced documentation loans should not be offered to subprime borrowers. Others questioned whether stated income loans are appropriate under any circumstances, when used with nontraditional mortgage products, or when used for wage earners who can readily provide standard documentation of their wages. Several commenters argued that simultaneous second-lien loans should be paired with nontraditional mortgage loans only when borrowers will continue to have substantial equity in the property.

The Agencies believe that the guidance provides adequate flexibility in the methods and approaches to mitigating risk, with respect to risk layering. While the Agencies have not prohibited any of the practices discussed, the guidance uniformly suggests strong quality control and risk mitigation factors with respect to these practices.

The Agencies declined to provide guidance recommending reduced documentation loans be limited to any particular set of circumstances. The final guidance recognizes that mitigating factors may determine whether such loans are appropriate, but

---

[4] This is similar to the standard in the Agencies' May 2005 Credit Risk Management Guidance for Home Equity Lending recommending that, for interest-only and variable rate HELOCs, borrowers should demonstrate the ability to amortize the fully drawn line over the loan term.

6

reminds institutions that a credible analysis of both a borrower's willingness and ability to repay is consistent with sound and prudent lending practices. The final guidance also cautions that institutions generally should be able to readily document income for wage earners through means such as W-2 statements, pay stubs, or tax returns.

## Portfolio and Risk Management Practices

Many financial institution and industry group commenters opposed provisions of the proposed guidance for the setting of concentration limits. Some commenters advocated active monitoring of concentrations or diversification strategies as more appropriate approaches. The intent of the guidance was not to set hard concentration limits for nontraditional mortgage products. Instead, institutions with concentrations in these products should have well-developed monitoring systems and risk management practices. The guidance was clarified to reiterate this point.

Additionally, a number of financial institution and industry association commenters opposed the provisions regarding third-party originations. They argued that the proposal would force lenders to have an awareness and control over third-party practices that is neither realistic nor practical. In particular, many of these commenters argued that lenders should not be responsible for overseeing the marketing and borrower disclosure practices of third parties.

Regarding controls over third-party practices, the Agencies clarified their expectations that institutions should have strong systems and controls for establishing and maintaining relationships with third parties. Reliance on third-party relationships can significantly increase an institution's risk profile. The guidance, therefore, emphasizes the need for institutions to exercise appropriate due diligence prior to entering into a third-party relationship and to provide ongoing, effective oversight and controls. In practice, an institution's risk management system should reflect the complexity of its third-party activities and the overall level of risk involved.

A number of commenters urged the Agencies to remove language in the proposed guidance relating to implicit recourse for loans sold in the secondary market. They expressed concern that the proposal added new capital requirements. The Agencies clarified the language in the guidance addressing this issue. The Agencies do not intend to establish new capital requirements. Instead, the Agencies' intent is to reiterate existing guidelines regarding implicit recourse under the Agencies' risk-based capital rules.

## Consumer Protection Issues

### Communications with Consumers

Many financial institution and trade group commenters suggested that the Agencies' consumer protection goals would be better accomplished through generally applicable regulations, such as Regulation Z (Truth in Lending)[5] or Regulation X (Real Estate Settlement Procedures).[6] Some commenters stated that the proposed guidance

---

[5] 12 CFR Part 226 (2006).
[6] 24 CFR Part 3500 (2005).

would add burdensome new disclosure requirements and cause a confusing overlap with current Regulation Z requirements. They also expressed concern that the guidance would contribute to an overload of information currently provided to consumers. Additionally, some argued that implementing the disclosure provisions might trigger Regulation Z requirements concerning advertising.[7] Some commenters also urged the Agencies to adopt model disclosure forms or other descriptive materials to assist in compliance with the guidance.

Some commenters voiced concern that the Agencies are attempting to establish a suitability standard similar to that used in the securities context. These commenters argued that lenders are not in a position to determine which products are most suitable for borrowers, and that this decision should be left to borrowers themselves.

Finally, several community and consumer organization commenters questioned whether additional disclosures are sufficient to protect borrowers and suggested various additional measures, such as consumer education and counseling.

The Agencies carefully considered the commenters' argument that consumer protection issues – particularly, disclosures – would be better addressed through generally applicable regulations. The Agencies determined, however, that given the growth in this market, guidelines are needed now to ensure that consumers will receive the information they need about the material features of nontraditional mortgages as soon as possible.

The Agencies also gave careful consideration to the commenters' concerns that the guidelines will overlap with Regulation Z, add to the disclosure burden on lenders, and contribute to information overload. While the Agencies are sensitive to these concerns, we do not believe they warrant significant changes to the guidance. The guidance focuses on providing information to consumers during the pre-application shopping phase and post-closing with any monthly statements lenders choose to provide to consumers. Moreover, the Agencies do not anticipate that the information outlined in the guidance will result in additional lengthy disclosures. Rather, the Agencies contemplate that the information can be provided in brief narrative format and through the use of examples based on hypothetical loan transactions.[8] We have, however, revised the guidance to make clear that transaction-specific disclosures are not required. Institutions will still need to ensure that their marketing materials promoting their products comply with Regulation Z, as applicable.

As previously discussed, some commenters, including industry trade associations, asked the Agencies to include model or sample disclosures or other descriptive materials as part of the guidance to assist lenders, including smaller institutions, in following the recommended practices for communications with consumers. The Agencies have determined not to include required model or sample disclosures in the guidance. Instead, the guidance provides a set of recommended practices to assist institutions in addressing particular risks raised by nontraditional mortgage products.

The Agencies have determined that it is desirable to first seek public comment on potential model disclosures, and in a Federal Register notice accompanying this guidance are seeking comment on proposed illustrations of consumer information for

---

[7] See 12 CFR Part 226.24(c) (2006).
[8] See ____ FR _____ (date) (Proposed Illustrations of Consumer Information for Nontraditional Mortgage Products).

nontraditional mortgage products that are consistent with the recommendations contained in the guidance. The Agencies appreciate that some institutions, including community banks, following the recommendations set forth in the guidance may prefer not to incur the costs and other burdens of developing their own consumer information documents. The Agencies are, therefore, requesting comment on illustrations of the type of information contemplated by the guidance.

The Agencies disagree with the commenters who expressed concern that the guidance appears to establish a suitability standard, under which lenders would be required to assist borrowers in choosing products that are suitable to their needs and circumstances. It was not the Agencies' intent to impose such a standard, nor is there any language in the guidance that does so. In any event, the Agencies have revised certain statements in the proposed guidance that could have been interpreted to suggest a requirement to ensure that borrowers select products appropriate to their circumstances.

Control Systems

Several commenters requested more flexibility in designing appropriate control systems. The Agencies have revised the "Control Systems" portion of the guidance to clarify that we are not requiring any particular means of monitoring adherence to an institution's policies, such as call monitoring or mystery shopping. Additional changes have also been made to clarify that the Agencies do not expect institutions to assume an unwarranted level of responsibility for the actions of third parties. Rather, the control systems that are expected for loans purchased from or originated through third parties are consistent with the Agencies' current supervisory policies. As previously discussed, the Agencies have also made changes to the portfolio and risk management practices portion of the final guidance to clarify their expectations concerning oversight and monitoring of third-party originations.

### IV.    Text of Final Joint Guidance

The text of the final Interagency Guidance on Nontraditional Mortgage Product Risks follows:

### Interagency Guidance on Nontraditional Mortgage Product Risks

Residential mortgage lending has traditionally been a conservatively managed business with low delinquencies and losses and reasonably stable underwriting standards. In the past few years consumer demand has been growing, particularly in high priced real estate markets, for closed-end residential mortgage loan products that allow borrowers to defer repayment of principal and, sometimes, interest. These mortgage products, herein referred to as nontraditional mortgage loans, include such products as "interest-only" mortgages where a borrower pays no loan principal for the first few years of the loan and "payment option" adjustable-rate mortgages (ARMs) where a borrower has flexible payment options with the potential for negative amortization.[1]

---

[1] Interest-only and payment option ARMs are variations of conventional ARMs, hybrid ARMs, and fixed rate products. Refer to the Appendix for additional information on interest-only and payment option ARM

While some institutions have offered nontraditional mortgages for many years with appropriate risk management and sound portfolio performance, the market for these products and the number of institutions offering them has expanded rapidly. Nontraditional mortgage loan products are now offered by more lenders to a wider spectrum of borrowers who may not otherwise qualify for more traditional mortgage loans and may not fully understand the associated risks.

Many of these nontraditional mortgage loans are underwritten with less stringent income and asset verification requirements ("reduced documentation") and are increasingly combined with simultaneous second-lien loans.[2] Such risk layering, combined with the broader marketing of nontraditional mortgage loans, exposes financial institutions to increased risk relative to traditional mortgage loans.

Given the potential for heightened risk levels, management should carefully consider and appropriately mitigate exposures created by these loans. To manage the risks associated with nontraditional mortgage loans, management should:

- Ensure that loan terms and underwriting standards are consistent with prudent lending practices, including consideration of a borrower's repayment capacity;
- Recognize that many nontraditional mortgage loans, particularly when they have risk-layering features, are untested in a stressed environment. As evidenced by experienced institutions, these products warrant strong risk management standards, capital levels commensurate with the risk, and an allowance for loan and lease losses that reflects the collectibility of the portfolio; and
- Ensure that consumers have sufficient information to clearly understand loan terms and associated risks prior to making a product choice.

The Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System (Board), the Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS) and the National Credit Union Administration (NCUA) (collectively, the Agencies) expect institutions to effectively assess and manage the risks associated with nontraditional mortgage loan products.[3]

Institutions should use this guidance to ensure that risk management practices adequately address these risks. The Agencies will carefully scrutinize risk management processes, policies, and procedures in this area. Institutions that do not adequately manage these risks will be asked to take remedial action.

The focus of this guidance is on the higher risk elements of certain nontraditional mortgage products, not the product type itself. Institutions with sound underwriting, adequate risk management, and acceptable portfolio performance will not be subject to criticism merely for offering such products.

---

loans. This guidance does not apply to reverse mortgages; home equity lines of credit ("HELOCs"), other than as discussed in the Simultaneous Second-Lien Loans section; or fully amortizing residential mortgage loan products.
[2] Refer to the Appendix for additional information on reduced documentation and simultaneous second-lien loans.
[3] Refer to Interagency Guidelines Establishing Standards for Safety and Soundness. For each Agency, those respective guidelines are addressed in: 12 CFR Part 30 Appendix A (OCC); 12 CFR Part 208 Appendix D-1 (Board); 12 CFR Part 364 Appendix A (FDIC); 12 CFR Part 570 Appendix A (OTS); and 12 U.S.C. 1786 (NCUA).

## LOAN TERMS AND UNDERWRITING STANDARDS

When an institution offers nontraditional mortgage loan products, underwriting standards should address the effect of a substantial payment increase on the borrower's capacity to repay when loan amortization begins. Underwriting standards should also comply with the agencies' real estate lending standards and appraisal regulations and associated guidelines.[4]

Central to prudent lending is the internal discipline to maintain sound loan terms and underwriting standards despite competitive pressures. Institutions are strongly cautioned against ceding underwriting standards to third parties that have different business objectives, risk tolerances, and core competencies. Loan terms should be based on a disciplined analysis of potential exposures and compensating factors to ensure risk levels remain manageable.

**Qualifying Borrowers** – Payments on nontraditional loans can increase significantly when the loans begin to amortize. Commonly referred to as payment shock, this increase is of particular concern for payment option ARMs where the borrower makes minimum payments that may result in negative amortization. Some institutions manage the potential for excessive negative amortization and payment shock by structuring the initial terms to limit the spread between the introductory interest rate and the fully indexed rate. Nevertheless, an institution's qualifying standards should recognize the potential impact of payment shock, especially for borrowers with high loan-to-value (LTV) ratios, high debt-to-income (DTI) ratios, and low credit scores. Recognizing that an institution's underwriting criteria are based on multiple factors, an institution should consider these factors jointly in the qualification process and may develop a range of reasonable tolerances for each factor. However, the criteria should be based upon prudent and appropriate underwriting standards, considering both the borrower's characteristics and the product's attributes.

For all nontraditional mortgage loan products, an institution's analysis of a borrower's repayment capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate,[5] assuming a fully amortizing repayment

---

[4] Refer to 12 CFR Part 34 - Real Estate Lending and Appraisals, OCC Bulletin 2005-3 – Standards for National Banks' Residential Mortgage Lending, AL 2003-7 – Guidelines for Real Estate Lending Policies and AL 2003-9 – Independent Appraisal and Evaluation Functions (OCC); 12 CFR 208.51 subpart E and Appendix C and 12 CFR Part 225 subpart G (Board); 12 CFR Part 365 and Appendix A, and 12 CFR Part 323 (FDIC); 12 CFR 560.101 and Appendix and 12 CFR Part 564 (OTS). Also, refer to the 1999 Interagency Guidance on the "Treatment of High LTV Residential Real Estate Loans" and the 1994 "Interagency Appraisal and Evaluation Guidelines." Federally Insured Credit Unions should refer to 12 CFR Part 722 - Appraisals and NCUA 03-CU-17 – Appraisal and Evaluation Functions for Real Estate Related Transactions (NCUA).

[5] The fully indexed rate equals the index rate prevailing at origination plus the margin that will apply after the expiration of an introductory interest rate. The index rate is a published interest rate to which the interest rate on an ARM is tied. Some commonly used indices include the 1-Year Constant Maturity Treasury Rate (CMT), the 6-Month London Interbank Offered Rate (LIBOR), the 11th District Cost of Funds (COFI), and the Moving Treasury Average (MTA), a 12-month moving average of the monthly average yields of U.S. Treasury securities adjusted to a constant maturity of one year. The margin is the

schedule.[6]  In addition, for products that permit negative amortization, the repayment analysis should be based upon the initial loan amount plus any balance increase that may accrue from the negative amortization provision.[7]

Furthermore, the analysis of repayment capacity should avoid over-reliance on credit scores as a substitute for income verification in the underwriting process.  The higher a loan's credit risk, either from loan features or borrower characteristics, the more important it is to verify the borrower's income, assets, and outstanding liabilities.

**Collateral-Dependent Loans** – Institutions should avoid the use of loan terms and underwriting practices that may heighten the need for a borrower to rely on the sale or refinancing of the property once amortization begins.  Loans to individuals who do not demonstrate the capacity to repay, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound.[8]  Institutions that originate collateral-dependent mortgage loans may be subject to criticism, corrective action, and higher capital requirements.

**Risk Layering** – Institutions that originate or purchase mortgage loans that combine nontraditional features, such as interest only loans with reduced documentation or a simultaneous second-lien loan, face increased risk.  When features are layered, an institution should demonstrate that mitigating factors support the underwriting decision and the borrower's repayment capacity.  Mitigating factors could include higher credit scores, lower LTV and DTI ratios, significant liquid assets, mortgage insurance or other credit enhancements.  While higher pricing is often used to address elevated risk levels, it does not replace the need for sound underwriting.

**Reduced Documentation** – Institutions increasingly rely on reduced documentation, particularly unverified income, to qualify borrowers for nontraditional mortgage loans.  Because these practices essentially substitute assumptions and unverified information for analysis of a borrower's repayment capacity and general creditworthiness, they should be

---

number of percentage points a lender adds to the index value to calculate the ARM interest rate at each adjustment period.  In different interest rate scenarios, the fully indexed rate for an ARM loan based on a lagging index (e.g., MTA rate) may be significantly different from the rate on a comparable 30-year fixed-rate product.  In these cases, a credible market rate should be used to qualify the borrower and determine repayment capacity.

[6] The fully amortizing payment schedule should be based on the term of the loan.  For example, the amortizing payment for a loan with a 5-year interest only period and a 30-year term would be calculated based on a 30-year amortization schedule.  For balloon mortgages that contain a borrower option for an extended amortization period, the fully amortizing payment schedule can be based on the full term the borrower may choose.

[7] The balance that may accrue from the negative amortization provision does not necessarily equate to the full negative amortization cap for a particular loan.  The spread between the introductory or "teaser" rate and the accrual rate will determine whether or not a loan balance has the potential to reach the negative amortization cap before the end of the initial payment option period (usually five years).  For example, a loan with a 115 percent negative amortization cap but a small spread between the introductory rate and the accrual rate may only reach a 109 percent maximum loan balance before the end of the initial payment option period, even if only minimum payments are made.  The borrower could be qualified based on this lower maximum loan balance.

[8] A loan will not be determined to be "collateral-dependent" solely through the use of reduced documentation.

used with caution. As the level of credit risk increases, the Agencies expect an institution to more diligently verify and document a borrower's income and debt reduction capacity.

Clear policies should govern the use of reduced documentation. For example, stated income should be accepted only if there are mitigating factors that clearly minimize the need for direct verification of repayment capacity. For many borrowers, institutions generally should be able to readily document income using recent W-2 statements, pay stubs, or tax returns.

**Simultaneous Second-Lien Loans** – Simultaneous second-lien loans reduce owner equity and increase credit risk. Historically, as combined loan-to-value ratios rise, so do defaults. A delinquent borrower with minimal or no equity in a property may have little incentive to work with a lender to bring the loan current and avoid foreclosure. In addition, second-lien home equity lines of credit (HELOCs) typically increase borrower exposure to increasing interest rates and monthly payment burdens. Loans with minimal or no owner equity generally should not have a payment structure that allows for delayed or negative amortization without other significant risk mitigating factors.

**Introductory Interest Rates** – Many institutions offer introductory interest rates set well below the fully indexed rate as a marketing tool for payment option ARM products. When developing nontraditional mortgage product terms, an institution should consider the spread between the introductory rate and the fully indexed rate. Since initial and subsequent monthly payments are based on these low introductory rates, a wide initial spread means that borrowers are more likely to experience negative amortization, severe payment shock, and an earlier-than-scheduled recasting of monthly payments. Institutions should minimize the likelihood of disruptive early recastings and extraordinary payment shock when setting introductory rates.

**Lending to Subprime Borrowers** – Mortgage programs that target subprime borrowers through tailored marketing, underwriting standards, and risk selection should follow the applicable interagency guidance on subprime lending.[9] Among other things, the subprime guidance discusses circumstances under which subprime lending can become predatory or abusive. Institutions designing nontraditional mortgage loans for subprime borrowers should pay particular attention to this guidance. They should also recognize that risk-layering features in loans to subprime borrowers may significantly increase risks for both the institution and the borrower.

**Non-Owner-Occupied Investor Loans** – Borrowers financing non-owner-occupied investment properties should qualify for loans based on their ability to service the debt over the life of the loan. Loan terms should reflect an appropriate combined LTV ratio that considers the potential for negative amortization and maintains sufficient borrower equity over the life of the loan. Further, underwriting standards should require evidence that the borrower has sufficient cash reserves to service the loan, considering the

---

[9] Interagency Guidance on Subprime Lending, March 1, 1999, and Expanded Guidance for Subprime Lending Programs, January 31, 2001. Federally insured credit unions should refer to 04-CU-12 – Specialized Lending Activities (NCUA).

possibility of extended periods of property vacancy and the variability of debt service requirements associated with nontraditional mortgage loan products.[10]

## PORTFOLIO AND RISK MANAGEMENT PRACTICES

Institutions should ensure that risk management practices keep pace with the growth and changing risk profile of their nontraditional mortgage loan portfolios and changes in the market. Active portfolio management is especially important for institutions that project or have already experienced significant growth or concentration levels. Institutions that originate or invest in nontraditional mortgage loans should adopt more robust risk management practices and manage these exposures in a thoughtful, systematic manner. To meet these expectations, institutions should:

- Develop written policies that specify acceptable product attributes, production and portfolio limits, sales and securitization practices, and risk management expectations;
- Design enhanced performance measures and management reporting that provide early warning for increasing risk;
- Establish appropriate ALLL levels that consider the credit quality of the portfolio and conditions that affect collectibility; and
- Maintain capital at levels that reflect portfolio characteristics and the effect of stressed economic conditions on collectibility. Institutions should hold capital commensurate with the risk characteristics of their nontraditional mortgage loan portfolios.

**Policies** – An institution's policies for nontraditional mortgage lending activity should set acceptable levels of risk through its operating practices, accounting procedures, and policy exception tolerances. Policies should reflect appropriate limits on risk layering and should include risk management tools for risk mitigation purposes. Further, an institution should set growth and volume limits by loan type, with special attention for products and product combinations in need of heightened attention due to easing terms or rapid growth.

**Concentrations** – Institutions with concentrations in nontraditional mortgage products should have well-developed monitoring systems and risk management practices. Monitoring should keep track of concentrations in key portfolio segments such as loan types, third-party originations, geographic area, and property occupancy status. Concentrations also should be monitored by key portfolio characteristics such as loans with high combined LTV ratios, loans with high DTI ratios, loans with the potential for negative amortization, loans to borrowers with credit scores below established thresholds, loans with risk-layered features, and non-owner-occupied investor loans. Further, institutions should consider the effect of employee incentive programs that could produce higher concentrations of nontraditional mortgage loans. Concentrations that are not effectively managed will be subject to elevated supervisory attention and potential examiner criticism to ensure timely remedial action.

---

[10] Federally insured credit unions must comply with 12 CFR Part 723 for loans meeting the definition of member business loans.

**Controls** – An institution's quality control, compliance, and audit procedures should focus on mortgage lending activities posing high risk.  Controls to monitor compliance with underwriting standards and exceptions to those standards are especially important for nontraditional loan products.  The quality control function should regularly review a sample of nontraditional mortgage loans from all origination channels and a representative sample of underwriters to confirm that policies are being followed.  When control systems or operating practices are found deficient, business-line managers should be held accountable for correcting deficiencies in a timely manner.

Since many nontraditional mortgage loans permit a borrower to defer principal and, in some cases, interest payments for extended periods, institutions should have strong controls over accruals, customer service and collections.  Policy exceptions made by servicing and collections personnel should be carefully monitored to confirm that practices such as re-aging, payment deferrals, and loan modifications are not inadvertently increasing risk.  Customer service and collections personnel should receive product-specific training on the features and potential customer issues with these products.

**Third-Party Originations** – Institutions often use third parties, such as mortgage brokers or correspondents, to originate nontraditional mortgage loans.  Institutions should have strong systems and controls in place for establishing and maintaining relationships with third parties, including procedures for performing due diligence.  Oversight of third parties should involve monitoring the quality of originations so that they reflect the institution's lending standards and compliance with applicable laws and regulations.

Monitoring procedures should track the quality of loans by both origination source and key borrower characteristics.  This will help institutions identify problems such as early payment defaults, incomplete documentation, and fraud.  If appraisal, loan documentation, credit problems or consumer complaints are discovered, the institution should take immediate action.  Remedial action could include more thorough application reviews, more frequent re-underwriting, or even termination of the third-party relationship.[11]

**Secondary Market Activity** – The sophistication of an institution's secondary market risk management practices should be commensurate with the nature and volume of activity.  Institutions with significant secondary market activities should have comprehensive, formal strategies for managing risks.[12]  Contingency planning should include how the institution will respond to reduced demand in the secondary market.

---

[11] Refer to OCC Bulletin 2001-47 – Third-Party Relationships and AL 2000-9 – Third-Party Risk (OCC). Federally insured credit unions should refer to 01-CU-20 (NCUA), Due Diligence over Third Party Service Providers.  Savings associations should refer to OTS Thrift Bulletin 82a – Third Party Arrangements.

[12] Refer to "Interagency Questions and Answers on Capital Treatment of Recourse, Direct Credit Substitutes, and Residual Interests in Asset Securitizations," May 23, 2002; OCC Bulletin 2002-22 (OCC); SR letter 02-16 (Board); Financial Institution Letter (FIL-54-2002) (FDIC); and CEO Letter 163 (OTS). See OCC's Comptroller Handbook for Asset Securitization, November 1997.  See OTS Examination Handbook Section 221, Asset-Backed Securitization.  The Board also addressed risk management and capital adequacy of exposures arising from secondary market credit activities in SR letter 97-21.  Federally insured credit unions should refer to 12 CFR Part 702 (NCUA).

While third-party loan sales can transfer a portion of the credit risk, an institution remains exposed to reputation risk when credit losses on sold mortgage loans or securitization transactions exceed expectations. As a result, an institution may determine that it is necessary to repurchase defaulted mortgages to protect its reputation and maintain access to the markets. In the agencies' view, the repurchase of mortgage loans beyond the selling institution's contractual obligation is implicit recourse. Under the agencies' risk-based capital rules, a repurchasing institution would be required to maintain risk-based capital against the entire pool or securitization.[13] Institutions should familiarize themselves with these guidelines before deciding to support mortgage loan pools or buying back loans in default.

**Management Information and Reporting** – Reporting systems should allow management to detect changes in the risk profile of its nontraditional mortgage loan portfolio. The structure and content should allow the isolation of key loan products, risk-layering loan features, and borrower characteristics. Reporting should also allow management to recognize deteriorating performance in any of these areas before it has progressed too far. At a minimum, information should be available by loan type (e.g., interest-only mortgage loans and payment option ARMs); by risk-layering features (e.g., payment option ARM with stated income and interest-only mortgage loans with simultaneous second-lien mortgages); by underwriting characteristics (e.g., LTV, DTI, and credit score); and by borrower performance (e.g., payment patterns, delinquencies, interest accruals, and negative amortization).

Portfolio volume and performance should be tracked against expectations, internal lending standards and policy limits. Volume and performance expectations should be established at the subportfolio and aggregate portfolio levels. Variance analyses should be performed regularly to identify exceptions to policies and prescribed thresholds. Qualitative analysis should occur when actual performance deviates from established policies and thresholds. Variance analysis is critical to the monitoring of a portfolio's risk characteristics and should be an integral part of establishing and adjusting risk tolerance levels.

**Stress Testing** – Based on the size and complexity of their lending operations, institutions should perform sensitivity analysis on key portfolio segments to identify and quantify events that may increase risks in a segment or the entire portfolio. The scope of the analysis should generally include stress tests on key performance drivers such as interest rates, employment levels, economic growth, housing value fluctuations, and other factors beyond the institution's immediate control. Stress tests typically assume rapid deterioration in one or more factors and attempt to estimate the potential influence on default rates and loss severity. Stress testing should aid an institution in identifying, monitoring and managing risk, as well as developing appropriate and cost-effective loss mitigation strategies. The stress testing results should provide direct feedback in determining underwriting standards, product terms, portfolio concentration limits, and capital levels.

---

[13] Refer to 12 CFR Part 3 Appendix A, Section 4 (OCC); 12 CFR Parts 208 and 225, Appendix A, III.B.3 (FRB); 12 CFR Part 325, Appendix A, II.B (FDIC); 12 CFR 567 (OTS); and 12 CFR Part 702 (NCUA) for each Agency's capital treatment of recourse.

**Capital and Allowance for Loan and Lease Losses** – Institutions should establish an appropriate allowance for loan and lease losses (ALLL) for the estimated credit losses inherent in their nontraditional mortgage loan portfolios. They should also consider the higher risk of loss posed by layered risks when establishing their ALLL.

Moreover, institutions should recognize that their limited performance history with these products, particularly in a stressed environment, increases performance uncertainty. Capital levels should be commensurate with the risk characteristics of the nontraditional mortgage loan portfolios. Lax underwriting standards or poor portfolio performance may warrant higher capital levels.

When establishing an appropriate ALLL and considering the adequacy of capital, institutions should segment their nontraditional mortgage loan portfolios into pools with similar credit risk characteristics. The basic segments typically include collateral and loan characteristics, geographic concentrations, and borrower qualifying attributes. Segments could also differentiate loans by payment and portfolio characteristics, such as loans on which borrowers usually make only minimum payments, mortgages with existing balances above original balances, and mortgages subject to sizable payment shock. The objective is to identify credit quality indicators that affect collectibility for ALLL measurement purposes. In addition, understanding characteristics that influence expected performance also provides meaningful information about future loss exposure that would aid in determining adequate capital levels.

Institutions with material mortgage banking activities and mortgage servicing assets should apply sound practices in valuing the mortgage servicing rights for nontraditional mortgages. In accordance with interagency guidance, the valuation process should follow generally accepted accounting principles and use reasonable and supportable assumptions.[14]

## CONSUMER PROTECTION ISSUES

While nontraditional mortgage loans provide flexibility for consumers, the Agencies are concerned that consumers may enter into these transactions without fully understanding the product terms. Nontraditional mortgage products have been advertised and promoted based on their affordability in the near term; that is, their lower initial monthly payments compared with traditional types of mortgages. In addition to apprising consumers of the benefits of nontraditional mortgage products, institutions should take appropriate steps to alert consumers to the risks of these products, including the likelihood of increased future payment obligations. This information should be provided in a timely manner – before disclosures may be required under the Truth in Lending Act or other laws – to assist the consumer in the product selection process.

---

[14] Refer to the "Interagency Advisory on Mortgage Banking," February 25, 2003, issued by the bank and thrift regulatory agencies. Federally Insured Credit Unions with assets of $10 million or more are reminded they must report and value nontraditional mortgages and related mortgage servicing rights, if any, consistent with generally accepted accounting principles in the Call Reports they file with the NCUA Board.

**Concerns and Objectives** – More than traditional ARMs, mortgage products such as payment option ARMs and interest-only mortgages can carry a significant risk of payment shock and negative amortization that may not be fully understood by consumers. For example, consumer payment obligations may increase substantially at the end of an interest-only period or upon the "recast" of a payment option ARM.  The magnitude of these payment increases may be affected by factors such as the expiration of promotional interest rates, increases in the interest rate index, and negative amortization.  Negative amortization also results in lower levels of home equity as compared to a traditional amortizing mortgage product.  When borrowers go to sell or refinance the property, they may find that negative amortization has substantially reduced or eliminated their equity in it even when the property has appreciated.  The concern that consumers may not fully understand these products would be exacerbated by marketing and promotional practices that emphasize potential benefits without also providing clear and balanced information about material risks.

In light of these considerations, communications with consumers, including advertisements, oral statements, promotional materials, and monthly statements, should provide clear and balanced information about the relative benefits and risks of these products, including the risk of payment shock and the risk of negative amortization.  Clear, balanced, and timely communication to consumers of the risks of these products will provide consumers with useful information at crucial decision-making points, such as when they are shopping for loans or deciding which monthly payment amount to make.  Such communication should help minimize potential consumer confusion and complaints, foster good customer relations, and reduce legal and other risks to the institution.

**Legal Risks** – Institutions that offer nontraditional mortgage products must ensure that they do so in a manner that complies with all applicable laws and regulations.  With respect to the disclosures and other information provided to consumers, applicable laws and regulations include the following:

- Truth in Lending Act (TILA) and its implementing regulation, Regulation Z.
- Section 5 of the Federal Trade Commission Act (FTC Act).

TILA and Regulation Z contain rules governing disclosures that institutions must provide for closed-end mortgages in advertisements, with an application,[15] before loan consummation, and when interest rates change.  Section 5 of the FTC Act prohibits unfair or deceptive acts or practices.[16]

---

[15] These program disclosures apply to ARM products and must be provided at the time an application is provided or before the consumer pays a nonrefundable fee, whichever is earlier.

[16] The OCC, the Board, and the FDIC enforce this provision under the FTC Act and section 8 of the FDI Act. Each of these agencies has also issued supervisory guidance to the institutions under their respective jurisdictions concerning unfair or deceptive acts or practices. *See* OCC Advisory Letter 2002-3 - Guidance on Unfair or Deceptive Acts or Practices, March 22, 2002; Joint Board and FDIC Guidance on Unfair or Deceptive Acts or Practices by State-Chartered Banks, March 11, 2004.  Federally insured credit unions are prohibited from using any advertising or promotional material that is inaccurate, misleading, or deceptive in any way concerning its products, services, or financial condition. 12 CFR 740.2.  The OTS also has a regulation that prohibits savings associations from using advertisements or other representations that are inaccurate or misrepresent the services or contracts offered. 12 CFR 563.27.  This regulation supplements its authority under the FTC Act.

Other federal laws, including the fair lending laws and the Real Estate Settlement Procedures Act (RESPA), also apply to these transactions. Moreover, the Agencies note that the sale or securitization of a loan may not affect an institution's potential liability for violations of TILA, RESPA, the FTC Act, or other laws in connection with its origination of the loan. State laws, including laws regarding unfair or deceptive acts or practices, also may apply.

**Recommended Practices**

Recommended practices for addressing the risks raised by nontraditional mortgage products include the following:[17]

**Communications with Consumers** – When promoting or describing nontraditional mortgage products, institutions should provide consumers with information that is designed to help them make informed decisions when selecting and using these products. Meeting this objective requires appropriate attention to the timing, content, and clarity of information presented to consumers. Thus, institutions should provide consumers with information at a time that will help consumers select products and choose among payment options. For example, institutions should offer clear and balanced product descriptions when a consumer is shopping for a mortgage – such as when the consumer makes an inquiry to the institution about a mortgage product and receives information about nontraditional mortgage products, or when marketing relating to nontraditional mortgage products is provided by the institution to the consumer – not just upon the submission of an application or at consummation.[18] The provision of such information would serve as an important supplement to the disclosures currently required under TILA and Regulation Z or other laws.[19]

<u>Promotional Materials and Product Descriptions</u>.  Promotional materials and other product descriptions should provide information about the costs, terms, features, and risks of nontraditional mortgages that can assist consumers in their product selection decisions, including information about the matters discussed below.

- <u>Payment Shock</u>. Institutions should apprise consumers of potential increases in payment obligations for these products, including circumstances in which interest rates or negative amortization reach a contractual limit. For example, product

---

[17] Institutions also should review the recommendations relating to mortgage lending practices set forth in other supervisory guidance from their respective primary regulators, as applicable, including guidance on abusive lending practices.

[18] Institutions also should strive to: (1) focus on information important to consumer decision making; (2) highlight key information so that it will be noticed; (3) employ a user-friendly and readily navigable format for presenting the information; and (4) use plain language, with concrete and realistic examples. Comparative tables and information describing key features of available loan products, including reduced documentation programs, also may be useful for consumers considering the nontraditional mortgage products and other loan features described in this guidance.

[19] Institutions may not be able to incorporate all of the practices recommended in this guidance when advertising nontraditional mortgages through certain forms of media, such as radio, television, or billboards. Nevertheless, institutions should provide clear and balanced information about the risks of these products in all forms of advertising.

descriptions could state the maximum monthly payment a consumer would be required to pay under a hypothetical loan example once amortizing payments are required and the interest rate and negative amortization caps have been reached.[20] Such information also could describe when structural payment changes will occur (e.g., when introductory rates expire, or when amortizing payments are required), and what the new payment amount would be or how it would be calculated. As applicable, these descriptions could indicate that a higher payment may be required at other points in time due to factors such as negative amortization or increases in the interest rate index.

- Negative Amortization. When negative amortization is possible under the terms of a nontraditional mortgage product, consumers should be apprised of the potential for increasing principal balances and decreasing home equity, as well as other potential adverse consequences of negative amortization. For example, product descriptions should disclose the effect of negative amortization on loan balances and home equity, and could describe the potential consequences to the consumer of making minimum payments that cause the loan to negatively amortize. (One possible consequence is that it could be more difficult to refinance the loan or to obtain cash upon a sale of the home).

- Prepayment Penalties. If the institution may impose a penalty in the event that the consumer prepays the mortgage, consumers should be alerted to this fact and to the need to ask the lender about the amount of any such penalty.[21]

- Cost of Reduced Documentation Loans. If an institution offers both reduced and full documentation loan programs and there is a pricing premium attached to the reduced documentation program, consumers should be alerted to this fact.

Monthly Statements on Payment Option ARMs. Monthly statements that are provided to consumers on payment option ARMs should provide information that enables consumers to make informed payment choices, including an explanation of each payment option available and the impact of that choice on loan balances. For example, the monthly payment statement should contain an explanation, as applicable, next to the minimum payment amount that making this payment would result in an increase to the consumer's outstanding loan balance. Payment statements also could provide the consumer's current loan balance, what portion of the consumer's previous payment was allocated to principal and to interest, and, if applicable, the amount by which the principal balance increased. Institutions should avoid leading payment option ARM borrowers to select a non-amortizing or negatively-amortizing payment (for example, through the format or content of monthly statements).

Practices to Avoid. Institutions also should avoid practices that obscure significant risks to the consumer. For example, if an institution advertises or promotes a nontraditional mortgage by emphasizing the comparatively lower initial payments permitted for these loans, the institution also should provide clear and comparably prominent information alerting the consumer to the risks. Such information should explain, as relevant, that

---

[20] Consumers also should be apprised of other material changes in payment obligations, such as balloon payments.
[21] Federal credit unions are prohibited from imposing prepayment penalties. 12 CFR 701.21(c)(6).

20

these payment amounts will increase, that a balloon payment may be due, and that the loan balance will not decrease and may even increase due to the deferral of interest and/or principal payments.  Similarly, institutions should avoid promoting payment patterns that are structurally unlikely to occur.[22]  Such practices could raise legal and other risks for institutions, as described more fully above.

Institutions also should avoid such practices as: giving consumers unwarranted assurances or predictions about the future direction of interest rates (and, consequently, the borrower's future obligations); making one-sided representations about the cash savings or expanded buying power to be realized from nontraditional mortgage products in comparison with amortizing mortgages; suggesting that initial minimum payments in a payment option ARM will cover accrued interest (or principal and interest) charges; and making misleading claims that interest rates or payment obligations for these products are "fixed."

**Control Systems** – Institutions should develop and use strong control systems to monitor whether actual practices are consistent with their policies and procedures relating to nontraditional mortgage products.  Institutions should design control systems to address compliance and consumer information concerns as well as the safety and soundness considerations discussed in this guidance.  Lending personnel should be trained so that they are able to convey information to consumers about product terms and risks in a timely, accurate, and balanced manner.  As products evolve and new products are introduced, lending personnel should receive additional training, as necessary, to continue to be able to convey information to consumers in this manner.  Lending personnel should be monitored to determine whether they are following these policies and procedures.  Institutions should review consumer complaints to identify potential compliance, reputation, and other risks.  Attention should be paid to appropriate legal review and to using compensation programs that do not improperly encourage lending personnel to direct consumers to particular products.

With respect to nontraditional mortgage loans that an institution makes, purchases, or services using a third party, such as a mortgage broker, correspondent, or other intermediary, the institution should take appropriate steps to mitigate risks relating to compliance and consumer information concerns discussed in this guidance.  These steps would ordinarily include, among other things, (1) conducting due diligence and establishing other criteria for entering into and maintaining relationships with such third parties, (2) establishing criteria for third-party compensation designed to avoid providing incentives for originations inconsistent with this guidance, (3) setting requirements for agreements with such third parties, (4) establishing procedures and systems to monitor compliance with applicable agreements, bank policies, and laws, and (5) implementing appropriate corrective actions in the event that the third party fails to comply with applicable agreements, bank policies, or laws.

---

[22] For example, marketing materials for payment option ARMs may promote low predictable payments until the recast date.  Such marketing should be avoided in circumstances in which the minimum payments are so low that negative amortization caps would be reached and higher payment obligations would be triggered before the scheduled recast, even if interest rates remain constant.

**APPENDIX:  Terms Used in this Document**

**Interest-only Mortgage Loan** – A nontraditional mortgage on which, for a specified number of years (e.g., three or five years), the borrower is required to pay only the interest due on the loan during which time the rate may fluctuate or may be fixed.  After the interest-only period, the rate may be fixed or fluctuate based on the prescribed index and payments include both principal and interest.

**Payment Option ARM** – A nontraditional mortgage that allows the borrower to choose from a number of different payment options.  For example, each month, the borrower may choose a minimum payment option based on a "start" or introductory interest rate, an interest-only payment option based on the fully indexed interest rate, or a fully amortizing principal and interest payment option based on a 15-year or 30-year loan term, plus any required escrow payments.  The minimum payment option can be less than the interest accruing on the loan, resulting in negative amortization.  The interest-only option avoids negative amortization but does not provide for principal amortization.  After a specified number of years, or if the loan reaches a certain negative amortization cap, the required monthly payment amount is recast to require payments that will fully amortize the outstanding balance over the remaining loan term.

**Reduced Documentation** – A loan feature that is commonly referred to as "low doc/no doc," "no income/no asset," "stated income" or "stated assets."  For mortgage loans with this feature, an institution sets reduced or minimal documentation standards to substantiate the borrower's income and assets.

**Simultaneous Second-Lien Loan** – A lending arrangement where either a closed-end second-lien or a home equity line of credit (HELOC) is originated simultaneously with the first lien mortgage loan, typically in lieu of a higher down payment.

[THIS SIGNATURE PAGE PERTAINS TO THE FINAL "INTERAGENCY

GUIDANCE ON NONTRADITIONAL MORTGAGE PRODUCT RISKS."]

**Dated:**  September 25, 2006

John C. Dugan   (signed)

John C. Dugan,

Comptroller of the Currency.

[THIS SIGNATURE PAGE PERTAINS TO THE FINAL "INTERAGENCY

GUIDANCE ON NONTRADITIONAL MORTGAGE PRODUCT RISKS."]

By order of the Board of Governors of the Federal Reserve System, September 27, 2006.

Jennifer J. Johnson   (signed)

Jennifer J. Johnson,

Secretary of the Board.

[THIS SIGNATURE PAGE PERTAINS TO THE FINAL "INTERAGENCY

GUIDANCE ON NONTRADITIONAL MORTGAGE PRODUCT RISKS."]

Dated at Washington, D.C., this 27th day of September, 2006.

By order of the Federal Deposit Insurance Corporation.

Robert E. Feldman   (signed)

Robert E. Feldman,

Executive Secretary.

[THIS SIGNATURE PAGE PERTAINS TO THE FINAL "INTERAGENCY

GUIDANCE ON NONTRADITIONAL MORTGAGE PRODUCT RISKS."]

Dated:  September 28, 2006

By the Office of Thrift Supervision.

John M. Reich  (signed)

John M. Reich,

Director.

[THIS SIGNATURE PAGE PERTAINS TO THE FINAL "INTERAGENCY

GUIDANCE ON NONTRADITIONAL MORTGAGE PRODUCT RISKS."]

By the National Credit Union Administration on September 28, 2006.

JoAnn M. Johnson   (signed)

JoAnn M. Johnson,

Chairman.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Otis D. Wright II and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

## CV10- 8914 ODW (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[_] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[_] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Daniel L. Germain (State Bar No. 143334)
Rosman & Germain LLP
16311 Ventura Blvd., Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Thomas Young and Gregory Filzen, individually and on behalf of all others similarly situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>Babette E. Heimbuch, James P. Giraldin, Gisselle Acevedo, Brian E. Argrett, Jesse Casso, Jr., Christopher M. Harding, William P. Rutledge, Steven L. Soboroff, Administrative Committee of the First Federal DEFENDANT(S). Bank of California Employee Stock Ownership Plan and Does 1-10, | CASE NUMBER<br><br>CV10-8914 ODW (MANx)<br><br><br>**SUMMONS** |
|---|---|

TO:     DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Daniel L. Germain_____, whose address is _Rosman & Germain, 16311 Ventura Blvd., Suite 1200, Encino, CA 91436-2152_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

**TANYA DURANT**

Dated: _____11-19-10_____     By: _____

Deputy Clerk

1188

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

Thomas Young and Gregory Filzen, individually and on behalf of all others similarly situated.

**DEFENDANTS**
Babette E. Heimbuch, James P. Giraldin, Gisselle Acevedo, Brian E. Argrett, Jesse Casso, Jr., Christopher M. Harding, William P. Rutledge, Steven L. Soboroff, Ad. Comm. of the First Fed. Bank of Cal. Emp. Stock Ownership Plan

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Daniel L. Germain, Rosman & Germain LLP
16311 Ventura Blvd., Suite 1200, Encino, CA 91436-2152
Telephone: (818) 788-0877

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

---

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes   ☐ No   ☒ **MONEY DEMANDED IN COMPLAINT:** $ According to Proof

---

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

---

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☒ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | **REAL PROPERTY** | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

---

FOR OFFICE USE ONLY:   Case Number: **CV10-8914**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ Date November 19, 2010

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |